**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE and DEMOCRATIC PARTY OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>MARGE BOSTELMANN, JULIE M. GLANCEY, ANN S. JACOBS, DEAN KNUDSON, ROBERT F. SPINDELL, JR., and MARK L. THOMSEN, in their official capacities as Wisconsin Elections Commissioners,<br><br>Defendants. | Civil Action No. 3:20-cv-00249 |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

### I. NATURE OF THE CASE

Plaintiffs, the Democratic National Committee and the Democratic Party of Wisconsin, bring this emergency motion for a temporary restraining order and a preliminary injunction to address the immediate and severe effects the coronavirus pandemic is having on the Wisconsin primary election scheduled for April 7. Plaintiffs are requesting that the Court grant emergency relief *today* because a Wisconsin statutory provision, Wis. Stat. § 6.28(1), establishes that today is the last day for Wisconsin citizens to register to vote electronically or by-mail. After today and absent intervention by the Court, Wisconsinites will only be able to register to vote in-person, which will effectively prevent potentially thousands of citizens from participating in the primary. With the directives from the federal and state government for people throughout the country, including in Wisconsin, to shelter in place and stay in their homes, registering in person is simply not feasible. The citizens of Wisconsin should not be forced to violate government directives and risk their health and that of their families in order to exercise their constitutional right to vote.

Accordingly, Plaintiffs respectfully request that the Court stay application of Wis. Stat. § 6.28(1) and extend the period for electronic and by-mail registration until at least April 3, 2020.

The extraordinary circumstances created by the coronavirus pandemic also require additional relief—relief beyond staying Wis. Stat. § 6.28(1)—to ensure that there is not widespread disenfranchisement of Wisconsin voters. Because of the government "shelter-in-place" directives and the very real health risks of voting in person, Wisconsin will almost certainly have a dramatic increase in voting by-mail in the primary election and, in all likelihood, in the November general election. This inevitable reality gives rise to a direct clash with a requirement of Wisconsin law—set forth in Wis. Stat. § 6.87(6)—that mail-in ballots must arrive at municipal clerks' offices by 8:00 p.m. on Election Day in order to be counted, even if ballots were mailed and postmarked before or on Election Day. With the impending surge in mail-in ballots and the strains that the coronavirus pandemic is already placing on the mail system and postal workers, there is a strong likelihood that large numbers of mail-in ballots lawfully cast by Wisconsin citizens—potentially thousands of ballots—will arrive after the 8:00 p.m. deadline on April 7. Absent relief from the Court, those ballots will be thrown away and potentially thousands of citizens will be disenfranchised. There is no legitimate reason for the State to continue to impose this Election Day receipt deadline and certainly not the type of extremely compelling state interest that the State must show given the potential widespread disenfranchisement of Wisconsin voters. Accordingly, Plaintiffs request that the Court stay the application of Wis. Stat. § 6.87(6) and order that the State accept mail-in ballots postmarked on or before Election Day until at least ten days after Election Day.

The final voting provisions that trigger an immediate need for relief are the requirements that: (1) copies of proof of residence accompany electronic and by-mail voter registration

applications, Wis. Stat. § 6.34; and (2) copies of photo identification accompany absentee ballot applications, id. § 6.86, 6.87. Relief from the documentary requirements is needed because of the severe logistical obstacles that Wisconsin voters face in attempting to generate copies of documents needed to prove residency and identity. With the widespread, government-mandated closings of commercial businesses, libraries, and places of work, voters do not have access to the copiers and scanners needed to generate copies of these documents, and they would put their health at risk by leaving their homes in search of this type of equipment. There are other existing requirements that protect the integrity of ballots that are cast. For instance, a voter must already sign a comprehensive certificate on absentee ballots stating she is a resident of the locality from where she is voting. Wis. Stat. § 6.87(2). This certificate is subject to penalties for false statements. *Id*. Accordingly, Plaintiffs request that the Court stay the documentary requirements of Wis. Stats. §§ 6.34, 6.86, and 6.87.

In sum, this is a case about an unprecedented public health crisis testing the exercise of fundamental rights. The provisions of Wisconsin law at issue (the "Challenged Provisions") are forcing voters to choose between risking their health—and the health of others—and casting a ballot or preserving their health and not exercising the right to vote. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Immediate relief is required to protect this basic right for thousands of Wisconsin citizens, including the constituents and members of the Plaintiff organizations.

## II.   STATEMENT OF FACTS

The Democratic presidential primary election is currently scheduled for April 7, 2020. Today, March 18, is the last day for Wisconsinites to submit voter registrations electronically or

by-mail. Wis. Stat. § 6.28(1). After today, individuals may still register to vote in-person, either at a municipal clerk's office or at a polling place on Election Day. *Id*. (citing Wis. Stat. §§ 6.29, 6.55(2)). To register, a voter must include proof of residency. *See* Wis. Stat. § 6.34. To apply for an absentee ballot, a voter must include a proof of identification with the application. *See* Wis. Stat. §§ 6.86, 6.87. A voter seeking to vote by-mail absentee must submit an application no later than April 2, 2020, Wis. Stat. § 6.86(6)(b), and the voter must mail his or her absentee ballot so that it arrives at the municipal clerk's office by 8:00 p.m. on Election Day. Wis. Stat. § 6.87(6). If the absentee ballot arrives after 8:00 p.m. on Election Day—even if cast long before Election Day—it is rejected and the voter is disenfranchised. *Id*.

Voters must navigate these requirements in the midst of an unprecedented public health crisis enveloping the world. Wisconsin is not exempt from the coronavirus or COVID-19. As of March 17, 72 people in the State had tested positively for the illness. Ex. 4. And, effective 5:00 p.m. on March 17, Governor Tony Evers ordered "a statewide moratorium on mass gatherings of 10 people or more to mitigate the spread of COVID-19." Ex. 1. Restaurants, bars, indoor shopping malls, and all public and private schools have been ordered closed. *Id*. Libraries, too, are shuttering across the state, including those in Madison. Ex. 2.

In past elections, same-day voter registration has been a popular option. In the 2016 general election, for example, 12.7% of voters registered on Election Day. Ex. 5. In the 2014 general election, 11.12% of voters participated in same-day registration. *Id*.

Meanwhile, requests for absentee ballots are "pouring in," according to the Wisconsin Elections Commission. Ex. 3. Between last Friday, March 13, and Monday, March 16, 64,000 requests have come in. *Id*. On Monday *alone*, 39,000 requests for absentee ballots were recorded. As of March 17, 173,773 applications for absentee ballots have been received. *Id*. This means

- 4 -

that approximately 22% of *all* absentee ballot requests through March 16 came on March 16. As the coronavirus and its effects continue to spread, there is little reason to expect these numbers to abate.

As of March 17, elections officials have sent out nearly 129,000 absentee ballots and just over 6,000 completed absentee ballots have been received.[1] Ex. 6. But not all these absentee ballots will be counted—even if they are cast on or before Election Day. Many of them will arrive after 8:00 p.m. on Election Day and, as Wisconsin law dictates, they will be rejected. In the 2018 general election, for instance, 1,445 absentee ballots arrived after the Election Day deadline and were therefore not counted, according to data from the Election Assistance Commission.

### III.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 65(b), a court may issue a temporary restraining order without notice to Defendants if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b). "Where the adverse party has received notice of a motion for a temporary restraining order and a hearing has been held on the motion, it is proper for the court to consider the motion as one for a preliminary injunction." *Milwaukee Cty. Pavers Ass'n v. Fielder*, 707 F. Supp. 1016, 1018 n.3 (W.D. Wis. 1989); *see also Planned Parenthood of Wis., Inc. v. Van Hollen*, 963 F. Supp. 2d 858, 865 (W.D. Wis. 2013).

"[T]he same showing is required to obtain either" a temporary restraining order or a preliminary injunction. *Van Hollen*, 963 F. Supp. 2d at 865 (citing *Winnig v. Sellen*, 731 F. Supp. 2d 855, 857 (W.D. Wis. 2011)). "'To win a preliminary injunction, a party must show that it has

---

[1] Wis. Elections Comm'n, Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary (Mar. 17, 2020), *available at* https://elections.wi.gov/node/6730.

(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits.'" *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011)). "If the moving party makes this threshold showing, the court 'weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied.'" *Id*. (quoting *Ezell*, 651 F.3d at 694). This Court "applies a sliding scale in weighing whether preliminary relief is warranted." *Van Hollen*, 963 F. Supp. 2d at 864. "[T]he more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while supporting some preliminary relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d 721, 725 (7th Cir. 2009).

## IV. ARGUMENT

### A. Plaintiff is likely to succeed on the merits.

The Challenged Provisions disenfranchise valid voters during an unprecedented public health crisis and deprive Wisconsinites of their liberty interest in voting without due process of the law. Plaintiffs are therefore highly likely to succeed on the merits of their claims.

#### a. Plaintiffs are likely to succeed on their right-to-vote claim.

The Challenged Provisions severely restrict Wisconsin voters' right to vote by forcing them to venture out in public during a public health crisis—contrary to governmental guidance, *see, e.g.*, 1–2, 4—or else not vote. Under the *Anderson/Burdick* balancing test, the Supreme Court requires courts to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those

- 6 -

interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)). This inquiry is highly fact-specific and may not be undertaken by rote. Rather, the court applies a "flexible standard." *Id.* When voting rights are severely restricted, a law "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). But even less severe burdens remain subject to balancing: "[h]owever slight" the burden on voting rights may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288–89). In evaluating the burden a law imposes, a court must focus on both the burden on the general electorate and the effect on the actual individuals affected by the law. *Id.* at 201; *see also One Wis. Institute, Inc. v. Thomsen*, 198 F. Supp. 3d 896, 930 (W.D. Wis. 2016).

Courts have repeatedly recognized that disenfranchisement severely burdens the right to vote—and that even disenfranchising a small number of voters can give rise to a severe burden. *See, e.g.*, *League of Women Voters of N.C. ("LOWV") v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("[T]he possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges."); *Ne. Ohio Coal. for the Homeless ("NEOCH") v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012).

Here, the Challenged Provisions operate to disenfranchise thousands of voters by forcing them to venture out in public during a global pandemic and risk contracting an ailment that has killed thousands globally—or else not vote. Today's voter registration deadline means that individuals wishing to register to vote can only do so in-person. *See* Wis. Stat. § 6.28(1) (citing

Wis. Stat. §§ 6.29, 6.55(2)). Currently, individuals are being urged, if not ordered, to avoid public spaces. Ex. 1. Understandably, many individuals will abide by these precautions and will not leave their homes to go to the municipal clerk's office or a polling place on election day or during the early vote period. Thus, they will remain unregistered and unable to exercise their fundamental right to vote.

This is similar to a case decided in the wake of the devastating Hurricane Matthew. In Florida, a federal court explained that the state imposed a "severe burden on the right to vote" when the hurricane and subsequent evacuations prevented eligible voters from registering to vote. *Florida Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016). If the state enforced its deadline, that court explained, it "would categorically deny the right to vote" to thousands of individual and it would be "nonsensical to prioritize those deadlines over the right to vote." *Id*. at 1258. In fact, courts have regularly held election deadlines must give way for voters to have their votes cast and counted. *See id*.; *see also Ga. Coal. for the Peoples' Agenda, Inc., v. Deal*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016) (granting preliminary injunction to extend voter-registration deadline due to a hurricane and observing that "an individual's loss of the right to vote is clearly an irreparable injury that outweighs any damage caused by extending the deadline").

Additionally, the Challenged Provisions require individuals registering to vote or voters applying for an absentee ballot to provide copies of documentation—proof of residency for registrants and voter identification for absentee ballot applicants. *See* §§ 6.34, 6.86, 6.87. But to provide these documents means a voter must locate a copier, scanner, computer, and/or printer. These are machines not every individual or household has access to, particularly among less-affluent populations, the elderly (a population specifically at risk in this pandemic), and college

students, among others. Even more, libraries (which likely have public access to copiers, scanners, and printers) are closing throughout the state. *See, e.g.*, Ex. 2. Therefore, among large swaths of Wisconsin's population, to provide the required documentation means leaving the house, locating a copier, scanner, and/or printer (a task increasingly more difficult as locations with those machines shutter), and being exposed to the coronavirus. Again, individuals will understandably decline to risk their health and the health of the public to scan a document. Thus, these requirements also severely burden individuals' voting rights because it unnecessarily risks their exposure to a deadly virus and results in disenfranchisement.

Finally, the Challenged Provisions require that absentee ballots be received by election offices no later than 8:00 p.m. on Election Day. Wis. Stat. § 6.87(6). If an absentee ballot arrives after 8:00 p.m. on Election Day, it is not counted. *Id*. As more and more people request absentee ballots to avoid venturing out into crowded spaces during a global pandemic, these deadlines operate with suppressive effect. They inundate local elections officials and risk preventing them from processing the voluminous requests for absentee ballots. Moreover, the Election Day deadline prevents having ballots counted even if they are sent on or before Election Day.

In a situation analogous for its lack of foreseeability, one court allowed ballots cast on or before Election Day—but received after Election Day—to be counted due to the anthrax attacks of 2002. *In re Holmes*, 788 A.2d 291 (N.J. Sup. Ct. 2002). The court held that "rigid application of the rule that all ballots be received by the board by 8:00 P.M. of Election Day would unfairly deprive absentee voters of their franchise as a result of exceptional circumstances neither within their control nor which, in light of human experience, might reasonably be expected." *Id*. at 295. The same must result here. In similar contexts, courts have held that deadlines must give way when voting rights are at stake. *See Doe v. Walker*, 746 F. Supp. 2d 667, 677 (D. Md. 2010)

(extending deadline to count votes after UOCAVA challenge); *United States v. Cunningham*, No. 3:08-cv-709, 2009 WL 3350028, at *4 (E.D. Va. Oct. 15, 2009) (same).

No "precise interest" Wisconsin articulates can justify the burdens the Challenged Provisions inflicts on its voters. *Anderson*, 460 U.S. at 789. First, while the State has an interest in identifying a deadline for voter registrations, it has no precise interest in limiting voter registrations after today to *only* in-person registrations. In fact, the State offers same-day voter registration, in-person voter registration at municipal clerks' offices through April 3, Wis. Stat. 6.29(2)(a), and is equipped to process registrations as late as Election Day. This limitation to only in-person registrations is all the more puzzling when the state itself has issued a press release identifying near record-breaking levels of absentee ballot requests—indicating that the electorate justifiably fears in-person interactions at the polling place or city hall. Ex. 3.

Second, while Wisconsin has interests in preventing voter fraud and ensuring electoral integrity, these interests do not justify the severe burden of requiring registrants and voters to seek out scanners, copiers, and printers during a global pandemic. The state's interests can be solved by far less risky means. For instance, a voter must already sign a comprehensive certificate on absentee ballots stating she is a resident of the locality from where she is voting. Wis. Stat. § 6.87(2). This certificate is subject to penalties for false statements. *Id.*

Finally, while the state has an interest in ensuring the finality of elections, rejecting validly cast ballots that happen to arrive after 8:00 p.m. on Election Day does not serve that interest. In fact, this purported state interest is undercut by Wisconsin's own processes. Ballots are *still* being processed long after Election Day. For instance, voters who cast provisional ballots have until 4:00 p.m. on the Friday after Election Day to cure them, while local boards of canvassers have until 9:00 a.m. on the Monday following Election Day to record and count the

cured ballots. *See* Wis. Stat. § 6.97(3)–(4). County clerks need not deliver the election's results to the State Election Commission until "no later than 9 days after each primary." Wis. Stat. § 7.60(5). Even more, Wisconsin does not need to complete the canvassing following the "spring election" at issue here until May 15—more than five weeks after Election Day. Wis. Stat. § 7.70(3)(a). There is, then, ample time to accept and count validly cast absentee ballots that are postmarked by Election Day but arrive at some point thereafter. Doing so would not violate Wisconsin's interest in finality of elections.

### b. Plaintiff is likely to succeed on their Procedural Due Process claim.

Plaintiff is also likely to succeed on its procedural due process claim. Wisconsin cannot deprive any person of liberty without "due process of law," U.S. Const. amend. XIV, § 1. In the current environment of self-quarantines, the shuttering of significant portions of the national and global economies, and social distancing amidst an extraordinary global pandemic, the Challenged Provisions do just that because they operate to deprive voters' liberty interest in voting without process.

Courts must first consider "'private interest that will be affected by the official action.'" *Boyd v. Owen*, 481 F.3d 520, 525 (7th Cir. 2007) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Next, courts must consider the "fairness and reliability" of the existing procedures and the "probable value, if any, of additional procedural safeguards." *Mathews*, 424 U.S. at 343. Finally, courts assess the public interest, "includ[ing] the administrative burden and other societal costs that would be associated with" additional or substitute procedures. *Id*. at 347.

Each of these factors weighs heavily in Plaintiff's favor here. *First*, the right to vote is unquestionably a liberty interest and cannot be "confiscated without due process." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357 (D. Ariz. 1990). This liberty interest extends to by-mail voting in Wisconsin. *See, e.g.*, *Saucedo v. Gardner*, 335 F. Supp. 3d

202, 215 (D.N.H. 2018) ("voter has a sufficient liberty interest once 'the State permits voters to vote absentee.'") (quoting *Zessar v. Helander*, 2006 WL 642646, at *5 (N.D. Ill. Mar. 13, 2006)).

*Second*, the degree of deprivation resulting from the Challenged Provisions is extraordinarily high. This deprivation is neither hypothetical nor speculative; it is happening each day that the coronavirus spreads, governments respond to the growing threat, and individuals opt to take extraordinary precautions to avoid the pandemic in the form of physical isolation. Already, Wisconsin voters have requested—and continue to request—record levels of absentee voting. *See* Ex. 6.

*Third*, the Challenged Provisions are neither fair nor reliable in the context of a growing global pandemic. The administrative burden on Wisconsin in waiving the proof of residency requirement and extending the deadline for electronic and by-mail voter registrations, waiving the photo identification requirement for absentee ballot applications, and extending time in which a likely avalanche of absentee ballots may be received and counted is marginal compared to the deprived liberty interest. *Mathews*, 424 U.S. at 335.

### B. An injunction is necessary to avoid irreparable harm.

The Challenged Provisions operate to inflict two irreparable harms on Wisconsin voters. First, it results in disenfranchisement. Disenfranchisement constitutes irreparable injury. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *LOWV*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.") (citations omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (explaining that the loss of constitutional "freedoms . . . unquestionably constitutes irreparable injury"). Once the election comes and goes, "there can be no do-over and no redress." *LOWV*, 769 F.3d at 247. The Seventh Circuit has recognized that once a constitutional violation has been demonstrated, no further showing of irreparable injury is

necessary. *Ezell*, 651 F.3d at 699 (infringement on constitutional rights caused irreparable harm); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.4 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm.").

Second, the Challenged Provisions contribute to public health risks. They operate to encourage determined registrants and voters to venture out into the world and interact face-to-face with people—despite what numerous governmental entities are warning against doing. At worst, the Challenged Provisions risk exposing Wisconsinites to an ailment that has already claimed thousands of lives internationally. *Cf. Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (affirming preliminary injunction barring county from closing hospital because doing so would cause irreparable harm to patients and cause "exacerbation of the current overcrowded situation and additional suffering . . . avoided" by enjoining closure). The Seventh Circuit has recognized that "the denial of injunctive relief after a district court has found a risk of imminent and substantial danger to public health or to the environment should be rare." *LAJIM, LLC v. Gen. Electric Co.*, 917 F.3d 933, 942 (7th Cir. 2019). Plaintiffs' attachments show that the risk of substantial danger to the public health is substantial, imminent, and ongoing. *See* Exs. 1–2, 4.

### C. Traditional legal remedies will not adequately protect Plaintiffs' rights.

Because members and constituents of Plaintiffs face the inability to register and vote without exposing themselves to the coronavirus and negatively impacting the public health, traditional legal remedies are inadequate. The Seventh Circuit has presumed that money damages cannot adequately remedy a constitutional violation. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (reversing denial of preliminary injunction on complaint alleging First Amendment claims). More specifically, money damages cannot cure disenfranchisement post hoc. *Cf. Frank v. Walker*, 196 F. Supp. 3d 893, 904 (E.D. Wis. 2016) (finding, where plaintiffs

faced violations of their voting rights in elections that might occur before the resolution of their claims, "traditional legal remedies, such as monetary damages, would be inadequate"). Given the close proximity of the primary election, it is certain than an election will occur, necessitating action from this Court to ensure that Plaintiffs' voters' and constituents' rights are not violated.

### D. The balance of hardships weighs in favor of an injunction.

The balance of the equities favors Plaintiff. On the one hand, an injunction would protect the health of the public. An injunction would also prevent disenfranchisement by removing barriers to voting during a time of an unprecedented public health crisis. On the other hand, the state will have a handful more administrative tasks. But mild inconvenience is outweighed by the vindication of constitutional rights. *See Taylor v. Louisiana.*, 419 U.S. 522, 535 (1975) (holding "administrative convenience" cannot justify practices that impinge upon fundamental rights); *see also Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018) (holding increased administrative burden of "disseminating information" and "training poll managers. . . is minimal compared to the potential loss of a right to vote"); *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) ("[t]he potential hardships that Georgia might experience are minor when balanced against the right to vote, a right that is essential to an effective democracy."); *Fla. Democratic Party*, 2016 WL 6090943, at \*26 ("Any potential hardship [to the state] imposed by providing the same opportunity . . . for [] voters pales in comparison to that imposed by unconstitutionally depriving those voters of their right to vote and to have their votes counted.").

Here, Wisconsin law does not require counties begin their canvass until one week after Election Day. Wis. Stat. § 7.60(3). The law also provides that county clerks must deliver the results to the state election commission "no later than 9 days after each primary . . ." Wis. Stat. § 7.60(5). Even more, the state need not complete its canvass until May 15. *See* Wis. Stat. §

7.70(3)(a). There is, in short, ample time for the modest administrative tasks that an injunction would require—tasks far outweighed by the protection of voting rights and to benefit public health.

### E. An injunction is in the public interest.

Without question, an injunction that is aimed to protect the public from more exposure to the coronavirus *and* avoid disenfranchisement is in the public interest. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y*, 453 F.3d at 859. "The vindication of constitutional rights . . . serve[s] the public interest almost by definition," including specifically when the right at issue is the right to vote. *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012). This is because the public has a "strong interest in exercising the fundamental political right to vote." *Purcell*, 549 U.S. at 4. In sum, "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). Enjoining the Challenged Provisions here would do precisely do—allow as many qualified Wisconsinites as possible to safely vote.

## V. CONCLUSION

For the reasons stated, Plaintiffs respectfully request that the Court issue a temporary restraining order and a preliminary injunction that: (1) requires defendants to extend Wisconsin's electronic and by-mail registration deadline at least from March 18, 2020 up to and including April 3, 2020); (2) enjoins the enforcement of Wis. Stat. § 6.34's proof of residency requirement for voter registrations; (3) enjoins the enforcement of Wis. Stat. §§ 6.86 - 87 photo identification requirements for absentee ballot requests until the COVID-19 crisis is over; and (4) prohibits

defendants from rejecting ballots that are postmarked before or on Election Day that arrive within ten days of Election Day.

                              Respectfully submitted,

                              /s/ *Bruce V. Spiva*
                              Marc E. Elias
                              John Devaney
                              Bruce V. Spiva
                              Amanda R. Callais
                              Zachary J. Newkirk*
                              PERKINS COIE LLP
                              700 Thirteenth St., N.W., Suite 600
                              Washington, D.C. 20005-3960
                              Telephone: (202) 654-6200
                              Facsimile: (202) 654-9959
                              melias@perkinscoie.com
                              acallais@perkinscoie.com
                              scommand@perkinscoie.com

                              Charles G. Curtis, Jr.
                              Sopen B. Shah
                              PERKINS COIE LLP
                              33 East Main Street, Suite 201
                              Madison, Wisconsin 53703-3095
                              Telephone: (608) 663-7460
                              Facsimile: (608) 663-7499
                              CCurtis@perkinscoie.com
                              SShah@perkinscoie.com

                              *Counsel for the Plaintiffs*
                              *\*Motion for Admission Forthcoming*