IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DEMOCRATIC NATIONAL COMMITTEE
AND DEMOCRATIC PARTY OF WISCONSIN,

        Plaintiffs,

    v.                             Case No. 20-CV-0249

MARGE BOSTELMANN, JULIE M. GLANCEY,
ANN S. JACOBS, DEAN KNUDSON, ROBERT
F. SPINDELL, JR., AND MARK L. THOMSEN,
IN THEIR OFFICIAL CAPACITIES AS
WISCONSIN ELECTIONS COMMISSIONERS,

        Defendants.

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants Marge Bostelmann, Julie M. Glancey, Ann. S. Jacobs, Dean Knudson, Robert F. Spindell, Jr., and Mark L. Thomsen, by their attorneys, Eric J. Wilson, Deputy Attorney General, and Brian P. Keenan, S. Michael Murphy, and Jody J. Schmelzer, Assistant Attorneys General, submit this response in opposition to Plaintiffs' motion for temporary restraining order and preliminary injunction.

## INTRODUCTION

As the Court recognized at yesterday's hearing, this case is not really about deficiencies in Wisconsin's systems for voter registration or requesting

absentee ballots. Instead, the plaintiffs challenge that those systems have become unconstitutional because voting on election day—and thus election-day registration—is more burdensome than normal due to the COVID-19 virus. While the virus is of great public concern, and has required significant protective measures, most Wisconsin voters can still vote absentee if they no longer wish to go to the polls. The burdens the plaintiffs allege apply to subsets of the voting population, and they have not shown the number of voters affected or the specific burdens those voters face.  Given the risks of changing election law within weeks of the election—voter confusion and inability to ensure these changes are effectuated statewide—the Court should deny the plaintiffs' motion.

## RELEVANT FACTS

WEC administers and enforces Wisconsin elections law. (Wolfe Decl. ¶ 3.)[1] In administering elections, WEC works with the State's county and municipal clerks. (*Id.*) In Wisconsin, there are 72 county clerks and 1,850 municipal clerks. Over 60 percent of the State's municipal clerks are part-time. (*Id.*)

---

[1] WEC is and administrative agency that does not have the authority to delay, cancel or reschedule our upcoming April 7 election, nor does it have the authority to make changes to existing laws and regulations. (Wolfe Decl. ¶ 4.)

While the WEC is tasked with the enforcement of chapters 5 to 10, and 12, Wis. Stats., due to the decentralized nature of election administration in Wisconsin, voter registration, absentee balloting and administering the photo ID law are all done by local election officials. (*Id.*) For example, the WEC issues clerk communications, training materials and forms for local clerks, but ultimately local clerks are tasked with implementing any changes in policy or the law in their community. (*Id.*)

In Wisconsin, the presidential preference primary and spring election is on April 7, 2020. (Wolfe Decl. ¶ 5.) In addition to the presidential primary, there is an election for a Justice of the Wisconsin Supreme Court and elections for many local offices including mayors and members of local governing bodies in each of the state's municipalities. (*Id.*)

In general, implementation of any changes to the rules for the April 7 election would be complicated due to Wisconsin's decentralized election administration structure discussed above.  (Wolfe Decl. ¶ 6.) Approximately two-thirds of the municipal clerks in Wisconsin municipalities responsible for conducting elections are employed part-time. (Wolfe Decl. ¶ 7.) Communicating significant changes to those clerks, making necessary modifications to IT applications and ensuring consistent implementation across the state would pose a significant challenge under the compressed timeline available. (*Id.*)

## I.    Changes to the March 18 online and by-mail registration deadline.

There are several different ways to register to vote in Wisconsin. (Wolfe Decl. ¶ 8.) Prior to Election Day, voters can register in three different ways: (1) electronic registration through https://myvote.wi.gov (MyVote), which is the voter facing web application that is the public's interface with election systems; (2) by mailing the registration form and proof of residence document to the appropriate local election official; or (3) in person at the office of the municipal clerk, the municipal board of elections, or at another location authorized by the municipality. (*Id.* ¶ 9.)

Under current law, the deadline for online and by-mail voter registration is 20 days prior to the election. Wis. Stat. §6.28(1)(a). For the April 7 election, that was the end of the day on Wednesday, March 18. (*Id.* ¶ 10.)

### A.    Reactivation of the online voter registration system.

Because the deadline for online voter registration has now passed, the online system would have to be reactivated to accept new voter registrations. (Wolfe Decl. ¶ 11.) From a technical standpoint, the reactivation of the online registration process is possible, but not without significant risk. (*Id.*) There are essentially three steps required that could be completed in approximately 48–72 hours:

> **Step 1**:  **Modifying code in MyVote**. This would effectively reset the "clock" that tells MyVote to stop accepting on-line registration requests.

4

A software developer would have to set a new deadline, if ordered by the Court.

**Step 2**: **Testing of the new code**. This step is more critical and requires more time to complete correctly. Moving on from this step should be based on meeting appropriate testing standards and not based on passage of time. Testing evaluates the proper function of code changes to validate correct operation and the absence of errors or other defects. Because the registration process includes an interface (API) with the Department of Transportation (DOT) (*see* Paragraph 23, *below*), testing may require collaboration with DOT. If necessary, debugging would occur before testing is complete. This step also includes testing of the statewide voter registration system to ensure that the voter registration is entered into the system with the correct status and that information is mapped correctly to the pollbook.

**Step 3**: **Deployment**. The final step is to release and activate the new code, making it accessible to the public. This process would also include the deployment of public notices on both MyVote and the WEC website indicating the system changes

(*Id.*)

There is significant risk involved in deploying software changes to the election systems that function as the backbone of election management in the state in the weeks preceding a statewide election. (Wolfe Decl. ¶ 12.) Such a change would violate a statewide enterprise level change freeze enacted to protect critical elections operations from unintentional disruption. (*Id.*) During a change freeze, all state agencies are prohibited from making changes to any state agency information technology services and servers in order to mitigate the risk that errors or security vulnerabilities are introduced to state election systems. (*Id.*) Deployment of any software changes can produce unanticipated consequences. The changes freeze guards against that possibility. (*Id.*)

When the system is functioning properly, online registrations are processed immediately and would ordinarily be completed with little discernable delay. (Wolfe Decl. ¶ 13.) But reactivation of online registration capabilities would have various impacts on local election officials and voters. (*Id.*) The most significant effect for clerks and other election would be on municipal poll books. (Wolfe Decl. ¶ 14.) Most large municipalities, and many counties, send their poll books to publishers for printing immediately after the online registration deadline passes. (*Id.*) In these jurisdictions, this means that any voter who registered after March 18 would not appear in these poll books. (*Id.*) Instead, voters registering after March 18 would appear in either the supplemental or post-supplemental poll book. (*Id.*) In communities using electronic pollbooks, the voter file needs to be uploaded at least a week prior to the election so that it can be tested. (*Id.*)

The reactivation of on-line registration would also produce more registration list alerts for clerks. (Wolfe Decl. ¶ 15.) These electronic notices require clerks to validate, and sometimes process, changes to voter records in their jurisdictions. (*Id.*) Processing these alerts ensures the correct voters appear on the poll list. (*Id.*)

For voters, the risk of confusion would likely present the greatest challenge to reactivation of the electronic database. (Wolfe Decl. ¶ 16.) The registration deadline is referenced in dozens of documents, forms, and web

pages. (*Id.*) Locating and changing all the existing language would be impractical and introduce problems for future elections, including the May 12, 2020 election in Congressional District 7. (*Id.*)

An extended deadline for online and by-mail voter registration would likely impact municipal clerk's opportunity to cure defects. (Wolfe Decl. ¶ 19.) By-mail applications are more likely to be missing information than online applications. (*Id.*) When applications are received weeks ahead of the election, clerks have time to contact voters and obtain missing information. (*Id.*) But busy clerks in the days immediately prior to an election may be unable to contact voters to correct defects, or voters may lack adequate time to respond to clerk inquiries. (*Id.*) Voters appearing at a polling location expecting to be registered but not appearing on any poll list due to a defect that was not cured, is a real issue that could affect voter's confidence in the entire process, not to mention the possibility that the voter may not be able to cast a ballot if they are unable to register at the polls. (*Id.*)

Lastly, communicating changes to the online and by-mail registration deadlines to 1,850 municipal clerks and 72 county clerks and to voters would be challenging, as would attaining consistent application throughout the state. (Wolfe Decl. ¶ 20.)

**B.     Processing online and by-mail voter registrations if the deadline was extended.**

The process for by-mail voter registrations would not change significantly if deadlines were extended to April 3. (Wolfe Decl. ¶ 17.) As with online registrations, these voters could appear on supplemental or post-supplemental poll books. (*Id.*)

The primary election administration concern would be practical implementation of a new deadline imposed by the Court. (*Id.* ¶ 18.) The problem is that a mailing-date based deadline does not account for mail delays. (*Id.*) Poll books need to be final at some point before the election, and it is impossible to know whether a timely-sent registration with a later deadline is still in the mail at the time of poll book finalization. (*Id.*) Currently, mailed registrations must be postmarked by March 18. (*Id.*) A postmark-based deadline, however, may not work for an extended deadline. (*Id.*) This is because mailed registration forms that arrive after April 3 would risk that the voter does not appear in the poll book on April 7. (*Id.*) Clerks would need to process these registration forms and, with the April 7 election approaching, registration forms received after April 3 may not be able to be processed.  (*Id.*) Instead, a new deadline for by-mail registrations would need to be defined by the arrival date or, alternatively, be set so early as to effectively eliminate the risk that by-mail registrations would arrive after April 3. (*Id.*) Further, given

that this lawsuit assumes that these new registrants would be requesting absentee ballots, applications received very close to the election would likely not allow time for the ballot to be sent to and returned by the voter. (*Id.*)

There is no way to establish a uniform "drop dead" cutoff date for new by-mail voter registrations, because what works for one municipality may not work for all 1,850 municipalities. (Wolfe Decl. ¶ 21.) For example, the City of Milwaukee will soon start printing poll books. (*Id.*)

## II.   The proof of residency requirement for new voter registrations.

In registering to vote, an elector needs to fill out a form containing information showing that he or she meets the qualifications for voting in Wis. Stat. § 6.02 and submit proof of the elector's residence per Wis. Stat. § 6.34. (Wolfe Decl. ¶ 22.) There are many acceptable forms of proof of residency, including common documents like a gas, electric, or telephone service statement (utility bill) for the period commencing no earlier than 90 days before Election Day or a bank or credit card statement. (*Id.* ¶ 23.) Voters may present a proof of residency document as a hard copy, paper document or an electronic document on your smartphone, tablet, or computer. (*Id.* ¶ 24.)

Voters registering at the polls on election day do not need to make a photocopy of their proof of residency document. (*Id.* ¶ 25.) They only need to show the proof of residency document to the poll worker. (*Id.*)

Only voters with a valid, unexpired Wisconsin driver license or Wisconsin state ID card may register to vote online. (Wolfe Decl. ¶ 26.) To register online, the address at which the voter is registering must match the voters' address with DOT. (*Id.*) When the website is active, these voters can complete their online registration immediately. (*Id.*) If the address at which the voter wishes to register is different from that with the DOT, then the voter needs to update their address with DOT before registering online. (*Id.*) A person can change their address with DOT online. (*Id.*) For those that attempt to register but whose voting addresses or other data do not match information in the DOT database, the website directs them to the DOT website. (*Id.*) When the online registration system is running, the DOT address change occurs quickly, and the voter can then proceed complete their online voter registration. (*Id.*) For these individuals, no proof of residency is needed because the DMV matching with the voter's name, date of birth, address, and driver license number provided for voting purposes serves as the voter's proof of residency. (*Id.*)

People unable to register online, because they do not have a Wisconsin driver license or state ID card or because their DMV product is invalid or cannot match, can fill out the voter registration form online, then print it, sign it and mail or deliver it to their municipal clerk's office along with a copy of a proof of residence document. (Wolfe Decl. ¶ 27.) Voters can send an original of any proof of residency document if they no longer need the document. (*Id.*)

Voters may also deliver the registration form (with proof of residence) to their municipal clerk's office by the Friday before the election, or they may bring it to their polling place on election day. (Wolfe Decl. ¶ 28.) For either of these options, the voter need only show the document to the municipal clerk or poll worker and does not need a copy of the proof of residency document. (*Id.*)

Once an individual is registered to vote, that registration is valid until they move, change their name or otherwise no longer meet the qualifications of an elector under Wis. Stat. § 6.02, or become disqualified under Wis. Stat. § 6.03. (Wolfe Decl. ¶ 29.) If an individual were permitted to register to vote without submitting the required proof of residency document, that requirement would essentially be waived for as long as their registration is valid, unless a court order or legislation required submission of such documentation at a later date. (*Id.*)

## III.   Voter ID requirements for absentee ballots.

Individuals must be registered to vote to request an absentee ballot. (Wolfe Decl. ¶ 30.) The deadline for registered voters to request an absentee ballot be mailed to them is the Thursday before the election, which is April 2 for the upcoming April 7 spring election. (*Id.*)

There are several ways registered voters can request absentee ballots. (Wolfe Decl. ¶ 31.) The easiest way is to sign up at MyVote website. (*Id.*) If the elector has a photo ID on file with their clerk's office due to a previous absentee

by-mail request, they do not need to upload or mail a copy of their ID to get an absentee ballot. (*Id.*) If the elector does not already have a photo ID on file with their clerk's office, they must upload a copy. (*Id.*) The elector can take a picture and upload it on the MyVote website with the same device used to access the website. (*Id.*) Devices such as a computer, tablet, or phone can take a picture and upload it. (*Id.*) The entire process of requesting a ballot, taking a picture of an ID, and uploading the picture can be done with a smart phone. (*Id.*)

Voters can also request absentee ballots by mailing, emailing or faxing their municipal clerk's office. (Wolfe Decl. ¶ 32.) *See also* Wis. Stat. § 6.86(a)1, (ac). Voters can find their clerk's contact information on MyVote. (*Id.*) Just as with online requests, if voters already have a photo ID on file from previous absentee requests under their current registration, they will not need to provide it again. (*Id.*) If voters do not have a photo on file, their request must be accompanied by a copy of their photo ID. (*Id.*)

Voters who are indefinitely confined, meaning they may have difficulty getting to the polls for reason of age, illness, infirmity, or disability are not required to provide a photo ID. (Wolfe Decl. ¶ 33.) Voters in care facilities can have a representative of the facility confirm the resident's identity instead of providing a photo ID. (*Id.*)

12

## IV.   Relevant deadlines after the April 7 election.

After the polls close on April 7, 2020, election inspectors tabulate the votes received at the polling place, municipal clerks report the returns within two hours after tabulation, and the county clerks post the results within two hours after receiving the returns. (Wolfe Decl. ¶ 34.) *See* Wis. Stat. §§ 7.51(1), (4), 7.60(1). Municipalities have two ways to count absentee ballots. (*Id.*) In some municipalities, absentee ballots are counted at the polling places. (*Id.*) *See* Wis. Stat. §§ 6.88, 7.51. In other municipalities, a municipal board of absentee ballot canvassers counts all absentee ballots in the jurisdiction. (*Id.*) *See* Wis. Stat. § 7.52. The official results of the elections are not determined until each official board of canvassers (for the municipality, county, state, school district, or other special purpose district) has met and completed the official canvass of their respective offices. (*Id.* ¶ 35.)

After the April 7, 2020 election, municipal boards of canvass have until April 13 to certify the results to the county. (Wolfe Decl. ¶ 36.) The municipal boards of canvass must publicly declare the results for municipal contests by the third Tuesday of April. (*Id.*) *See* Wis. Stat. § 7.53(2)(d). This is also the date that the term begins for most local offices. (*Id.*) County boards of canvass have 10 days to certify their election results to WEC, which is **April 17, 2020**. (*Id.*) *See* Wis. Stat. § 7.60(5). WEC then must publicly canvass the returns wherein it aggregates the election results. WEC has until **May 15, 2020**, to certify the

13

election results for state and federal contests. (*Id.*) *See* Wis. Stat. § 7.70(3)(a). WEC plays no role in tabulating votes received at polling places; its role is to aggregate and certify the results. (*Id.* ¶ 37.)

It would be problematic to count absentee ballots received up to ten days after the election given the canvass and certification deadlines because it would have a domino effect on all the canvass processes and statutory deadlines for each unit of government. (Wolfe Decl. ¶ 38.)

## PRELIMINARY INJUNCTION LEGAL STANDARD

A preliminary injunction is an extraordinary and drastic remedy, and is never awarded as a matter of right. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). "[A]n injunction requiring an affirmative act by the defendant" must be "cautiously viewed" and granted only "sparingly." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). "Preliminary relief is properly sought only to avert irreparable harm to the moving party." *Chi. United Indus., Ltd. v. City of Chicago,* 445 F.3d 940, 944 (7th Cir. 2006).

A "moving party must show that it has '(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits.'" *Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (citation omitted); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "For preliminary relief to be granted, the irreparable harm must . . . be likely. That is, there must be more

14

than a mere possibility that the harm will come to pass . . . ." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).

Only if the moving party shows likelihood of success on the merits and a suffering of irreparable harm if the injunction does not issue, then "the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest." *Wis. Right To Life*, 751 F.3d at 830 (citation omitted). "The equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Id.* (citation omitted).

A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Granting a preliminary injunction involves the "exercise of a very far-reaching power" and is "never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citations omitted).

## ARGUMENT

Plaintiffs cannot meet their burden of proving that they are entitled to the extraordinary remedy of a preliminary injunction. First, they cannot show that they will suffer irreparable harm if the injunction is not issued. That alone prevents the Court from granting their motion. Second, even if they could prove

irreparable harm, they cannot show some likelihood of success on the merits under the *Anderson/Burdick* balancing test. The Court should deny Plaintiffs' motion.

## V.   Plaintiffs are not likely to succeed on the merits of their claims.

The plaintiffs are not likely to succeed on the merits of their four claims under the *Anderson/Burdick* test, and their procedural due process claim is redundant to those claims.

### A.   The *Anderson/Burdick* balancing test.

The Constitution both protects the right to vote and "confers on the states broad authority to regulate the conduct of elections, including federal ones." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004); see also U.S. Const. art. I, § 4, cl. 1 (permitting States to prescribe "[t]he Times, Places and Manner of Holding Elections for Senators and Representatives"). "Election laws will invariably impose some burden upon individual voters." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). The general "constitutional question is whether the restriction and resulting exclusion are reasonable given the interest the restriction serves." *Griffin*, 385 F.3d at 1130.

The question is answered by applying the *Anderson-Burdick* test, which has two steps. At the first step, courts identify any burden on the right to vote, weigh its character and magnitude, and measure its severity. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citation omitted). Courts

evaluate a law's impact not in isolation but "as a part of [the State's] electoral scheme" as a whole. *Burdick*, 504 U.S. at 441. Any burdens imposed by the law are to be measured against the baseline of "the usual burdens of voting." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (opinion of Stevens, J.).

In the second step of the analysis, a court turns to the State's interests. "If the burden on the plaintiffs' constitutional rights is 'severe,' a state's regulation must be narrowly drawn to advance a compelling state interest," satisfying strict scrutiny. *Stone v. Bd. of Election Comm'rs*, 750 F.3d 678, 681 (7th Cir. 2014) (citation omitted). But "[i]f the burden is merely 'reasonable' and 'nondiscriminatory,' by contrast, the government's legitimate regulatory interests will generally carry the day." *Id.* (citation omitted). Under this flexible analysis, "[l]esser burdens . . . trigger less exacting review." *Timmons*, 520 U.S. at 358, and "minimally burdensome and nondiscriminatory regulations" in particular "are subject to a less-searching examination closer to rational basis." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (citations omitted). A justification's sufficiency is generally a "legislative fact" that must be accepted if reasonable. *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014); *see Crawford*, 553 U.S. at 194–97 (opinion of Stevens, J.); *see also Husted*, 834 F.3d at 632.

### 1. Plaintiffs' are not likely to succeed on their request to extend the March 18 electronic and by-mail voter registration deadline.

The state has a valid interest in cutting off electronic and mail registration three weeks before the election. After that date, clerks can begin printing their poll books for use at polling locations. For example, the City of Milwaukee will begin printing its poll books in the next few days, after the online and mail registration date has closed. (Wolfe Decl. ¶¶ 14, 21.) Later registrations can be added to a supplemental pool book but, at a certain point, registration needs to close so that poll books can be finalized. Thus, Wisconsin's voter registrations system, which in ordinary circumstances is "easy," *Frank*, 768 F.3d at 748, serves legitimate state interests in the orderly administration of elections.

Plaintiffs argue that the March 18 deadline for online and by-mail voter registration is unconstitutional, during the COVID-19 pandemic, because they hypothesize that "potentially thousands of citizens" will be prevented from voting because "registering in person is simply not feasible." (Pl. Br. 1.) Defendants recognize that some voters may face difficulties registering during this time, but many voters will not be affected. Most voters do not need to register to vote because they have already registered, and some voters were able to register before the March 18 deadline. In addition, voters can still register in person either at the clerk's office (where they can also cast an

absentee ballot at the same time) or at the polling place on election day. While the Governor has issued an executive order preventing gatherings of 10 or more people, the order exempts government facilities. And in-person absentee voting and registration can be accomplished under the "curbside voting" provisions of Wis. Stat. § 6.82. That process allows an elector to both register and complete a ballot without entering the municipal clerk's office during absentee voting or the polling place on election day. There is no order preventing someone from registering at the clerk's office. While some subset of voters may be burdened in today's special circumstances, Plaintiffs have not established either the number of voters or the burdens those voters would face. The Seventh Circuit has made it clear that a plaintiff is not entitled to a preliminary injunction based upon speculative allegations of potential harm to the plaintiff. *See Goodman v. Ill. Dep't. of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (stating that a preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion").

As a counter-vailing interest, extending the deadline could negatively impact the elections process. First, as it relates to electronic registration, changing a software program this close to the election presents significant risks in the event something goes wrong. (Wolfe Aff. ¶ 12.) This system is the backbone of election management in the state, and thus changes to the system

risk negatively impacting the entire election. (Wolfe Aff. ¶ 12.) There is a statewide enterprise level change freeze enacted to protect critical elections operations from unintentional disruption and mitigate the risk that errors or security vulnerabilities are introduced to state election systems. (Wolfe Aff. ¶ 12.) Deployment of any software changes would violate that freeze and risks unanticipated consequences that might negatively affect the election.

Further, Defendants do not handle mail-in registrations; local clerks handle those. Given that there are 1850 municipal election clerks in Wisconsin, there is a risk that any injunction regarding mail-in ballots will not be applied in the same manner by each and every clerk. Both the communication and the implementation of such a significant change would be a challenge so close to the election given Wisconsin's decentralized system, and would create potential confusion and increased likelihood of mistakes in other aspects of conducting the election. And mail-in applications with errors will likely result in a failure to register because clerks will not have time to help voters fix mistakes in their applications. (Wolfe Decl. ¶ 19.) The Court should consider these potential problems when ruling on this aspect of Plaintiffs' claims.

And even if the Court were to grant some relief, it would need to set a deadline by which mail-in registrations are received—by April 3 at the latest—in order to allow clerks to process the application prior to the election and get a person's name on a poll list. (Wolfe Decl. ¶ 18.) But given that Plaintiffs want

late registrations for purposes of absentee voting, in order to be practical, the date would need to be sufficiently ahead of election day to allow the absentee ballot to be delivered to the voter and returned to the clerk. Plaintiffs allege that the mail is slow, (Pl. Br. 2); mail from the clerk would be delayed the same as mail from a voter. At a certain point, absentee ballots could not practically be postmarked by election day—the extended deadline Plaintiffs' request.

2. **Plaintiffs are not likely to succeed on their request for relief from the proof of residency requirement for new voter registrations.**

Wisconsin has a legitimate state interest in requiring voters to prove that they live at the address at which they register to vote. Proof of residency helps "ensur[e] that voters actually reside in the municipalities where they register to vote." *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 937 (W.D. Wis. 2016). That interest is especially relevant to the April 7 election, which involves elections for many local offices and the elector's address determines which local races he may vote in. Further, this Court found that, at least in normal circumstances, the proof of residency requirements "impose only slight burdens on voters." *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 935 (W.D. Wis. 2016). That same analysis would apply to voters attempting to register in person today, either at the polling place or with the clerk. Even in today's circumstances, the burden of supplying proof of residence is slight for the vast majority of voters, and Plaintiffs have not

21

established that a significant number of voters would face a burden or whether that burden would be severe.

The potential burdens are limited to those who cannot easily print or copy a proof of residence document. Plaintiffs do not offer evidence as to the number of people this may affect or the specific burdens such a person might face. Those without the ability to copy or print a proof of residence document at home may be able to secure copies at commercial establishments like FedEx stores, UPS stores, convenience stores, and any other store offering copying services. The Governor's executive orders have not shut down all stores, and Wisconsin is not subject to a "shelter in place" directive. Plaintiffs' only evidence of difficulty is that the Madison library has closed, (Spiva Decl. Ex. 2), but libraries are not the only source for copying services (and some libraries are still open). Thus, Plaintiffs have not proven the burdens on the narrow set of voters who cannot easily provide a proof of residence document even in today's circumstances.

While online registration and registration by mail are no longer available, the proof of residence requirement would not be an issue should the Court grant the plaintiffs' motion to extend those deadlines. Those who register to vote online do not need to provide a separate proof of residence document. Online registration is limited to those who have a valid Wisconsin drivers' license or ID card. (Wolfe Decl. ¶ 26.) To register online, a person's voter

registration address must match the address on file with the Wisconsin Department of Transportation (DOT). (Wolfe Decl. ¶ 26.) If there is a successful match, then the voter is immediately registered to vote without providing a proof of residence document—the DOT address serves as proof of residence. (Wolfe Decl. ¶ 26.) If a person's DOT address is outdated, they can change that address online at the DOT website. (Wolfe Decl. ¶ 26.) When the system is active, that change becomes effective in short order such that the person can then register to vote. (Wolfe Decl. ¶ 26.) Thus, the burdens for those able to register electronically are very small.

The same is true of those who register by mail. These individuals need to send in a completed registration form by mail to their clerk's office. Wis. Stat. § 6.33; (Wolfe Decl. ¶ 27.) Many of them will print the application form, which is available online (Wolfe Decl. ¶ 27), and mail it in. If individuals can print the form, then they should also be able to print a proof of residence document. Wisconsin allows many forms of proof of residence, Wis. Stat. § 6.34(a), such as a utility bill (including electric, utility or phone bills) or a bank statement (including a credit card statement). (Wolfe Decl. ¶ 23.) Many voters would have these documents either available to print from an online source or in hard copy to send along with the application.

Lastly, this Court should consider that Plaintiffs are requesting that voters be allowed to register—which extends beyond this one election—based

on circumstances affecting the current election. While extending voter registration for one election can be considered temporary relief because it would not apply to future elections, allowing voters to register without following the law is a form of permanent relief because it does apply to future elections. (Wolfe Decl. ¶ 28.) The low burdens on voters in normal circumstances, the large number of voters who can still provide proof of residence, and Plaintiffs' failure to provide any evidence in support of their claims, provide additional reasons to deny Plaintiffs' motion.

### 3.  Plaintiffs are not likely to succeed on their request for relief from the voter ID requirement with new absentee ballot requests.

The important state interests served by a photo ID requirement for voting are well-established. The Supreme Court and Seventh Circuit have discussed these interests, including election system modernization, deterring voter fraud, and safeguarding voter confidence. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 192–97, 203 (2008) (holding that these interests were sufficient to defeat a challenge to a voter ID law) (quotations omitted). As the Seventh Circuit has described, "[t]he Supreme Court thought that a photo ID requirement has other benefits: it deters fraud (so that a low frequency stays low); it promotes accurate record keeping (so that people who have moved after the date of registration do not vote in the wrong precinct); it promotes voter confidence. *Frank,* 768 F.3d at 750 (citations omitted).

Against these important interests, Plaintiffs offer nothing more than speculation, and misguided speculation at that. They first imply that all people who wish to vote by absentee ballot must include a copy of a photo ID with their request. (Pl. Br. 8.) But a copy of an ID is only required the first time you request an absentee ballot after registering. (Wolfe Decl.   ¶¶ 31–32.) If the elector has a photo ID on file with their clerk's office due to a previous absentee by-mail request, he or she does not need to submit another copy. (Wolfe Decl. ¶ 31.) Thus, the measures taken to protect against COVID-19 do not add any additional burdens to voters who have previously voted via absentee ballot and thus already have a photo ID on file.

Additionally, voters who are indefinitely confined, meaning they may have difficulty getting to the polls for reason of age, illness, infirmity, or disability are not required to provide a photo ID. Wis. Stat. § 6.86(2)(a); (Wolfe Decl. ¶ 33.) And voters in care facilities can have a representative of the facility confirm the resident's identity instead of providing a photo ID. (Wolfe Decl. ¶ 33.) It is not the case that everyone voting absentee needs to provide a copy of an ID, and the law already makes exceptions that apply to the elderly, ill, and infirm, who are the people that Plaintiffs identify as "specifically at risk in this pandemic." (Pl. Br. 8.)

Plaintiffs next argue that voters seeking to vote absentee "means a voter must locate a copier, scanner, computer, and/or printer." (Pl. Br. 8.) This is

inaccurate; requesting an absentee ballot can be accomplished entirely on a computer, tablet, or even a phone. All a voter must do is visit the MyVote Wisconsin website, https://myvote.wi.gov, and enter the request. (Wolfe Decl. ¶ 31.) A voter can satisfy the ID requirement by taking a picture of their ID with their computer, tablet, or phone, and uploading the photo to the website. (Wolfe Decl. ¶ 31.) Thus, many voters can satisfy this requirement without even leaving their homes or with assistance from a family member or friend with a smartphone. Plaintiffs do not argue, let alone demonstrate, that accessing a device such as a phone is unduly burdensome.

Thus, the burden Plaintiffs allege—but do not support with evidence from any voters—is limited to those who cannot use the website for requesting an absentee ballot. Those voters who merely choose to request an absentee ballot by fax or mail, but could use the website, are not burdened at all. Those that cannot use the website, and are not indefinitely confined, and do not already have a copy of their ID on file with the clerk, are required to submit a printed copy of their ID. But those that print out their form to mail in would have access to some printing capability, and some subset of that group would be able to also copy their ID or take a photograph and print the photograph. And those without the ability to use a copy machine or print a copy may be able to secure copies at commercial establishments like FedEx stores, UPS stores, convenience stores, and any other store offering copying services. The

Governor's executive orders have not shut down all stores. Plaintiffs' only evidence of difficulty is that the Madison library has closed, (Spiva Decl. Ex. 2), but libraries are not the only source for copying services. Plaintiffs have submitted no evidence of the number of people that (1) must obtain a paper copy of their ID and (2) are not able to secure a copy.

### 4.    Plaintiffs are not likely to succeed on their request to extend the date to accept absentee ballots.

Plaintiffs request that this Court enter an injunction that "prohibits defendants from rejecting ballots that are postmarked before or on Election Day that arrive within ten days of Election Day." (Pl. Br. 15–16.) As an initial matter, that relief may not grant Plaintiffs what they want because it does not require that these ballots actually be counted in the first instance. WEC does not count ballots, absentee ballots or otherwise. Instead, ballot counting is done at the local level, with absentee ballots counted at polling places, Wis. Stat. § 6.88, or by a municipal board of absentee ballot canvassers, Wis. Stat. § 7.52. (Wolfe Decl. ¶ 34.) WEC is not involved in counting these votes. (Wolfe Decl. ¶ 37.) Thus, ordering WEC to accept absentee ballots received after April 7 does not require that the ballots be counted in the first instance. This could result in different treatment of ballots depending on whether those ballots are counted at the local level.

Wisconsin has a state interest in counting ballots received on election day. Extending the deadline for counting ballots had a domino effect on canvassing and certifying election results. (Wolfe Decl. ¶ 38.) Municipal boards of canvass have until April 13 to certify the results to the county and must publicly declare the results for municipal contests by the third Tuesday of April. Wis. Stat. § 7.53(2)(d). This is also the date that the term begins for most local offices. (Wolfe Decl. ¶ 36.) County boards of canvass have 10 days to certify their election results to WEC, which is April 17, 2020. Wis. Stat. § 7.60(5). WEC then must publicly canvass the returns wherein it aggregates the election results. (Wolfe Decl. ¶ 36.) Extending the deadlines to receive absentee ballots will delay all these deadlines, including for local elections where terms start in mid-April.

Plaintiffs have not shown that there is an unconstitutional burden. Instead, they merely hypothesize that because absentee voting is likely to increase this year and "the strains that the coronavirus pandemic is already placing on the mail system and postal workers, there is a strong likelihood that large numbers of mail-in ballots" will be received after April 7. (Pl. Br. 2.) Nor do Plaintiffs explain why ballots postmarked up to election day should be counted when, even assuming no mail delays, a voter would need to mail the ballot several days before election day to have it counted. This is insufficient to show a burden on the right to vote and surely insufficient to support a

temporary restraining order governing how ballots will be counted over two weeks from now.

Lastly, the defendants also note that Plaintiffs' request is overbroad in asking for ballots received ten days after election day to be counted. They have submitted no evidence that any ballots, let alone a significant number, would be mailed on election day and received ten days later. And the greater the number of days for ballots to be received, the larger the impact on the state's vote canvassing and certifying processes.

## B.  Plaintiffs' procedural due process claim is duplicative and should be dismissed.

Plaintiffs' procedural due process claim is not viable because it is redundant to their First and Fourteenth Amendment claim asserting an undue burden on the right to vote. (*See* Compl., Dkt. 1 ¶¶ 42–47.) Constitutional claims must be addressed under the most applicable provision. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "When a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994). The Seventh Circuit holds that plaintiffs cannot expand their claims by attaching additional constitutional labels to them. *Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005). This premise applies

equally to Plaintiffs' procedural due process claim, which is redundant of their claim under the First and Fourteenth Amendment.

Here, Plaintiffs challenge the same election law requirements in both their First/Fourteenth Amendment claim and their procedural due process claim. Plaintiffs allege the same facts in support of both claims, and they claim the same injury—voter disenfranchisement. By inserting a procedural due process claim into the mix, Plaintiffs are advocating for the application of two different legal standards to the same set of operative facts. But the Supreme Court has held that laws imposing a burden on the fundamental right to vote are subject to the *Anderson-Burdick* test—not the test set forth in *Mathews v. Eldridge,* 424 U.S. 319 (1976). *See Anderson*, 460 U.S. at 788; *Burdick*, 504 U.S. at 434.

Plaintiffs have not indicated how their right under the First and Fourteenth Amendments are different from their procedural due process rights. Accordingly, Plaintiffs' procedural due process claim should be dismissed because it is redundant of the rights guaranteed by the more specific First and Fourteenth Amendments governed by the *Anderson-Burdick* test.

## VI.   Plaintiffs have failed to meet their burden of showing that they will suffer irreparable harm without a preliminary injunction.

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at

22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* Without proving irreparable harm, the Court need not decide any other question. *See Abbott Labs v. Mead Johnson & Co.,* 971 F.2d 6, 19 & n.6 (7th Cir. 1992) (plaintiff's failure to demonstrate irreparable harm "dooms a plaintiff's case and renders moot any further inquiry").

Plaintiffs' motion fails for the same reasons their claims are unlikely to succeed on the merits. Plaintiffs argue that they face irreparable harm if their motion for preliminary injunction is denied because (1) voters will be disenfranchised and (2) the laws will contribute to public health risks. (Pl. Br. 12–13.) As shown above, Plaintiffs have not shown a significant number of voters will be disenfranchised or will have to risk their health in order to vote.

## VII.  There are public interest concerns with altering the election rules within weeks of the election.

Before entering an injunction, the Court must consider whether the injunction is in the public interest. In an election case, this Court must consider "in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Specifically, "[c]ourt

orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5. The Court must consider the effect on the election even when an injunction is intended to eliminate an allegedly unconstitutional barrier to voting. In *Purcell*, the Supreme Court reversed a Ninth Circuit injunction that prohibited Arizona from enforcing a voter ID requirement.

Plaintiffs' requests would change Wisconsin election law less than three weeks before election day. Several of the potential negative effects have been discussed above, such as the risk in changing Wisconsin's electronic elections systems so close to the election. And given that Wisconsin elections are run in a decentralized manner through local clerks around the state, it will be challenging to ensure that last-minute changes to the law are applied equally throughout the State. While WEC can communicate any court-ordered changes to the laws to the clerks, the clerks administer the elections at the ground level. (Wolfe Decl. ¶ 4.) There is no guarantee that nearly 2000 clerks will uniformly be able to adapt quickly to these changes, particularly when they are busy preparing for the upcoming election. For example, even if this Court enjoined the proof of residency requirement, clerks who are used to ensuring a proper proof of residence document may still deny registration to a voter if they by fail to change their procedures immediately after any WEC directive to do so.

Similarly, clerks who are busy preparing for the election may not realize they should accept a late application received by mail, or they may not have sufficient staff to handle a new task added just for this election. And all municipalities may not treat late-received absentee ballots in the same manner. There is no guarantee that an injunction could be implemented in a uniform manner statewide.

In addition, communicating these changes to voters will be difficult, and voters may be confused as to what is allowed in terms of registration and absentee ballots. The public information currently available on Defendants' and clerks' websites references current law, as one would expect. (Wolfe Aff. ¶ 16.) While some voters will hear about a court order, many will not. As in *Purcell*, a change in the law this close to an election could "result in voter confusion." 549 U.S. at 4–5.

Defendants understand the Plaintiffs' concerns that voting has become more difficult during the time of the COVID-19 pandemic. If this Court finds certain of the challenged laws impose burdens, it still needs to weigh the potential remedy to those burdens against the concerns about the proper functioning of the elections system as a whole, including voter confusion, statewide application of any injunction, and the risk of mistakes when the law is changed so closely to an election. Any relief must be tailored to alleviate

burdens without causing unnecessary disruption to the elections system this close to election day.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for temporary restraining order and preliminary injunction.

Dated this 20th day of March 2020.

Respectfully submitted,

ERIC J. WILSON
Deputy Attorney General of Wisconsin

Electronically signed by:

s/ Brian P. Keenan
BRIAN P. KEENAN
Assistant Attorney General
State Bar #1056525

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 267-2223 (Fax)
keenanbp@doj.state.wi.us