```
                    UNITED STATES DISTRICT COURT

             FOR THE WESTERN DISTRICT OF WISCONSIN

   * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEMOCRATIC NATIONAL COMMITTEE
and DEMOCRATIC PARTY OF WISCONSIN,

                     Plaintiffs,
                                     Case No. 20-CV-249-WMC
        vs.

MARGE BOSTELMANN, JULIE M. GLANCEY,
ANN S. JACOBS, DEAN KNUDSON, ROBERT
F. SPINDELL, JR. and MARK L. THOMSEN,
IN THEIR OFFICIAL CAPACITIES AS       Madison, Wisconsin
WISCONSIN ELECTIONS COMMISSIONERS,    March 19, 2020
                                      3:00 p.m.
                     Defendants.

   * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

    STENOGRAPHIC TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
         HELD BEFORE THE HONORABLE WILLIAM M. CONLEY

APPEARANCES:

For the Plaintiffs:
        Perkins Coie LLP
        BY:  BRUCE V. SPIVA
             JOHN DEVANEY
             AMANDA R. CALLAIS
        700 Thirteenth Street N.W.
        Suite 800
        Washington, D.C.  20005-3960

        Perkins Coie LLP
        BY:  SOPEN B. SHAH
        33 East Main Street
        Suite 201
        Madison, Wisconsin  53703-3095
```

```
             CHERYL A. SEEMAN, RMR, CRR
              Federal Court Reporter
             United States District Court
          120 North Henry Street, Room 410
             Madison, Wisconsin  53703
                  1-608-261-5708
```

```
 1  APPEARANCES CONTINUED:

 2  For the Defendants:

 3          Wisconsin Department of Justice
            BY:  BRIAN P. KEENAN
 4               JODY J. SCHMELZER
            Assistant Attorneys General
 5          17 West Main Street
            P.O. Box 7857
 6          Madison, Wisconsin  53707-7857

 7  For the Proposed Intervenors:

 8          Troutman Sanders
            BY:  MISHA TSEYTLIN
 9          One North Wacker Drive
            Suite 2905
10          Chicago, Illinois  60606

11                               ***

12      (Called to order at 3 p.m.)

13          THE COURT:  Hello.  This is Judge Conley and I am

14  calling Case No. 20-CV-249.  I'll hear appearances for the

15  plaintiff.

16          MR. SPIVA:  Judge, this is Bruce Spiva from

17  Perkins Coie on behalf of the plaintiffs.  With me on the

18  call is my partner, John Devaney, and my colleagues,

19  Amanda Collais and Sopen Shah.

20          THE COURT:  All right.  I will assume, Mr. Spiva,

21  that it is you who is speaking -- or Van Spiva, that it is

22  you who is speaking unless someone else identifies -- I'm

23  sorry.  Are you not going to be the principal speaker?

24          MR. SPIVA:  I will, Your Honor.  I was just going

25  to clarify that it is Spiva.  Van is my middle name.
```

 1            THE COURT:  Then, Mr. Spiva, I will assume that

 2   it is you who is speaking unless someone else identifies

 3   themselves for the record when I call on the plaintiff --

 4   or plaintiffs, as I assume you represent all plaintiffs.

 5   Is that correct?

 6            THE PLAINTIFF:  That is correct, Your Honor.

 7            THE COURT:  All right.  Very good.  Then I'll

 8   hear appearances for the defendant.

 9            MR. KEENAN:  This is Assistant Attorney General

10   Brian Keenan.  I'll be taking the lead for the defendants.

11   You can speak with me.  Also on the line is AAG Jody

12   Schmelzer.

13            THE COURT:  All right.  And if I call on the

14   defendant, I will assume it is Mr. Keenan speaking unless

15   Ms. Schmelzer identifies herself for the record.  And then

16   I believe we also have the proposed intervenor on the line

17   and I will hear appearances for the proposed intervenor.

18            MR. TSEYTLIN:  Thank you, Your Honor.  This is

19   Misha Tseytlin for the proposed intervenor, Wisconsin

20   Legislature.  Also on the phone is Eric McLeod.  And I

21   will be doing the speaking for the Legislature.

22            THE COURT:  Same set of rules for you: If anyone

23   else is speaking on behalf of the proposed intervenor,

24   they should indicate who they are for the record.

25            Finally, I know that we have members of the press on

1    the call which we are accommodating for purposes of this

2    telephonic conference.  Just a reminder that there is a

3    general policy against recording these hearings, whether

4    in person or on the phone.  And so you're welcome to make

5    all the notes you wish to, but a recording is a violation

6    of the court's rules.

7         With that said, I'm going to start with the

8    defendants to get a better understanding as to just where

9    we are as of today.  And then I want to assure both sides,

10   as well as the proposed intervenor --

11        There seems to be a lot of background noise.  If

12   anyone has not put their phone on mute, they should do so

13   now.  If we continue to have noise issues, we'll have to

14   deal with it a different way, but it sounds much better.

15   And if you're not being called on to speak, it should be

16   on mute.

17        I was going to assure both the plaintiffs and the

18   proposed intervenor that they will have an opportunity to

19   address all issues, including, to the extent they care to,

20   standing issues and the right of the intervenors to

21   actually be allowed to intervene.  But I'm focused, for

22   the immediate discussion, on the defendants answering some

23   specific questions about where we are actually.  And I'm

24   hoping that either you, Mr. Keenan, or Ms. Schmelzer can

25   help the Court in that regard.

1        Is it correct that yesterday was the deadline for

2   individuals to get an absentee ballot online or by mail

3   request if they are not already registered voters?

4           MR. KEENAN:  Yes, I believe, because yesterday

5   was the deadline for registering by mail or online, so I

6   don't know that you could request an absentee ballot if

7   you weren't registered.

8           THE COURT:  But you could still go into a clerk's

9   office and register and get an absentee ballot until April

10  2nd; is that right?

11          MR. KEENAN:  I believe so, yes, you can go in and

12  get an absentee ballot.  And if you're already registered,

13  you can still request the absentee ballot online.

14          THE COURT:  Yes, and we haven't gotten to that

15  yet.  I just wanted to confirm, is there a cutoff date for

16  getting an absentee ballot if you do it in person before a

17  clerk, is there a date by which that has to occur and is

18  it April 2nd?

19          MR. KEENAN:  There is.  And, you know, I'm not

20  sure what the law is.

21          THE COURT:  I'm going to speak to plaintiffs'

22  counsel in a minute, who hopefully can add any corrections

23  or additions.  But you believe there's some date before

24  April 7th that you're no longer able to register except on

25  the day of the election itself, correct?

1        MR. KEENAN:  Yeah.  I think -- I believe it

2  either was the Thursday or Friday before the election I

3  think and then you'd have to wait until the Election Day

4  to go to the polling place and register.

5        THE COURT:  All right.  And if you are registered

6  or you register in person with the clerk, you can still

7  get an absentee ballot online or by requesting one in the

8  mail until April 2nd; is that right?

9        MR. KEENAN:  Yes, I believe so.

10        THE COURT:  All right.  And then finally, there

11  is a hard deadline for receipt of the absentee ballots of

12  April 7th; is that correct?  So if an absentee ballot

13  arrived on April 8th, it would not be counted?

14        MR. KEENAN:  Yes, that's correct, under the laws.

15        THE COURT:  All right.  Then, Mr. Spiva, or

16  whoever else you want to address this question, any of

17  those general representations that are incorrect or that

18  you can supplement without going into any argument yet?

19        MR. SPIVA:  I believe, Your Honor, I was looking

20  at my notes and I think all of them were correct.  The one

21  thing I would say, I'm not sure he may have been answering

22  a different question, but I know -- strike that.  I

23  believe all of those were correct, Your Honor.

24        THE COURT:  And do you know what the deadline --

25  I'm sorry.  Do you know what the deadline is for obtaining

1   an absentee ballot in person from a clerk?

2        MR. SPIVA:  I believe it is the Friday before the

3   election, so that deadline, in terms of date, would be the

4   3rd of April.  And if one of my colleagues believes I'm in

5   error on that, please -- I'm pretty sure that's right.

6        THE COURT:  You're definitely right about April

7   3rd being a Friday, so let's work with that, since there

8   doesn't seem to be any disagreement and I don't think it's

9   likely to be material to the present TRO motion.

10     Then the second set of questions is I understand the

11  Commission met earlier today, or maybe it was late

12  yesterday, but have any of those dates -- has there been

13  any relief provided from any of the dates we've just

14  discussed, as far as defendants are aware of?

15       MR. KEENAN:  I'm not aware of any relief from

16  those dates, you know, at the present time.

17       THE COURT:  And do you anticipate any of those

18  dates changing, absent action by a federal court?

19       MR. KEENAN:  Well, we know that the Governor is

20  considering an executive order.  I don't know -- I'm not

21  part of that matter, but there may be something along

22  those lines.  I don't know what the context of that would

23  be specifically or, you know, exactly what would happen,

24  but I know that is being considered.

25       THE COURT:  And are you aware of any specific

1  statutory power that the Governor would have to either

2  alter those dates or alter the date of the election

3  itself?  Beyond the general powers that he might claim, is

4  there any statute authorizing moving an election date?

5       MR. KEENAN:  You know, I don't know if there's a

6  specific statute on elections.  I think it would be more

7  under like general health-emergency-type powers.

8       THE COURT:  And absent that, it would, I would

9  assume, be up to both the Legislature and the Governor to

10 move the date or does the Legislature have independent --

11      MR. KEENAN:  Yes, I believe so.

12      THE COURT:  -- does the Legislature have

13 independent power to move an election date without the

14 Governor approving it?

15      MR. KEENAN:  I was thinking that -- you know,

16 these things are in statute, but I think it has to be a

17 new law that would have to be passed by the Legislature

18 and the Governor.  Although I guess if Mr. Spiva

19 disagrees, he can let us know, but I think it would be a

20 new law.

21      THE COURT:  All right.  Mr. Spiva, any

22 corrections to those statements?

23      MR. SPIVA:  No corrections, Your Honor.  We did

24 look, when we were preparing to file this, to see whether

25 there were emergency powers of the Governor, as there are

1   in some states, to suspend state statutes and we didn't

2   find such an authority.  We found an authority that would

3   allow them to I think suspend administrative rules, but we

4   did not at least uncover anything that would give him the

5   authority to suspend or alter state statutes.

6          THE COURT:  All right.  Then let me direct these

7   next questions to plaintiffs.  Of the materials that

8   you've provided to me, is there any evidence that the

9   coronavirus has impacted someone's ability to go online

10  and register, or I should say to request a ballot online

11  or by mail, before March 18?

12         MR. SPIVA:  Well --

13         THE COURT:  I guess other than the fact that the

14  Madison Library closed yesterday or the day before.

15         MR. SPIVA:  Yeah.  I guess I don't know if Your

16  Honor considered this evidence, but we did have all of the

17  information in there, you know, backed up by documents

18  that, you know, the Governor issued an executive order

19  telling people to stay home, not to gather in groups of

20  more than ten.

21         THE COURT:  I'm sorry.  I'm missing your point.

22  You wouldn't need to gather in a group of more than ten to

23  go online and/or mail in a request for an absentee ballot

24  if you're not yet registered, would you?

25         MR. SPIVA:  You would not, Your Honor, but you

1   would, to register online, you would need to provide, or

2   by mail, you would need to provide proof of residency.

3              THE COURT:  Right.  And that's a fine point,

4   Mr. Spiva, but it gets me back to the question: Do you

5   have any evidence that that was inhibited on or before

6   March 18 by the coronavirus?

7              MR. SPIVA:  Well, only I guess what I'd call

8   circumstantial evidence, Your Honor, which is that all the

9   types of places people are being told to stay home from

10  work so they don't have access to their work, you know,

11  printers and scanners.  They're being told not to go down

12  the street to the Kinko's where they might have made

13  copies of the various types of documents that can serve as

14  proof of residence.  We don't have any -- we don't have

15  any survey evidence of how much people -- sorry.

16             THE COURT:  Yeah.  And you also don't have any

17  anecdotal evidence.  You don't have any affidavit from

18  anyone who says they stayed home and they were planning on

19  going online by March 18, correct?

20             MR. SPIVA:  I think what we have is the opposite,

21  Your Honor, which is that a lot of people have, in past

22  elections, relied on same-day registration on Election

23  Day.

24             THE COURT:  That's my point.  That's my point.

25  That's what we're really talking about here, isn't it,

 1   your concerns as to whether or not there will be problems

 2   with people either being afraid to appear on Election Day,

 3   as they had planned to, or long lines with people

 4   separated by six feet or more, as we saw on television in

 5   some states, that will inhibit them to vote on Election

 6   Day.  That's what you're -- that's what the evidence

 7   you've offered so far goes to, correct?  Because the only

 8   information I have about registration on or before March

 9   18 seems to be that it's very much in keeping with

10   registration in past elections, spring primary elections.

11   And that, you provided me.

12           MR. SPIVA:  We did, Your Honor, and it's way up,

13   I think, is the crux of it, suggesting that people are

14   increasingly concerned about going to the polls.  But I

15   don't disagree with Your Honor's characterization that the

16   fear is that, you know, people will not -- will be afraid

17   to go to the polls on Election Day or to go to the Clerk's

18   Office or a satellite location in those municipalities

19   that have them and to vote in person early.  And that

20   would be consistent with the guidance and the orders that

21   they've gotten from the Governor and their employers and

22   everybody else.  I mean, it would actually, to do that,

23   would actually be inconsistent with what the best advice

24   and guidance out there is from, you know, the Governor and

25   Public Health officials.

1          THE COURT:  And the relief that you're seeking on

2     behalf of those who are not yet registered is to extend

3     the March 18 deadline now that, and each day I suppose

4     it's increasingly clear, that there are risks and indeed

5     there are directions to people to stay home; that's the

6     principle relief you're looking for in your TRO?

7          MR. SPIVA:  In terms of the registration issue,

8     yes, Your Honor.

9          THE COURT:  Well, we'll come to the other ones.

10    Go ahead.

11         MR. SPIVA:  I was just going to say yes, Your

12    Honor.

13         THE COURT:  The --

14         MR. SPIVA:  I'm sorry, Your Honor.  And it is to

15    suspend the requirement, I don't know if you considered

16    this separate from the question you just asked, but this

17    is also to suspend the proof of residency in connection

18    with the voter registration online or by mail and the

19    photo ID component for people requesting absentee ballots.

20    So that would be the other part of the relief we're asking

21    for.

22         THE COURT:  And my concern about that second part

23    is if I'm extending the date, assuming I were to do that,

24    it would be because people hadn't followed through, but

25    they would be given time to do it.  Your point being that

1  people aren't going to do it because they're being told to

2  stay home, so they should be relieved of the usual

3  obligations of registering to vote.

4       MR. SPIVA:  The usual obligations in the sense of

5  providing documentary proof of residency, Your Honor.  But

6  they would still have to make the certifications that they

7  are, you know, a bona fide resident of Wisconsin, give

8  their address, all that, you know, but in the sense of,

9  yes, we are asking that the proof of residency, the

10  documentary proof-of-residency requirement, be suspended,

11  yes.

12       THE COURT:  And that's been challenged already in

13  court, including documenting the difficulties for various

14  populations to achieve that.  But you're suggesting this

15  is yet another hurdle that they would -- that this

16  particular group of voters is going to face because of the

17  impacts of the coronavirus?

18       MR. SPIVA:  Yes.  If I might, Your Honor, because

19  I was counsel of record in the *One Wisconsin* case where we

20  did challenge, it is different in one sense in that what

21  we were challenging there was the extension of the

22  proof-of-residency requirement in connection with voter

23  registration beyond 20 days prior to the election.  It has

24  long been Wisconsin law that within 20 days of the

25  election, you had to show proof of residency.  And we lost

1    that challenge and that is up on appeal.

2        This is very different, number one, because we are

3    now asking for a suspension of proof of residency in

4    connection with electronic or by-mail registration even

5    within the 20 days and we're asking for it directly in

6    connection with a, you know, a worldwide pandemic that is

7    creating an emergency, the likes of perhaps which we've

8    never seen before.  It's certainly at least as serious as

9    the hurricane that many courts have found to provide good

10   reason to suspend requirements such as these.

11           THE COURT:  Although the ones -- when you say

12   "such as these," I thought the only relief that was

13   obtained was extending the registration by a week.  What

14   other relief are you referring to?

15           MR. SPIVA:  In the Florida --

16           THE COURT:  I'm sorry.  Go ahead.

17           MR. SPIVA:  I'm sorry, Your Honor.  I didn't mean

18   to interrupt.  In the Florida cases that we cite, yes,

19   Your Honor is correct, the issue at hand there was the

20   registration -- extending the registration deadline, but

21   there was no proof-of-residency requirement, I don't

22   believe, and here it's a different set of circumstances.

23   I mean, people have been, you know, shut out from the

24   usual means of being able to make the types of copies or

25   scans that they might otherwise.

1        I believe Judge Peterson had, in response to the

2   challenge that we brought before, said that that burden

3   was slight.  And I think that that's a fair point,

4   obviously we disagreed with him, but that's a fair point

5   under normal circumstances where people are going to work

6   or they could go to the Kinko's or the library, or what

7   have you.

8        But here we have a completely different circumstance

9   where everything is being shut down.  And indeed it would

10  be dangerous and foolhardy for somebody to undertake any

11  of those usual steps.  So the burden is no longer, under

12  these circumstances, anywhere close to slight.  It's

13  really quite substantial for people who don't have access

14  to printers and scanners.

15          THE COURT:  Mr. Spiva, your position with respect

16  to the two forms of relief being sought, why don't we

17  begin with the more straightforward one, which would be to

18  extend the date for seeking an absentee ballot for someone

19  who's not registered online or by mail.

20          MR. SPIVA:  Yes, Your Honor.

21          THE COURT:  I'm sorry, I meant to hear from

22  defendants, Mr. Keenan.

23          MR. KEENAN:  Well, I think the one issue with

24  respect to online registration is that the system has been

25  taken offline per like when it was supposed to be taken

1  offline, so it's not up and running now, so someone going

2  to that site isn't going to be able to register.

3      And secondly, I think that in discussions with my

4  client, you know, just before this call, they informed me

5  that it's not like as simple as flipping a switch to turn

6  that system back on, that basically what happens is you

7  can only register online if you have a Wisconsin driver's

8  license or identification card.

9      And what happens is the MyVote site connects with the

10  DMV database to verify your address.  And when you

11  register online, you don't actually have to show proof of

12  residence because you can only register online if your

13  address matches what the DMV has and then that serves as

14  your proof of residence.

15      And so the link between those databases has been now

16  cut and so it would need to be reinstated.  But what I've

17  been told is that it's not as simple as flipping a switch,

18  that there would have to be a lot of testing and work done

19  to like get those two back connected together to make sure

20  it actually is working.

21          THE COURT:  So if I ordered -- hang on a

22  second -- so if I ordered it to be extended one week, I

23  may actually order -- have to order it for ten days to

24  give you time to get it back up and running?

25          MR. KEENAN:  Yeah.  There could be time that

1 would be required to be able to like get this thing back

2 up and running.

3         THE COURT:  Can you advise -- confirm the amount

4 of time that would be needed and provide me in writing a

5 statement, if not by the end of the day today, than by

6 noon tomorrow?

7         MR. KEENAN:  Yeah, I can do that.

8         THE COURT:  Preferably in the form of a

9 declaration.

10        MR. KEENAN:  Okay.

11        THE COURT:  The second -- well, I didn't mean

12 to -- I assume there are going to be some other

13 consequences.  What is entailed in reviewing the

14 application of an online or mail request where a person

15 isn't registered?

16        MR. KEENAN:  Well, I think the person has to

17 register first and then they can request the ballot.  The

18 online request for the ballot, if you're registered at the

19 polling site --

20        THE COURT:  Then it's my misstatement.  Let me

21 ask it a different way.  You had until March 18 to

22 register online or by mail if you're not already

23 registered; is that correct?

24        MR. KEENAN:  Yes, that's correct.

25        THE COURT:  So you're still -- I assume the

1   Commission or someone assigned the task is still reviewing

2   people who made a timely request to be registered or have

3   those all been cleared already?

4           MR. KEENAN:  I think the online ones are pretty

5   much -- they're cleared online and so those are done.

6           THE COURT:  All right.

7           MR. KEENAN:  And then if you can't register

8   online, there's some sort of problem, then you have to go

9   the mail route.  Those will go to the individual clerks of

10  whatever village or city you're in and they would be the

11  ones processing those applications.

12      I would note that the deadline is that it has to be

13  postmarked by March 18th, so there may be some that are in

14  the mail right now that will eventually end up at a

15  clerk's office.

16          THE COURT:  And are they mailed directly to the

17  local clerk?

18          MR. KEENAN:  Yes.

19          THE COURT:  Okay.  That's helpful.  But the

20  online, the Commission essentially can clear upon receipt.

21  And is it the Commissioner who clears the online

22  application --

23          MR. KEENAN:  Yes.

24          THE COURT:  -- applicants?

25          MR. KEENAN:  I believe the Commission runs the

1  website and the website clears them and then it goes --

2  kind of gets pushed to the local clerks.

3           THE COURT:  All right.  Then I guess what I would

4  like by noon tomorrow is a declaration both as to the time

5  it would take to get back online and to clear online

6  registration.  And if you're able to provide some

7  information as to what it would entail for the clerks to

8  continue to consider online and mail registration, I

9  should say mail registration, that would be helpful as

10 well.

11          MR. KEENAN:  Okay.

12          THE COURT:  There is this second question about

13 relief from the requirements of ID, photo ID, and proof of

14 residency in light of the coronavirus and the potential

15 for contracting COVID-19.  Do you have any response to

16 those requests on behalf of the Commission, or

17 Commissioners, I should say?

18          MR. KEENAN:  Yes.  So I think, as I mentioned

19 earlier, you don't need to submit a proof of residence

20 online because it's -- it functions through a DMV -- with

21 the DMV and it verifies your address with DMV and connects

22 to your driver's license number, then you're registered.

23      So the people that will be submitting a voter

24 registration request by mail, I mean, they're likely going

25 to have to print out their request and send it in.  And if

1  they can print out the form to send it in, we think they

2  probably can print out a bank statement or a utility bill

3  or some of these other forms of proof of residence.

4      And we're just not sure the universe of people that

5  would be able to kind of make the registration request to

6  their local clerk by mail, but couldn't get one of the

7  forms of proof of residence in the same envelope.  You

8  know, there's not a lot of evidence on that.  And we

9  think, you know, at least some people are going to be

10  able -- definitely are going to be able to print out their

11  utility bills, and whatnot, to show they're a resident.

12  So we think it is possible for many people to do it and I

13  just don't know that the plaintiffs have shown a lot about

14  like how many people are really burdened by that

15  requirement.

16          THE COURT:  If you don't have a driver's license,

17  how would you provide, or are you required to provide,

18  photo identification in either an online or by-mail

19  request?

20          MR. KEENAN:  So the -- yeah.  So that's a

21  separate requirement for just an absentee ballot request.

22  The first time you vote absentee, you need to provide

23  proof of -- the photo ID proof.  If you've already

24  provided that once, you don't have to provide it again.

25  So this relates to people who are requesting absentee

1  ballots for the first time.

2      If you do it online, what you can do is you submit

3  the form online and you can upload -- basically you could

4  take a picture of your ID on your phone and then you can

5  upload that picture to your application basically and

6  submit it to the website and then you're good to go.

7      So there's a -- I would think that a majority of

8  people that are able to access the website to request an

9  absentee ballot will probably be able to do that.  And to

10  the extent of people not being able to do that, it would

11  be a little bit uncertain.  People who are mailing it in

12  would have to provide a copy of the driver's license with

13  the application if it's their first time requesting an

14  absentee ballot.

15          THE COURT:  Let me ask -- go ahead, Mr. Keenan.

16          MR. KEENAN:  I was just going to say, in terms of

17  the evidence, I don't know how much evidence there is

18  about like how hard it would be to get a copy like that

19  and how many people would be affected.  But that would be,

20  you know, you would have to provide a copy of the ID to

21  submit that request by mail.

22          THE COURT:  And would that be true even if you

23  had a driver's license, a Wisconsin driver's license?

24          MR. KEENAN:  Yeah.  If you have a Wisconsin

25  driver's license, that sort of like automatically

1   registers you to vote, but you still need to provide it

2   with the absentee ballot application.

3           THE COURT:  Unless you'd applied before.

4           MR. KEENAN:  Yes.  If you've already provided it

5   once, then you don't have to provide it again.

6           THE COURT:  But if we're principally concerned

7   about a group of individuals who hadn't been thinking

8   about voting online and are not -- or registering online

9   and they're now thinking that the lines are going to be

10  long and it's going to be difficult, they would have to

11  provide some form of photo ID, because they presumably,

12  for the most part, hadn't done absentee voting before.

13          MR. KEENAN:  Yes.  If you haven't done absentee

14  voting before, you're going to have to provide it.

15          THE COURT:  All right.  I'm going to give you a

16  chance to at least address briefly whether you have a

17  different view of the burden on the plaintiffs here to get

18  any of the relief then laid out in the brief by the

19  plaintiffs.

20      You've indicated, for example, you don't think

21  they've met their burden of showing the difficulty of

22  electronic or by-mail registration and/or providing a

23  photo identification.  But are you in agreement that's

24  generally a balancing test under the *Anderson-Burdick*

25  balance that this court is required to make?

1        MR. KEENAN:  Yeah, I think that's a correct legal

2   standard would be like the *Anderson-Burdick* test would be

3   what would apply to the claim.

4        THE COURT:  And anything you want to add,

5   understanding that you've only had this for less than a --

6   well, I guess it's almost a full 24 hours since it was

7   filed.  I'm not sure how long you've had to actually look

8   at it.  But anything you want to respond to in terms of

9   the briefing itself?

10        MR. KEENAN:  Not at this point other than what

11   I've said.  I guess we have only had maybe like a half a

12   day to be with it, so I think that's what we've come up

13   with so far.

14        THE COURT:  And how soon could you get in a

15   written response?

16        MR. KEENAN:  So I was talking with my colleagues

17   about that and wondering whether we can -- I know that

18   time is of the essence, so I was thinking maybe by the end

19   of the day tomorrow.  But then I was sort of wondering if

20   I was setting a deadline then that we wouldn't be able to

21   meet.  But I think definitely by Monday we could have

22   something.

23        THE COURT:  And I'm afraid that, as you say,

24   given the shortness of time and the fact that there's

25   going to be a delay for getting anything back online if I

1  decide something may be appropriate in terms of relief,

2  that might be too short of time.

3      This probably is a good time to bring in the

4  intervenors, proposed intervenors.  In your submission to

5  the court, I believe that you suggested a quicker

6  turnaround time if you were allowed to make a submission.

7  When could you have something to me in writing?

8      MR. TSEYTLIN:  Thank you, Your Honor.  We did

9  indicate in the letter to you that, if necessary, we could

10 have something by 11:59 tonight.  I heard AG Keenan

11 suggest close of business on Friday.  That would obviously

12 be easier for us and it would probably be a more polished

13 product.  But certainly by Friday, close of business, we

14 could have a polished product to you.  But, if necessary,

15 we could get it by 11:59 tonight.

16      THE COURT:  Well, here's what I'm going to do:

17 I would ask that, because there's a question as to whether

18 the Wisconsin State Legislature should be allowed to

19 intervene, that you get something on file by noon

20 tomorrow.

21      MR. TSEYTLIN:  Absolutely.

22      THE COURT:  And I'll give the state until 3 p.m.

23 If the parties can file something more polished by 5 p.m.

24 tomorrow and I haven't already decided, I'll certainly

25 consider it.  But I feel as though I'm going to need to

1   act one way or the other on fairly strict timelines.  So

2   you may both have until 3 p.m. -- well, intervenors may

3   have until noon tomorrow.  The State -- or the

4   Commissioners may have until 3 p.m. tomorrow to file

5   something in writing in response.

6        I do want to give you an opportunity, Mr. Tseytlin,

7   to address some of the issues that have been already

8   discussed with the parties, and I'll give plaintiff a

9   chance to respond to both, with the understanding that I'm

10   essentially treating you now as appearing as *amicus curiae*

11   to the Court.

12        My concern about the State Legislature stepping in

13   has been expressed in earlier cases by this court and by

14   the Seventh Circuit and that has to do with whether there

15   really is a separate interest.  But I'm aware of the

16   statute recently passed by the State Legislature that

17   anticipates that question, as has already been held.

18   That's more a question -- that statute has more

19   application in state court than federal court.

20        It struck me that the obvious party to step in would

21   be the Republican Party and so I'm a little surprised that

22   the Legislature decided to step in rather than the party

23   that clearly has an interest in the election.  But with

24   that said, I'll hear anything that you want to add at this

25   point.

1          MR. TSEYTLIN:  Well, first --

2          MR. SPIVA:  Your Honor, just one second.  This is

3    Bruce Spiva.  If something I said may have -- there is one

4    more form of relief that we've requested and I just wanted

5    to --

6          THE COURT:  Yeah.  You're not -- Mr. Spiva, I've

7    told you I would give you an opportunity to respond.  And

8    I'm aware of the fact that -- I'm aware of the fact that

9    your complaint seeks other relief.  That has not been

10   missed by the Court and you will get a chance to respond.

11         MR. SPIVA:  Yes, Your Honor.

12         THE COURT:  But we're on a telephone call --

13         MR. SPIVA:  Yes, Your Honor.

14         THE COURT:  -- and you are not to interrupt.  I

15   will give everyone a chance to make the points they wish,

16   but I'm organizing this deliberately.

17      And with that said, Mr. Tseytlin, you have the floor.

18         MR. TSEYTLIN:  Thank you, Your Honor.  Just very

19   briefly about our intervention.  And I believe Your

20   Honor's decision in the *Planned Parenthood* case and the

21   Seventh Circuit's decision affirming it on appeal puts a

22   great amount of weight on whether the Attorney General

23   would actually defend the statutes at issue.

24      We are -- we do not know, especially given the

25   emergency posture, what position the Attorney General will

1    take, especially since it is my understanding that the

2    Election Commissioners at the hearing yesterday expressed

3    divergent views on several of the issues that are raised

4    in plaintiffs' complaint.  So we certainly -- the

5    intervention motion and whether it's mandatory or

6    permissive, et cetera, will turn a good deal as to whether

7    the Attorney General will in fact defend all of the laws

8    here.  Now --

9           THE COURT:  Having said that, in fairness to you,

10   Mr. Tseytlin, we probably won't know that by the time

11   you're filing.  If you want to file by the end of the

12   day -- well, actually, I can't really -- if you want to

13   have any word, I'm just going to keep you at noon.

14   Obviously, whatever is filed by the State at 3 p.m. may

15   have some impact as to the need for you to intervene, but

16   I will consider it as *amicus*, regardless.

17       I haven't heard the Attorney General abandon the

18   enforceability of any of these provisions.  Maybe the only

19   place where there would be a departure would be on the

20   application of the *Anderson-Burdick* balancing test, but

21   even there I'm not hearing a substantial difference.  But

22   I am willing to hear you now in terms of your general

23   position.

24          MR. TSEYTLIN:  Yes, Your Honor.  So just a couple

25   of points that struck us upon reading the plaintiffs'

1   submission.  One is that they do have a heavy burden on

2   all of the prongs and they have a heavy burden under

3   *Anderson-Burdick*.  And they did not, as Your Honor noted,

4   submit a single declaration from a single voter noting any

5   burden, any of the practical things that have been

6   discussed by counsel.

7        A lot of the things that they said in their uncited

8   claims appear to be just factually false.  For example,

9   claims that there are shelter-in-place orders in

10  Wisconsin, there's absolutely no citation to that.  And

11  claims about FedEx and UPS print stores being closed, no

12  citation to that.  That appears to be contrary to what's

13  on the publicly-available websites of those companies.

14       And so I think that they -- even if in abstract in

15  other cases courts have ordered interim relief based on

16  public disasters, those always have been after substantial

17  evidence that has been submitted.  And I would

18  respectfully submit that there's virtually no evidence

19  they've submitted to support they're oppressed.

20            THE COURT:  Mr. Tseytlin, that's why I tried to

21  focus on Election Day itself, because I think we would be

22  pollyannaish -- the Court would be pollyannaish not to

23  think that there is going to be some substantial

24  difficulty in manning the polls.  You know, just from my

25  own anecdotal experience, but I think it's true across the

1  state, we tend to rely on the elderly to man those polls,

2  for the most part.

3      I note that there was some statement that the

4  Commissioners have made efforts to try to get clerk's

5  offices to step up and fill a greater role on Election

6  Day, which is admirable.  But there will certainly be

7  impacts on individuals who will make the choice.  In fact,

8  if the past few days is any indication, perhaps more then

9  the choice to stay home and not get in a queue to vote.

10      So I give some credence to the reality, as we've seen

11  in other states already in recent elections, that there's

12  going to be difficulty if we get a good turnout on the day

13  of the election and that the calculus for the average

14  voter has changed in terms of whether they may want to

15  take advantage of early registration.

16      But I don't disagree with you in terms of the impacts

17  so far.  They may not have been as severe as suggested by

18  the plaintiffs in their unsupported statements.

19          MR. TSEYTLIN:  Thank you for that, Your Honor.  A

20  little bit more on that.  We did have an Election Day two

21  days ago where the CDC issued its guidance, which is very

22  similar to Governor Ever's guidance on Monday: more than

23  10 people not gathering.  The very next day, three

24  different states of different political persuasions, at

25  least in terms of their leadership, held elections.  And

1  in one state --

2       THE COURT:  And we saw, as I said, some

3  substantial lines, including people trying to stand more

4  than six feet apart from each other, which really created

5  some long lines.  I don't disagree that elections took

6  place, but I'm not sure that it would be unreasonable,

7  under a balancing test, to assume that there are going to

8  be people who are impacted who may want to take advantage

9  of online registration if we extended it for a short

10  period of time.

11       MR. TSEYTLIN:  That's a fair point, Your Honor,

12  but just a couple of things about that.  One is I do think

13  that's generally, although not exclusively, a policy

14  choice that different states are making.  It's a very

15  sensitive judgment how to balance the interest of

16  democracy and election security, on one hand, with public

17  safety on the other hand.  I would respectfully submit

18  that the elected officials and their appointees are, as a

19  general matter, in a better position to make those

20  judgments rather than, with respect, the federal court.

21       THE COURT:  Is there anyone who -- I certainly

22  agree that, as a general matter, that's true.  The reason

23  for my questions of the parties was I'm not sure who can

24  effectively do that at the state level.  I assume you

25  don't think that the Governor has the power to do that by

1  executive order.

2      MR. TSEYTLIN:  We do not.

3      THE COURT:  And the Legislature clearly has

4  indicated that they're opposed to any change, by virtue of

5  your representing them here.  And it sounds like the

6  Commissioners are split, almost by design, since they're

7  appointed, without any way of breaking a tie vote.

8    So I'm concerned about who's looking out for the

9  voters' interests when it's really the Commissioners are

10  the only one who would have the power to do something in

11  the near term and they're not.

12      MR. TSEYTLIN:  Well, I mean, I give respect to

13  all of the defendants, the Commissioner.  I'm sure that

14  they are each doing what they think is best.  My

15  understanding from the meeting yesterday is they reached

16  consensus on several issues.

17      THE COURT:  But as we just heard -- but as we

18  just heard, not on relieving any of the deadlines in light

19  of the likely impact of the coronavirus and the

20  possibility of actually achieving -- or getting COVID-19.

21  There was no consensus on taking any steps.  And in fact,

22  if I understand it, the consensus was that there's nothing

23  that can be done by the Commission in terms of the

24  statutory deadlines, which I assume is your position as

25  well.

1          MR. TSEYTLIN:  That's correct, Your Honor, but

2   that is a public policy judgment.  And I would like to --

3   to kind of raise the Purcell Principle, which is a bedrock

4   principle from the U.S. Supreme Court, that election rules

5   should not be changed in the middle of an election.

6          THE COURT:  But isn't that exactly what happened

7   in Florida and Georgia because of the impacts of a

8   hurricane?  And although these are very different impacts,

9   I'm not sure that they're not every bit as difficult.  In

10  fact, you could argue that the entire country has been

11  impacted, not just one part of the country.

12         MR. TSEYTLIN:  And I will say we took a brief

13  look at those cases and there was significant documentary

14  evidence submitted in those cases to support the relief

15  and extraordinary step of changing election rules after

16  Election Day.  And those were all District Court decisions

17  and the Purcell Principle is from U.S. Supreme Court.

18      And when there were proposed changes to Wisconsin's

19  voter ID through litigation a couple years ago right

20  before the election, it was decided, under the Purcell

21  Principle, that there should not be change,

22  notwithstanding the arguments there.

23      And I do think that even if the Court does not take

24  the Purcell Principle as a bright-line rule, I would at

25  least, under the language of the Supreme Court in the

1   *Purcell v. Gonzalez* case, 549 U.S. 1, suggests that it is

2   pretty close to a bright-line rule.  It should at least be

3   treated as a very strong presumption.

4        And I understand that, you know, we have all seen

5   what we have seen about what happened on Tuesday in the

6   states that decided to have in-person absentee --

7   in-person voting.  I think different people have different

8   impressions of how that worked, maybe based on the news

9   coverage they were watching, which is why it is so

10  important I think to have an extraordinary order that

11  changes the rules of the game in the middle of the

12  election to be, at minimum, based upon competent submitted

13  evidence and not entire speculation.

14       The Seventh Circuit has made clear that in order to

15  have a facial invalidation of statutes even you need a

16  very high burden.  But even on the as-applied one, a

17  narrower one like they had suggested in *Frank II*, the

18  voter ID case, to be possible, there would need to be

19  evidentiary showings with regard to specific voters having

20  problems.

21       And I do understand that there is an intuition that

22  some may have about problems that could arise or have

23  arisen in other states.  But I think that, as a legal

24  matter, the plaintiffs, who are very sophisticated

25  counsel, did not submit any sort of evidence like that and

1    I don't think it's legally permissible to grant them

2    relief on the record that they have chosen to build.

3              THE COURT:  All right.  Mr. Spiva, I said I would

4    give you an opportunity to respond and so I shall.

5              MR. SPIVA:  Thank you, Your Honor.  And I

6    apologize again.  I didn't mean to --

7              THE COURT:  There's no need to apologize.  This

8    is your time.  Any response you have, you should make it.

9              MR. SPIVA:  Okay.  Thank you, Your Honor.  Yes.

10   First, on the *Purcell* issue, I think here the Purcell

11   Principle actually cuts absolutely the opposite way.  And

12   the gravity that the Legislature's counsel refers to in

13   his letter to the Court this morning is that changing

14   election laws in the middle of an ongoing election is

15   problematic under *Purcell*.  But there the Supreme Court

16   was concerned that conflicting orders or orders right

17   before the election can themselves result in voter

18   confusion and incentive to remain away from the polls.

19        Here the confusion has been caused not by a court

20   order, nor would it be, but by COVID-19.  Wisconsin's

21   voters reasonably expected, based on Wisconsin law, that

22   they would be able to safely register in person until the

23   Friday before the election or at the polls themselves on

24   Election Day.  Now they can't, not because of a court

25   order, but because of the pandemic.  And so if Your Honor

1  grants the relief that we are seeking, it would actually

2  have the opposite effect in allowing people to be able to

3  vote who now can't because of the emergency.

4      My colleague, Mr. Tseytlin, mentioned that it's

5  better to -- that some states did go ahead with their

6  elections, yet Your Honor noted that there were problems

7  there.  And things are changing by the minute.  And

8  several states, including Ohio, did postpone their

9  elections and several more have since done that: in

10  Georgia, in Connecticut, in Louisiana.  All over the

11  country elections are being postponed because of this.

12  But here there's another option, which would be to allow

13  people to vote absentee and then remove some of the

14  barriers that might prevent them from voting.

15      I know that counsel has referred to a, you know, a

16  lack of evidence.  But, you know, in Exhibit 1 we have a

17  statement from the Department of Health Services of

18  Wisconsin not only for there being not gatherings of ten

19  or more people, but closing bars and restaurants, closing

20  the schools.  I mean, these are things that I know Your

21  Honor is well aware of.

22      And so in these very quickly, rapidly evolving

23  circumstances, I guess it's not surprising that we --

24  we're not able to come with a specific declaration from a

25  specific voter given that so many of us, you know -- I

1  mean, we're all -- I think even the fact that we're all

2  doing this argument from our basements, you know, suggests

3  that people are in a situation that they didn't anticipate

4  even a week ago, maybe even a few days ago.  And so I

5  think that the lack of a specific declaration, you know,

6  should be excused because the Court can take notice of

7  what's going on all around it.

8       And then finally, Your Honor, if I might address the

9  Election -- the Election Day receipt relief that we did

10  request.  And that really, and I won't repeat the papers,

11  Your Honor --

12          THE COURT:  It has to do with not rejecting

13  ballots that may be received and not postmarked on or

14  before the Election Day.

15          MR. SPIVA:  That's correct, Your Honor.  That's

16  correct.  And there's been a massive surge already of

17  by-mail voting.  There likely will -- that will continue

18  and accelerate, given the circumstances.  And that will I

19  think -- that will cause problems with delivery.

20          THE COURT:  Wouldn't it make more sense for me to

21  just address that when we actually have the numbers, that

22  is, how to -- to see how many people -- additional people

23  actually requested, assuming I gave any further relief?

24       I mean, it sounds like, based on the numbers, there's

25  not going to be a problem with registrations.  But if

1   you're able to demonstrate that local clerk's offices are

2   inundated and aren't going to be able to get through

3   current absentee requests, then you would have some

4   evidence.  But, at minimum, I would know before the

5   election date whether there's likely to be a tsunami of

6   absentee ballots coming in after the fact, because we'll

7   know how many actually were received that day.  I just

8   don't understand why I would take up that -- I don't

9   understand why I would take up that matter without better

10  evidence since we can wait on that.

11         MR. SPIVA:  Well, Your Honor, I think I don't

12  necessarily disagree, if I'm understanding Your Honor

13  correctly.  Certainly we'll know after, you know, 8 p.m.

14  on Election Day, we'll ultimately know how many ballots

15  come through after that point.  I think you may not know

16  until after that point though because of what's going on

17  with the mail --

18         THE COURT:  So what?  So what?  Why wouldn't I

19  just give relief then that those ballots have to be

20  compounded and included in the final numbers?

21         MR. SPIVA:  Well, yes, Your Honor, I think that

22  certainly would be --

23         THE COURT:  Prudent?  Does the word "prudent"

24  arise?  I mean, I just -- I don't know why I would decide

25  that now and I don't know why you're pressing it now,

1  because you haven't -- there isn't any evidence to support

2  that it's going to be an issue yet.

3         MR. SPIVA:  The only thing I would say, Your

4  Honor -- I mean, I take Your Honor's point, I think it's a

5  fair point -- is that it would give some clarity to the

6  election officials as to whether or not and for how long

7  they needed to count absentee ballots for those that are

8  received after 8 p.m. on Election Day.  That's the only

9  response that I have to Your Honor's question, which again

10 I say is a fair point.  We certainly would argue that you

11 have the authority and I think you should extend the

12 deadline at, you know, at that point if you haven't done

13 so before then.

14        THE COURT:  Mr. Spiva, understanding that you'll

15 have an opportunity to respond in writing by 3 p.m.

16 tomorrow, anything else that you want to add at this

17 point?

18        MR. KEENAN:  You mean Mr. Keenan?

19        THE COURT:  I'm sorry.  I keep doing that.  Yeah,

20 Mr. Keenan, anything else that you want to add at this

21 point?

22        MR. KEENAN:  No, I don't think so.  I would agree

23 with Your Honor's point about that, you know, we can see

24 what the number of post-Election-Day absentee ballots

25 actually is and whether it would affect any elections

 1  later on.  I don't think there's a reason to address this

 2  now.  But other than that, I have nothing more.

 3          THE COURT:  And, Mr. Tseytlin, anything else you

 4  want to add, understanding you'll have until noon tomorrow

 5  to respond in writing?

 6          MR. TSEYTLIN:  Nothing further, Your Honor.  We

 7  greatly appreciate that you allowed us to speak too, even

 8  though we are just proposed intervenors.

 9          THE COURT:  Mr. Spiva, back to you.  Anything

10  else you want to add before I close this hearing?

11          MR. SPIVA:  Only one other thing, Your Honor,

12  because I neglected to say it when I first started talking

13  after proposed intervenors, is we obviously oppose the

14  intervention.  And we think, pursuant to the *Planned*

15  *Parenthood of Wisconsin v. Kaul* case that Your Honor

16  decided initially and was affirmed by the Seventh Circuit,

17  that there is no basis for intervention here.

18          THE COURT:  And we'll see.  Obviously, with the

19  submissions by the Attorney General, we'll have a better

20  understanding of that question as well.

21      Regardless, I want to thank all for their assembling

22  quickly and providing insights that are helpful to me in

23  trying to decide the current motions before me.  I will

24  await written submissions and try to issue a prompt order

25  and consider what other steps are required in this case as

1  soon as I'm able.

2      Unless there's something more from any of the

3  parties, we'll close this argument and I'll await other

4  submissions.  Thank you all.  We are off the record and

5  adjourned.

6      (Adjourned at 4:12 p.m.)

7                              ***

8      I, CHERYL A. SEEMAN, Certified Realtime and Merit

9  Reporter, in and for the State of Wisconsin, certify that

10  the foregoing is a true and accurate record of the

11  proceedings held on the 19th day of March, 2020, before

12  the Honorable William M. Conley, of the Western District

13  of Wisconsin, in my presence and reduced to writing in

14  accordance with my stenographic notes made at said time

15  and place.

16  Dated this 25th day of March, 2019.

17

18

19                      _____
                                /s/

20                      Cheryl A. Seeman, RMR, CRR
                        Federal Court Reporter

21

22

23  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means unless
24  under the direct control and/or direction of the
    certifying reporter.

25