IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, et al., | ) ) ) ) | |
| *Plaintiffs*, | ) ) ) ) ) ) ) | |
| v. | ) ) | Civil Action No: 20-cv-00249-wmc |
| MARGE BOSTELMANN, et al., | ) ) ) | |
| *Defendants*. | ) | |

**BRIEF OF *AMICI CURIAE* DISABILITY RIGHTS WISCONSIN,
ACLU OF WISCONSIN, AND WISCONSIN CONSERVATION VOICES
IN SUPPPORT OF PLAINTIFFS IN *LEWIS V. KNUDSON***

Wisconsin's government and citizens are responding to the serious public health implications of COVID-19 and must act accordingly to ensure the protection of public safety. Yet even in this extraordinary moment, it remains true that the right to vote is a fundamental right, "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). Any emergency action must preserve both the State's interest in public safety and this most critical of rights, especially, in the midst of this crisis.

*Amici*, Disability Rights Wisconsin, the ACLU of Wisconsin, and Wisconsin Conservation Voices, respectfully seek leave to submit this brief, to alert this Court and the parties to fundamental principles that must guide any remedies fashioned in this case. *Amici* file in support of the Plaintiffs in *Lewis v. Knudson*, No. 20-cv-00278-wmc.

*First*, any result must preserve and maximize the right to vote of all eligible voters. *Amici* do not dispute Plaintiffs' contention that the April 7 election should be postponed to

provide elections officials and clerks time to revise procedures and practices to ensure that eligible voters are not deprived of their rights in light of the dire situation discussed below.

*Second*, in light of the unprecedented demand for mail absentee ballots, procedures must be changed to allow ballots postmarked until the date of the election to be counted.

*Third*, any remedy *must* retain meaningful opportunities for voters throughout the state to vote in person, not restrict an election to mail-only voting as has been suggested in news articles and other cases before the federal courts. *See, e.g.*, *City of Green Bay v. Bostlemann*, No. 20-cv-479 (E.D. Wis. filed Mar. 24, 2020), Am. Compl. ¶¶ 97, 120, ECF No. 26. Given the current public health emergency, it is imperative to expand access to absentee mail-in ballots. However, mandatory vote by mail cannot be the only option since it would fail to accommodate many voters, including voters with disabilities, who may require accommodations such as accessible voting machines, and voters of color, who may live in communities where mail service is not as robust as elsewhere or be distrustful of the mail system as the vehicle to exercise their fundamental right to vote. Moreover, mandatory vote by mail—especially if, as proposed, ballots are only sent to already registered voters—would deprive Wisconsin voters of the opportunity for same day registration upon which tens to hundreds of thousands of voters rely.

*Fourth*, *Amici* urge the Court to require Wisconsin officials to develop a concrete plan to address problems that may arise through April 7 or any rescheduled spring election date, and to ensure that such plans can be swiftly put into effect should the current emergency continue or recur in upcoming elections scheduled to be held on August 11 and November 3, 2020. Officials must categorically ensure that there are systems in place that preclude the chaos and disorganization that have led to the present litigation, and so no last-minute changes in procedures are again suddenly imposed upon Wisconsin voters and elections officials. Proactive

measures should include, but not be limited to, a communications plan that allows elections officials and the public—including those lacking access to or do not use electronic or social media—to be fully informed about rules and regulations that will be in place for those elections.

### I. STATEMENT OF INTEREST OF *AMICI CURIAE*

The ACLU of Wisconsin is one of the state affiliates of the American Civil Liberties Union, with 13,500 members and supporters statewide. The ACLU of Wisconsin has long been concerned about and involved in protecting voting rights of Wisconsin residents. The ACLU of Wisconsin spends a substantial amount of its time, especially in years of major elections, working to educate and inform voters about voting rules and processes. Since 2004, the ACLU of Wisconsin also has been a participant in the Wisconsin Election Protection coalition, which seeks to ensure that voters are aware of their voting rights and can freely exercise those rights. In addition, the ACLU of Wisconsin has been counsel in the District Court, Court of Appeals, and Supreme Court, on the long-running Wisconsin voter ID case, *Frank v. Walker*, No. 11-cv-01128 (E.D. Wis.), and has been an amicus on other voting rights cases, including before the Supreme Court in the partisan gerrymandering case, *Gill v. Whitford*, 138 S. Ct. 1916 (2018).

Disability Rights Wisconsin ("DRW") is a statewide non-profit organization designated by the Governor of the State of Wisconsin to act as the congressionally mandated protection and advocacy agency for Wisconsin citizens with mental illness, developmental disabilities and other physical impairments, pursuant to Wis. Stats. § 51.62, 29 U.S.C. § 794e, 42 U.S.C. § 15041 *et. seq.*, and 42 U.S.C. § 10801 *et. seq.* Through the years, DRW has had direct experience promoting the legal rights around voting issues in Wisconsin. This includes advocacy to ensure that people with disabilities have equal access to the polls, education of people with disabilities, service providers and families on voting laws; working with election officials on both the state and local level access to the polls for people with disabilities and working one-one-one with

3

clients to resolve individual problems with the voting process. DRW has participated as an amicus in the prior voting rights case of *Milwaukee Branch of the NAACP v. Walker*, No. 2011CV005492 (Dane Co. Cir. Ct.).

Wisconsin Conservation Voices ("WCV") brings people together to protect Wisconsin's environment and our democracy. WCV runs Wisconsin Native Vote, a robust program that works with Tribal communities to educate voters, register people to vote, and improve policies that impact Native Americans' access to the polls. Since 2011, Native Vote has worked to redress the ways in which Wisconsin's laws often disenfranchise Native Americans, including addressing proof of residency requirements that fail to account for the use of P.O. Boxes on reservations to limited access to early voting and voter registration.

## II. FACTUAL BACKGROUND

The rapid spread of COVID-19 has forced state and local county officials, poll workers, and voters to grapple with novel issues, especially how to hold safe, inclusive, and timely elections in this new reality. Several key events warrant particular emphasis here.

On March 12, 2020, Governor Tony Evers declared a public health emergency to, *inter alia*, "protect all Wisconsinites from the spread of this disease, and to prepare for the impacts it may have on the state."[1] Also on March 12, the Wisconsin Elections Commission (WEC) eliminated the Special Voting Deputy process, by which individuals are deputized as clerks to bring ballots to residential care facilities such as nursing homes and help individuals living there

---

[1] Exec. Order No. 72, *Relating to a Proclamation Declaring a Health Emergency in Response to the COVID-19 Coronavirus* (Mar. 12, 2020), https://evers.wi.gov/Documents/EO/EO072-DeclaringHealthEmergencyCOVID-19.pdf.

4

vote, and moved polling places out of those care facilities.[2] On March 17, the Acting Secretary of the Wisconsin Department of Health issued an order prohibiting gatherings of 10 or more persons and closing all schools in Wisconsin.[3] While schools and libraries are exempt from the order when used as polling places, the urgency of the situation that led to the order has had significant effects. It also raises concerns that the hastily relocated polling places will be inaccessible to voters with disabilities, despite legal requirements for accessibility.[4]

As the public health emergency has grown, so has the volume of requests for mail-in ballots.[5] It has proved so high that many communities have run out of ballot envelopes.[6] Exacerbated by staff shortages, these issues have led to inevitable delays mailing ballots. Simultaneously, local elections officials have taken actions that affect elections and limit citizens' ability to vote. This includes the decision by the cities of Milwaukee and Madison, among others, to eliminate in-person early voting and/or institute limited drive-up voting, despite the requirement that each municipality provide at least two weeks of early voting before an election.[7] Wis. Stat. § 6.86(1)(a)(2). In addition, communities have restricted or eliminated

---

[2] Wis. Elections Comm'n, *Guidance Regarding Election Procedures and Public Health Emergency* 2–4 (Mar. 12, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/March%2012%20Commission%20Meeting%20Agenda%20and%20Materials.pdf.

[3] Wis. Dep't of Health Services, *Emergency Order No. 5, Prohibiting Mass Gatherings of 10 People or More* (Mar. 17, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Gov.%20Evers_DHS%20order_3.17.20.pdf.

[4] *See* Wis. Elections Comm'n, *Introduction to Voting Accessibility* (outlining some of the requirements for voter accessibility), https://elections.wi.gov/voters/accessibility.

[5] Wis. Elections Comm'n, Absentee Ballot Requests for April 7 Exceed 550,000 Amid COVID-19 Concerns (Mar. 24, 2020), https://elections.wi.gov/node/6768.

[6] Wis. Elections Comm'n, Mem. From Meagan Wolfe to Clerks, *Absentee Envelope Order Status and Delivery Details COVID-19* (Mar. 20, 2020), https://elections.wi.gov/node/6741.

[7] *See* Laurel White, *Election Officials Across Wisconsin Eliminate, Scale Back In-Person Early Voting*, Wis. Public Radio (Mar. 23, 2020), https://www.wpr.org/election-officials-across-wisconsin-eliminate-scale-back-person-early-voting. After nearly a week of delay, communities like Milwaukee instituted "drive up" voting. *See Drive-up early voting begins Saturday in Milwaukee*, WISN (Mar. 28, 2020),

opportunities to register in person and moved polling places while they also lose poll workers—many of whom are elderly and at "high risk" of severe illness—in droves.[8]

These difficulties have only worsened as the State has increased efforts to combat the COVID-19 crisis. On March 24, Governor Evers issued a "safer at home" order that restricts the ability of most Wisconsin residents to move freely around their communities.[9] This order exempts elections officials and poll workers, but will certainly heighten the state of concern among Wisconsin's population and make it more difficult to recruit poll workers. On Sunday—fewer than 10 days before the scheduled election date—Milwaukee reported that it lacked a thousand of the 1400 poll workers it needed to run the April 7 election, and was considering consolidating polling sites around the city to "voting centers" in aldermanic districts.[10] The "safer at home" order also requires last minute polling place changes around the State, which will confuse many voters and could effectively disenfranchise voters who will be unaware of the changes and lack transportation to get to suddenly relocated polling sites. For example, on March 26 Menomonee Falls moved seven polling sites comprising 23 wards into one location.[11]

---

https://www.wisn.com/article/drive-up-early-voting-begins-saturday-in-milawukee/31964912. Still, it is not clear that all communities have done so—or that voters were widely made aware of these changes.

[8] Rashad Williams, *State officials encouraging more poll workers to replace older workers for their safety*, WAOM.com (Mar. 24, 2020), https://waow.com/2020/03/24/state-officials-encouraging-more-poll-workers-to-replace-older-workers-for-their-safety/.

[9] Wis. Dep't of Health Services, Emergency Order No. 12, Safer at Home (Mar. 24, 2020), https://evers.wi.gov/Documents/COVID19/EMO12-SaferAtHome.pdf.

[10] Chuck Quirmbach, *Ahead Of April 7 Election: Milwaukee Pollworker Shortages, Demand For Absentee Ballots,* WUWM (Mar. 30, 2020), https://www.wuwm.com/post/ahead-april-7-election-milwaukee-pollworker-shortages-demand-absentee-ballots.

[11] Cathy Kozlowicz, *Shortage of Poll Workers Prompts Menomonee Falls to move all voting for April 7 to the high school*, Milwaukee Journal Sentinel (Mar. 26, 2020), https://www.jsonline.com/story/communities/northwest/news/menomonee-falls/2020/03/26/voting-april-7-take-place-menomonee-falls-high-school/2915566001/; *see also* Patrick Marley and Molly Beck, *Lack of poll workers across Wisconsin, flood of absentee ballots spark fears votes will go uncounted, id.,* (Mar. 31, 2020), https://www.jsonline.com/story/news/politics/elections/2020/03/31/wisconsin-voting-sites-closing-due-coronavirus-poll-worker-shortage/5090003002/

At the same time, much, if not most, election participation has moved online. Defendants, among others, have urged voters to use online systems for registration and absentee ballot requests.[12] While beneficial for many voters, a narrow focus on digital registration and voting leaves out more vulnerable communities who may not know or understand the rules, lack digital access, or require assistance that may be impossible to obtain during the current health crisis, including persons with disabilities, and low income, homeless and rural voters.

It is absolutely clear that the fear and chaos swirling around this election will confuse and disenfranchise voters, persons with disabilities, low-income voters and voters of color —who are also less likely to have the digital access and expertise on which participation in the current state of emergency has increasingly depended.

### III. ARGUMENT

*Amici* have reluctantly concluded that they do not dispute Plaintiffs' claim that a free and fair election cannot be held a week from now, during a period when the Governor has prudently ordered Wisconsinites to stay at home to protect their health and that of their neighbors.

*Amici* do not take a stance on which date the spring election should be held, but strongly maintain that, whatever the date, the State must provide necessary accommodations to allow *all* Wisconsin voters to exercise their fundamental right to vote—including providing opportunities for same day registration and in-person voting. The right to vote is "personal" and a State may violate it "if even a single person eligible to vote is unable to" vote. *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016). And "[v]oting . . . cannot take place . . . without an elaborate administrative infrastructure." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 946 (7th Cir.

---

[12] Wis. Elections Comm'n, *Online Voter Registration for April 7 Available Again Until March 30* (Mar. 25, 2020), https://elections.wi.gov/node/6776.

7

2019). The State and municipalities thus must establish a clear plan to avoid further chaos before any rescheduled spring election, and before the August and November 2020 elections.

### A. *Amici* Do Not Dispute the Request to Extend the Election Date.

*Amici* do not dispute Plaintiffs' request to postpone the election. The unforeseeable demand for absentee ballots, sudden relocation of polling places, potentially to locations inaccessible to persons with disabilities, significant loss of poll workers, and lack of sanitizing equipment, among innumerable other issues, may justify such a postponement. *Amici* are well aware that the current crisis has led to *ad hoc*, differing actions from municipality to municipality. *See, e.g., City of Green Bay*, No. 20-cv-479 (E.D. Wis.), Mem. in Supp. of Pls.' T.R.O. Mot. and Prelim. Inj., at 2–9, ECF No. 3. *Amici* therefore understand that Plaintiffs see no mechanism, other than a delay of the April 7 election, to avoid chaos and disparate treatment and effectively adopt and implement consistent rules on a statewide basis.

*Amici* are also concerned that the current *ad hoc* emergency actions of various municipalities—many of which violate State law—undermine the equal protection rights of the voters they represent. "A citizen's right to a vote free of arbitrary impairment by state action [is] secured by the Constitution . . . ." *Baker v. Carr*, 369 U.S. 186, 208 (1962). *See also Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 234 n.13 (6th Cir. 2011) ("The Supreme Court has held in cases since *Snowden* [*v. Hughes*, 321 U.S. 1, 8 (1944)] that the Equal Protection Clause protects the right to vote from invidious and arbitrary discrimination" and "a showing of intentional discrimination has not been required in these cases.").

In *Louisiana v. United States*, the Supreme Court affirmed that voting rights "cannot be obliterated by the use of laws . . . which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar." 380 U.S. 145, 153 (1965). Descending from this precedent, *Bush v. Gore* reaffirmed that the Fourteenth Amendment's Equal Protection Clause forbids the

State from, "[h]aving once granted the right to vote on equal terms . . . by later arbitrary and disparate treatment, valu[ing] one person's vote over that of another." 531 U.S. 98, 104–05 (2000). That rule extends beyond "the initial allocation of the franchise" to "the manner of its exercise." *Id*. at 104. Only "specific standards" and "uniform rules" provide "sufficient guarantees of equal treatment." *Id.* at 106–07.

Lower courts in this Circuit have held accordingly. In *Black v. McGuffage*, the court found that plaintiffs pled a viable equal protection claim where the challenged statute:

> [left] the choice of voting system up to local authorities. But that choice necessarily means that some authorities will choose a [less accurate] system . . . . [and] voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office.

209 F. Supp. 2d 889, 899 (N.D. Ill. 2002). "Similarly situated persons" were improperly "treated differently in an arbitrary manner." *Id.*; *see also Hunter*, 635 F.3d at 234–36 (counting some provisional ballots cast in wrong precinct due to poll worker error, while not considering evidence of same errors for similarly situated ballots, violates equal protection); *Pierce v. Allegheny Cnty. Bd. of Elections*, 324 F. Supp. 2d 684, 690 (W.D. Pa. 2003) (allowing third party delivery of absentee ballots only in some counties violates Fourteenth Amendment and could dilute votes in county where delivery not allowed). The case law makes clear that a state cannot engage in election practices that result in voters being given unequal access to the ballot depending on the community in which they live. *Cf. McNally v. Tollander*, 100 Wis. 2d 490, 447–48 (1981) (setting aside election because of procedural irregularities resulting in "deprivations of the right to vote [which] seriously undermine[d] the appearance of fairness").

Such actions also raise due process concerns. *See, e.g.*, *Hunter*, 635 F.3d at 235 (arbitrary election administration implicates "both equal-protection and due-process rights"); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 468–70, 477–78 (6th Cir. 2008)

(structural electoral dysfunction based on a lack of uniform rules, standards and procedures such as registration lists, polling places, absentee and provisional ballots, and assistance for disabled voters could lead to widespread disfranchisement and state a due process claim). "[S]ubstantial changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process if they 'result in significant disenfranchisement and vote dilution.'" *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (citations omitted).

At this point, differential and arbitrary treatment and a failure to follow uniform rules, and unprecedented structural dysfunction, already imperil the election's fairness. For example, while State law requires municipalities to provide at least a certain amount of early voting, some municipalities have cancelled it outright, others are allowing voters to make appointments for early voting, others employ curbside voting, and others are conducting early voting as before. Polling places are being relocated at the last minute and there is a massive poll worker shortage throughout the state. It is likely that random and differential treatment will be applied until and including the April 7 election, depriving voters of their voting rights. One has only to look at the recent elections in Illinois to see the profoundly adverse effect on voters of last-minute changes in or closures of polling places and lack of election workers.[13] Allowing the April 7 election to proceed in such a manner could violate the constitutional right to equal protection and due process of Wisconsin's voters.

### B. Wisconsin Must Ensure Mail Absentee Ballots are Sent and Counted.

State law requires that a ballot be received by Election Day. Wis. Stat. § 6.87(6). Even during typical elections, hundreds or thousands of ballots go uncounted because of that

---

[13] *See, e.g.*, Kathleen Foody, *Illinois officials point fingers over primary voting issues*, Associated Press (Mar. 17, 2020), https://apnews.com/c96f7b7a4537785a4d305b986d4df3a2.

requirement—often due to delays in mail service. Indeed, 1407 non-military mailed absentee ballots were received *after* the deadline in Wisconsin's 2019 spring election—a contest with far fewer issues on the ballot, and lacking a high-turnout presidential primary. The current situation will inevitably and vastly worsen that problem leading to voter disenfranchisement.

Clerks have been so overwhelmed with mail absentee ballot requests that they have even run out of ballot envelopes. It will only get worse. Large numbers of voters who planned to vote in person—often at now-closed early voting sites—have yet to request their ballots. Many persons, including many tribal members living on reservations, do not receive mail at home and must travel to the location of a P.O. Box.[14] The process of fulfilling absentee requests and obtaining the supplies necessary to do so has been delayed, and will continue to be delayed. The U.S. Postal Service itself explicitly recommends that voters leave a full week for a mail ballot to be received.[15] Even barring additional printing or mailing delays, voters who request their ballots by the April 2 deadline—or even today—will not have time to receive and return their ballots to meet the U.S. Postal Service guidelines.

Moreover, recent studies suggest that voters of color are more likely to be affected by receipt deadlines. For example, in Arizona, where (as in Wisconsin) ballots must be received by Election Day, a recent expert report found that "[p]eople in counties with the highest Hispanic and Native American populations had the highest rates of late rejected [mail] absentees." Dr. Stephen Ansolabehere, Expert Report in *Voto Latino v. Hobbs*, No. 2:19-cv-05685-DWL (D. Ariz. Feb. 25, 2020) at 20, https://www.democracydocket.com/wp-

---

[14] Br. of Amici Curiae National Congress of American Indians *et al.* in Supp. of Pets. at *10, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008), Nos. 07-21, 07-25, 2007 WL 3440943 ("*Crawford* Br."), https://www.brennancenter.org/sites/default/files/legal-work/95a3999cc34efe3da7_t8m6bnj4d.pdf.

[15] U.S. Postal Service, Postal *Bulletin 22539* (Feb. 13, 2020) at 5, https://about.usps.com/postal-bulletin/2020/pb22539/pb22539.pdf.

11

content/uploads/sites/41/2020/03/2020-2-25-Ansolabehere-Expert-Rpt.-filed11.pdf; *see also Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1006 (9th Cir. 2020) (finding that the testimony at trial was that "minority voters" "tend to miss critical deadlines").

To avoid disenfranchising these many voters who, through no fault of their own, cannot meet the State's stringent guidelines, it should be ordered that elections officials continue to accept and process absentee ballot applications, and count any ballots postmarked by Election Day, including by any rescheduled election date. In addition, *Amici* recommend that municipalities be required to set up drop boxes where voters can deliver absentee ballots without having to have contact with other persons, and that any ballots placed in such boxes by 8 p.m. on Election Day also be counted.

C. **Wisconsin Must Ensure That Voters Have Opportunity to Vote in Person.**

While *Amici* do not dispute the need for a delay in the election, a fair election simply cannot be conducted entirely by mail.[16] Mailing ballots to registered voters will, of course, help many voters—including persons with fragile health—and likely reduce the burden for in-person voting. But *Amici* know from experience that switching to a mail-only voting system without providing opportunities for in-person voting would disenfranchise countless voters who planned to register at the polls, lack reliable access to mail service, have difficulty with the process of applying for and returning a mail ballot, need the kinds of accommodations for persons with disabilities that are only available at in-person voting sites, or generally distrust mail service.

Even so-called "vote by mail" states provide opportunities to register and vote in person:

> Five states currently conduct all elections entirely by mail: Colorado, Hawaii, Oregon, Washington and Utah. At least 21 other states have laws that allow certain smaller elections, such as school board contests, to be conducted by mail. For these elections, all registered voters receive a ballot in the mail. The

---

[16] *Amici* are aware that Plaintiffs do not seek such a remedy, but as noted *supra*, others do.

12

> voter marks the ballot, puts it in a secrecy envelope or sleeve and then into a separate mailing envelope, signs an affidavit on the exterior of the mailing envelope, and returns the package via mail or by dropping it off. . . .
>
> While "all-mail elections" means that every registered voter receives a ballot by mail, *this does not preclude in-person voting opportunities on and/or before Election Day.*  For example, despite the fact that all registered voters in Colorado are mailed a ballot, voters can choose to cast a ballot at an in-person vote center during the early voting period or on Election Day . . . .

National Council of State Legislatures, *All Mail Elections (aka Vote by Mail)* (Mar. 24, 2020), https://www.ncsl.org/research/elections-and-campaigns/all-mail-elections.aspx (emphasis added).

Further, such a system would not enfranchise thousands of voters who register for the first time, or re-register to update their names or addresses, at the polls.[17]  Since 1976, Wisconsin law has allowed voters to register on Election Day.[18]  Voters accordingly rely on same day registration as a routine aspect of their voting experience.  In some years fewer voters use same day registration during spring elections, but numbers still reach the tens if not hundreds of thousands.[19]  Data suggest that recent movers, who must re-register even if they previously voted, are on average younger, of lower income, and are more likely to be racial and ethnic

---

[17] State of Wis. Gov. Accountability Bd., *Final Report on the Impacts and Costs of Eliminating Election Day Registration in Wisconsin* (Feb. 18, 2013) at 4, https://elections.wi.gov/sites/elections.wi.gov/files/publication/65/final_edr_report_02_18_2013_pdf_86368.pdf.

[18] *Id.* at 1, 5.

[19] Wis. Elections Comm'n, *2018 Spring Election EL-190NF: Election Voting and Registration Statistics Report* (Apr. 2, 2018) (more than 39,600 election day registrants for 2018 spring election), spreadsheet at https://elections.wi.gov/node/5815 (more than 39,600 election day registrants for 2018 spring election) ; *Id.*, *2016 Spring Election EDR Report* (more than 259,000 election day registrants for 2016 spring election and presidential primary), spreadsheet at https://elections.wi.gov/publications/statistics/gab-190/2016-spring-election-presidential-primary.

minorities.[20] The characteristics associated with more frequent moving are also associated with lower overall likelihoods of being registered.[21] The remedy that some persons, including some elections officials, propose will effectively and completely disenfranchise those voters.

In-person voting options and extended early voting also can be critical for persons with disabilities, such as blind and visually impaired voters who need to use accessible voting machines at in-person polling sites. It is also especially important for voters of color and young voters. For example, recent data from California, which is experimenting with vote-by-mail, show that older, white voters more frequently vote by mail; in comparison, Black and Hispanic voters and young people are more likely to vote in-person.[22] And a Florida study found that voters of color and young voters were more likely to have their mail absentee ballots rejected than white voters or older voters.[23] Mailing ballots is not an evident option for transient or homeless voters. *See, e.g.*, *Spirit Lake Tribe v. Benson Co., N.D.*, No. 10-cv-00095, 2010 WL 4226614, at *3 (D.N.D. Oct. 21, 2010) (mail-in only procedures had disparate impact on tribal voters lacking "stable housing arrangements" in communities characterized by "poverty and transience"). In addition, as noted above, stringent mail receipt deadlines adversely affect voters.

In urging this Court not to consider a remedy that orders mail balloting as the sole means to vote in Wisconsin's 2020 spring election, *Amici* do not in any way discount the gravity of the

---

[20] These patterns are evident in many Census datasets and reports. *See, e.g.* David K. Ihrke & Carol S. Faber, *2012. Geographic Mobility: 2005 to 2010*, Current Population Reports, P20-567, Table 2 (U.S. Census Bureau Dec. 2012), https://www.census.gov/prod/2012pubs/p20-567.pdf.

[21] *See generally* Jan E. Leighley & Jonathan Nagler, *Who Votes Now? Demographics, Issues, Inequality, and Turnout in the United States* Table 2 (Princeton Univ. Press. 2013).

[22] Center for Election Innovation & Research, *California Voter's Choice Act November 6, 2018 General Election Report*, https://electioninnovation.org/wp-content/uploads/2020/03/VCA-November-2018-General-Election-Report.pdf.

[23] Dr. Daniel Smith for ACLU of Florida, *Vote-by-Mail Ballots Cast in Florida* (Sept. 2018), https://www.aclufl.org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf.

public health issues the State faces. *Amici*'s point is that in-person voting is critically important to many Wisconsin voters, and that the State must plan now for measures that would allow for safe administration of in-person voting at *any* election that occurs.

### D. State and Local Governments Must Create a Robust Emergency Plan.

Whether or not the crises caused by the current pandemic could have been predicted, we now know that they exist and adversely affect elections. It is therefore incumbent on State and local elections officials to develop a comprehensive emergency plan to address problems that could occur on a rescheduled spring election date, or at the time of the August 11 or November 3 elections, should this (or another) crisis continue or recur.

State law already requires elections officials to be proactive. Wis. Stat. § 323.02(8)(a) defines "[e]mergency management" to include "all measures undertaken by or on behalf of the state and its subdivisions to . . . Prepare for and minimize the effect of a disaster or the imminent threat of a disaster." WEC accordingly has a "Contingency Planning and Election Security Plan" which addresses, among other things, disaster planning and instructs local elections officials to develop a range of contingency plans.[24] The plan even mentions the possibility of "influenza or other pandemics that may affect poll workers or [] staff."[25] It discusses things such as the need for standby poll workers, alternative polling places, and communications strategies.

Still, it is abundantly clear that neither the State nor municipalities anticipated anything like the current crisis, nor have they presently implemented a comprehensive emergency plan to address COVID-19. That must change immediately. *Amici* urge the Court to order Defendants

---

[24] Wis. Elections Comm'n, *Contingency Planning and Election System Security*, at 13 (Oct. 2016), https://elections.wi.gov/sites/default/files/publication/contingency_planning_and_election_system_security__19422.pdf.

[25] *Id.*; *see also id.* at 13–16.

to develop a far more detailed and specific plan for responding to the real possibility of further election disruption this year within 45 days of the Court's order, and to require that every municipality do the same within 60 days. The chaos and current patchwork system of changing or avoiding legal requirements must not recur. As election law scholar Richard Hasen recently stated: "[t]oo much local control in election administration is a recipe for disaster, because in a close election everyone will look at the small number places where things failed, not the vast majority of places that manage to conduct a single election well."[26] Given no good options in the midst of a pandemic, states will "need to assert more authority over local jurisdictions to manage the expected surge in absentee balloting, the added expenses of running polling places consistent with stringent health requirements, and other potential threats to the election like cyberattacks."[27] Voters, as well as the legitimacy of this and future elections, depend on it.

## IV.  CONCLUSION

It is incumbent on this Court to ensure that Wisconsinites are able to exercise their fundamental right to vote. Registration restrictions and hurdles in casting a ballot could deny qualified Wisconsin voters of this fundamental right. Any relief this Court orders should account for these barriers to the ballot.

---

[26] Richard L. Hasen, *What happens in November if one side doesn't accept the election results?*, Slate (Mar. 30, 2020), https://slate.com/news-and-politics/2020/03/2020-election-meltdown-coronavirus-delay.html.

[27] *Id.*

Dated: March 31, 2020                                  Respectfully submitted,

                                                       /s/ Karyn L. Rotker
Adriel I. Cepeda Derieux*                              Karyn L. Rotker (WI Bar No.: 1007719)
T. Alora Thomas-Lundborg*                              Laurence J. Dupuis (WI Bar No.: 1029261)
Dale E. Ho*                                            American Civil Liberties Union
American Civil Liberties Union Foundation              of Wisconsin Foundation
125 Broad Street, 18th Floor                           207 E. Buffalo Street, Suite 325
New York, NY 10004                                     Milwaukee, WI 53202
Tel.: (212) 549-2500                                   Tel.: (414) 272-4032
acepedaderieux@aclu.org                                krotker@aclu-wi.org
athomas@aclu.org                                       ldupuis@aclu-wi.org
dho@aclu.org

                                                       Kristin Kerschensteiner (WI Bar No.:1035208)
*Motion for Admission *Pro Hac Vice*                   Disability Rights Wisconsin
Forthcoming                                            131 W. Wilson St., Suite 700
                                                       Madison WI 53703
                                                       (608)267-0214
                                                       Kitk@drwi.org


                                                       *Attorneys for Amici Curiae*