## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

DEMOCRATIC NATIONAL COMMITTEE
and DEMOCRATIC PARTY OF WISCONSIN,

                    Plaintiffs,

v.

                                                          Case No. 20-cv-249-wmc

MARGE BOSTELMANN, JULIE M. GLANCEY,
ANN S. JACOBS, DEAN KNUDSON, ROBERT F.
SPINDELL, JR., and MARK L. THOMSEN,

                    Defendants,

        and

REPUBLICAN NATIONAL COMMITTEE
and REPUBLICAN PARTY OF WISCONSIN,

                    Intervening Defendants
---------------------------------------------------------------------------------------------------------------

SYLVIA GEAR, MALEKEH K. HAKAMI, PATRICIA
GINTER, CLAIRE WHELAN, WISCONSIN ALLIANCE
FOR RETIRED AMERICANS and LEAGUE OF WOMEN
VOTERS OF WISCONSIN,

                    Plaintiffs,

v.

                                                          Case No. 20-cv-278-wmc

MARGE BOSTELMANN, JULIE M. GLANCEY,
ANN S. JACOBS, DEAN KNUDSON, ROBERT F.
SPINDELL, JR., MARK L. THOMSEN, and
MEAGAN WOLFE,

                    Defendants.
---------------------------------------------------------------------------------------------------------------

REVEREND GREG LEWIS, SOULS TO THE POLLS, VOCES
DE LA FRONTERA, BLACK LEADERS ORGANIZING FOR
COMMUNITIES, AMERICAN FEDERATION OF TEACHERS
LOCAL, 212, AFL-CIO, SEIU WISCONSIN STATE COUNCIL,
and LEAGUE OF WOMEN VOTERS OF WISCONSIN,

    Plaintiffs,

v.

         Case No. 20-cv-284-wmc

DEAN KNUDSON, JULIE M. GLANCEY, ROBERT F.
SPINDELL, JR., MARK L. THOMSEN, ANN S. JACOBS,
MARGE BOSTELMANN, in their official capacity as members
of the Wisconsin Election Commission, MEAGAN WOLFE, in
her official capacity as the Administrator of the Wisconsin Elections
Commission,

    Defendants.

---

## PROPOSED AMICUS BRIEF BY THE WISCONSIN COUNTIES ASSOCIATION AND WASHINGTON COUNTY IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Proposed Amici Wisconsin Counties Association and Washington County (collectively, the "Counties"), by and through their attorneys, respectfully submit this amicus brief in opposition to the Motion for Temporary Restraining Order and Preliminary Injunction filed in *Lewis et al. v. Knudson* (20-cv-284).[1] The interest of the Counties are set forth in the Counties' Motion to Allow Amicus Brief of Wisconsin Counties Association and Washington County, and Alternative Motion to Intervene.

## **INTRODUCTION**

On March 26, 2020, Plaintiffs Reverend Greg Lewis, Souls to the Polls, Voces De La Frontera, Black Leaders Organizing For Communities, American Federation of Teachers Local, 212, AFL-CIO, SEIU Wisconsin State Council, and League of Women Voters of Wisconsin (collectively, "Plaintiffs"), filed a complaint for declaratory and injunctive relief against the members of the Wisconsin Elections Commission ("the Commission") and the Administrator of the Commission, seeking, *inter alia*, the postponement of the April 7, 2020 election. The Plaintiffs have now moved for an emergency temporary restraining order seeking several changes to the procedures for the election, including postponing the planned election date of April 7, 2020. For the following reasons, the Counties respectfully submit that this Court should deny Plaintiffs' request for a TRO to the extent Plaintiffs request relief that would result in the postponement of the April 7, 2020 election date.

---

[1] On March 28, 2020, the Court issued an order consolidating the cases docket numbered 20-cv-249, 20-cv-278, and 20-cv-284 and directing all parties to "file all submissions in the '249 case and they will automatically be docketed in the other cases." Consistent with the Court's order, the Counties are filing this brief in the '249 case, however, the Counties' brief opposes the request for a temporary restraining order filed in the '284 case.

Even if the Plaintiffs could show the elements necessary to obtain a TRO, the balance of the equities in this case weighs against moving the April 7, 2020 election date. Plaintiffs' request for such relief—the postponement of an already in progress election—is extraordinary, unprecedented, and would cause significant hardship to those who for months have acted in reliance on the planned election date of April 7, 2020. *See Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (en banc) (per curiam) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented."). With respect to the Counties in particular, the Plaintiffs' request to move the election date raises significant questions as to the continuity of all county governments, due to the impending expiration of the terms of every county board supervisor seat in the state. *See Chisom v. Roemer*, 853 F.2d 1186, 1189-92 (5th Cir. 1988) (finding public interest weighed against enjoining pending judicial election when injunction would introduce uncertainties due to expiration of judicial term). Ultimately, however, the Court need not even reach this step because the Plaintiffs have not shown the elements necessary to obtain a TRO with respect to their request to postpone the election date.

I.     **The Public Interest Weighs Against Postponing the Election Date.**

Even if the Plaintiffs can show the elements necessary to obtain a TRO—which they cannot—this Court should deny any relief that involves moving the April 7, 2020, election date. "Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1054 (7th Cir. 2017). "[E]lection cases are different from ordinary injunction cases," however, because any request to enjoin a statewide election significantly affects the public interest.

*Southwest Voter Registration Educ. Project*, 344 F.3d at 919. Thus, "[w]hen an election is imminent and when there is inadequate time to resolve factual disputes and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures." *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (internal quotation marks and brackets omitted). Even after there has been an adjudication that the Constitution has been violated, the Supreme Court has "invited the use of a velvet glove over the mailed fist." *Chisom v. Roemer*, 853 F.2d at 1189 (citing *Reynolds v. Sims*, 377 U.S. 533 (1964). The Court should "consider the proximity of a forthcoming election and complexities of state election laws" and "reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the Court's decree." *Reynolds v. Sims*, 377 U.S. at 585.

Indeed, it would be "unprecedented" for a court to interfere with an election after voting has begun. *Southwest Voter Registration Educ. Project*, 344 F.3d at 919. As the Ninth Circuit explained in *Southwest Voter Registration Educ. Project*, doing so causes material hardship to the state and its citizens:

> If the recall election scheduled for October 7, 2003, is enjoined, it is certain that the state of California and its citizens will suffer material hardship by virtue of the enormous resources already invested in reliance on the election's proceeding on the announced date. Time and money have been spent to prepare voter information pamphlets and sample ballots, mail absentee ballots, and hire and train poll workers. Public officials have been forced to divert their attention from their official duties in order to campaign. Candidates have crafted their message to the voters in light of the originally-announced schedule and calibrated their message to the political and social environment of the time. They have raised funds under current campaign contribution laws and expended them in reliance on the election's taking place on October 7. Potential voters have given their attention to the candidates' messages and prepared themselves to vote. Hundreds of thousands of absentee voters have already cast their votes in similar reliance upon the election going forward on the timetable announced by the state. These investments of time, money, and the exercise of citizenship rights cannot be returned. If the election is postponed, citizens who have already cast a vote will effectively be told that the vote does not count and that they must

3

vote again. In short, the status quo that existed at the time the election was set cannot be restored because this election has already begun.

344 F.3d at 919. The same interests recognized by the Ninth Circuit weigh in favor of denying Plaintiffs' request to move the election date. Voting has already been occurring in this election, and moving the election date now—one week from the election—would effectively eliminate the efforts of public officials, candidates, and potential voters over the last several weeks and months to prepare for this election.

With respect to the Counties in particular, postponing the April 7, 2020 election date will also create significant concern with respect to continuity of county government and arguably could result in a scenario in which Wisconsin counties would be left with no boards whatsoever. As set forth below, all county supervisors are elected for two-year terms and there is no requirement that a successor qualify before the incumbent's term expires. If the election is not held as scheduled on April 7, 2020, all Wisconsin counties could effectively be left with no boards—due to the expiration of the terms of the incumbent supervisors—until new supervisors are elected. At minimum, postponing the election raises significant questions about the continuity of county government under the circumstances. Such concerns are precisely the type of public interest on which courts have relied to deny moving election dates. *Chisom*, 853 F.2d at 1190 (vacating preliminary injunction because staying the judicial election at issue would "cast a cloud over the affected court" due to the expiration of a justice's term).

A.     **Wisconsin Statutes Seemingly Provide for Expiration of a County Board Supervisor's Term on the Third Monday or Third Tuesday of April.**

When an office, such as county supervisor, is an elective office, the office becomes vacant when "the incumbent's term expires."  Wis. Stat. § 17.03(10). There is a statutory exception to this rule for certain offices with a term that "shall continue for 4 years *and until his or her successor*

4

*qualifies*." Wis. Stat. §§ 17.03(10), 59.20(2)(a) and (b) (*e.g.*, the sheriff, coroner, register of deeds, and district attorney) (emphasis added). But, that exception does not apply to county supervisors.[2] Specifically, under Wisconsin law, county supervisors are elected for two-year terms and there is no requirement that a successor qualify before the incumbent's term expires.[3]  Unlike statutes applicable to other governmental office holders, Chapter 59 does not contemplate a scenario in which an incumbent county supervisor serves out a respective term until a successor qualifies. Moreover, Wis. Stat. § 17.03(10) specifically provides that the office of county supervisor is vacant upon expiration of the two-year term – *i.e.*, the statutes are not silent as to continuation in office.  Instead, a Wisconsin county supervisor is simply elected to a 2-year term.[4]

Under these circumstances, the Counties are concerned that, unless the election is held as scheduled on April 7, 2020, all Wisconsin counties could effectively be left with no boards—due to the expiration of the terms of the incumbent supervisors—until new supervisors are eventually elected.[5]  In the case of Washington County, in addition to no county board, it would effectively

---

[2] The exception is also inapplicable to the office of county executive, but for ease of reference the argument herein shall focus on the office of county board supervisor.

[3] Wis. Stat. § 59.10(1)(b) (in self-organized counties, "[t]he term of office of supervisors is 2 years"); § 59.10(2)(b) (in Milwaukee County "supervisors shall be elected for 2-year terms at the election to be held on the first Tuesday in April next preceding the expiration of their respective terms, and shall take office on the 3rd Monday in April following their election"); § 59.10(3)(d) (stating that in other counties "[s]upervisors . . . shall be elected for 2-year terms at the election to be held on the first Tuesday in April in even-numbered years and shall take office on the 3rd Tuesday in April of that year").

[4] There are currently 47 counties that have elected to "self-organize" under Wis. Stat. § 59.10.  While Wis. Stat. § 59.10(1)(b) authorizes a board to stagger the terms of its board members, there is no Wisconsin county that has staggered board member terms.  As a result, every county board supervisor seat is up for election on April 7.

[5] Ordinarily, vacancies on a board are filled by appointment by a county board chair (with the approval of the board) or upon a special election ordered by a board under Wis. Stat. § 59.10(3)(3). In the event the Spring General Election does not occur as originally scheduled, however, the County and WCA are concerned that no county board and/or board chair would be

have no recognized administration because the County is scheduled to elect its inaugural county executive on April 7.[6]

Additionally and equally problematic is that without a board in place immediately following the Spring General Election, it would be likely county boards across the state would violate the statutorily-mandated meeting requirement under Chapter 59 (in addition to other concerns regarding the absence of a duly elected board).  Section 59.11(1)(c) provides that a board (except in counties with a population of 750,000 or more) "shall meet on the 3rd Tuesday of each April to organize and transact business.  At this meeting, the board may transact any business permitted at the annual meeting, including the appointment of all county commissions and committees."  This organizational meeting happens once every biennium and is critically important for county governance purposes – the board elects leadership and determines who will serve on what committees and in what capacity.  In the event the Spring General Election were rescheduled or otherwise delayed, county supervisor seats could become "vacant" and no board would exist to "meet on the 3rd Tuesday" in April as statutorily required, thus resulting in the complete evisceration of any legislative body and legislative leadership in county government.

## B.   The Hold Over in Office Rule of Construction Provides Counties with Little Comfort.

Plaintiffs suggest that application of "hold over" principles would provide for the continued functioning of county boards in the event the Spring Election is postponed beyond the statutory

---

in place upon expiration of the incumbents' terms and therefore nobody would have the ability to fill the other vacancies on a respective board.

[6] The Milwaukee County Executive is likewise scheduled to be elected on April 7.  Based upon the same analysis, Milwaukee County would be left with not only no board, but also no executive.

date for expiration of all county supervisor terms of office. (Pl. Brief in Support of Motion for Emergency Temp. Restraining Order, 20-cv-284, Dkt. No. 18, pp 9-11).  Plaintiffs' argument is misguided.

First, Plaintiffs suggest that several counties – Outagamie, Racine, Kenosha, Eau Claire and Oneida – have either provided for succession in office in the event of an emergency vacancy in "charter ordinances" or otherwise in emergency management ordinances.[7]  Notwithstanding that there is no Wisconsin county operating under a "charter ordinance,"[8] this suggestion is simply untrue.  Even if a Wisconsin county could supersede state statute by ordinance, which it most certainly cannot, the ordinances do not even state what Plaintiffs claim they do.

For example, Section 2-609 of the Outagamie County Code of Ordinances, which Plaintiffs cite in support of the proposition that "many municipalities have an explicit succession provision in their respective charter ordinances to address filling local offices 'in the event a successor is not elected or qualified'" (Dkt. No. 18, p. 9) states only that "[t]he election and term of Supervisors shall be as provided in Wis. Stats. § 59.10(3)(d)."   In other words, the Outagamie County Ordinance incorporates the statutory term of office by reference.

Plaintiffs then cite to the Section 6.87 of the Racine County Code of Ordinances as an example of a county that has "continuity of government ordinances for emergencies or attacks."

---

[7] Copies of the Outagamie County, Racine County, Kenosha County, Eau Claire County and Oneida County ordinances Plaintiffs reference are appended to this Brief for the Court's convenience.

[8] Counties are "chartered" by virtue of Wis. Stat. § 2.01 and have no inherent or constitutional authority to self-govern.  Indeed, a "county is totally a creature of the legislature, and its powers must be exercised within the scope of authority ceded to it by the state."  *State ex rel. Conway v. Elvod,* 70 Wis. 2d 448, 450, 234 N.W.2d 354 (1975).

*Id.* at p. 10.   The cited section of the Racine County Code provides the following emergency succession plan:

> *Emergency interim successors to office.* If the county executive is unavailable, the chairman of the board of supervisors shall exercise the powers and discharge the duties of the office of county executive. If the chairman of the board of supervisors is unavailable, and if the vice-chairman is unavailable, the chairmen of the committees, in the order specified in section 2-42 hereof, if *(sic)* shall exercise the powers and discharge the duties of the office of board chairman and, if the county executive is unavailable, shall also exercise the powers and duties of that office, until the board chairman or the county executive, as the case may be, becomes available, but no emergency interim successor to the aforementioned offices may serve as chairman of the board of supervisors.

In other words, the Racine County emergency succession plan calls for the assumption of duties by other supervisors, none of whom would be available to succeed to an office in the event their own term of office has expired.  The other county ordinances Plaintiffs cite as examples of "explicit codes governing such succession" (*Id.* at 10) are similar and none provide an orderly succession in office plan for county board supervisors in the event the terms of office expire and the offices are statutorily deemed vacant.

The Plaintiffs also claim the "hold over" rules governing the interpretation and application of constitutional and statutory provisions dictating terms of office for state and municipal officers would operate to allow an incumbent to continue to serve beyond the statutory term of office. Unfortunately, the "hold over" rules fail to clearly provide for an incumbent's continued service when, as here, a statute indicates that an office becomes vacant as a matter of law. At minimum, counties will face significant uncertainty as to whether they would be able to rely on such rules to justify the continued functioning of county boards absent an election.

Wisconsin courts have recognized and applied the hold over rule of construction to provide that "where the written law contains no provision, either express or implied, to the contrary, an officer holds his office until his successor is elected and qualified."  *State v. Johnson,* 176 Wis.

107, 186 N.W. 729, 730 (1922); *see also* 3 McQuillin Mun. Corp. § 12:165 (3d ed.).  The *Johnson* court understandably acknowledged that the rule "prevents the inconvenience and annoyance resulting from the suspension of official functions because there is no officer authorized to discharge such functions."  *Id.*

But contrary to Plaintiffs' argument, none of the authorities suggest that the hold over rule of construction may operate to negate unambiguous statutory or constitutional language. *See Johnson*, 186 N.W. at 730 (holdover doctrine only applies "where the written law contains no provision, either express or implied, to the contrary…"); *Quien v. Rent Control Bd. of Peabody*, 45 Mass. App. Ct. 357, 377-78, 698 N.E.2d 911, 925-26 (1996) (holdover doctrine applies "unless otherwise provided …");  63C Am. Jur. 2d, Public Officers and Employees § 148 (holdover doctrine applies as a general rule, "apart from any constitutional or statutory regulation on the subject…").  Indeed, in *State ex rel. Martin v. Heil* (which Plaintiffs fail to cite), the Wisconsin Supreme Court rejected an application of the hold over rule when the language at issue unambiguously stated that the term of the governor shall be two years. 242 Wis. 41, 50, 7 N.W.2d 375 (1942). Given that the statutory language at issue with respect to county supervisors similarly provides for a two-year term of office, and given that the Legislature has not used the "until his or her successor qualifies" language with respect to county supervisors that it has used with other county offices, in light of *Heil* it is by no means certain that counties would be able to rely on the hold over rule to justify incumbents on county boards continuing to serve in office beyond the expiration of their two-year terms. *Cf. Mann v. Key*, 345 So.2d 293, 296 (Ala 1977) (refusing to apply hold over rule when "[t]he traditional language '. . . shall hold office until his successor is elected and qualified' is not used in the statutes relating to the office of the mayor.").

### C.     The Public Demands and Deserves Continuity in County Government.

Continuity of government—especially county government—is a significant public interest, especially during the current COVID-19 crisis. While the Wisconsin Department of Health Services ("DHS") was identified as the lead agency by Governor Evers in Executive Order #72 and is playing a crucial role in attempting to suppress the spread of COVID-19 to every corner of the state, it is Wisconsin counties and other local units of government that are on the front lines. County health officers are serving as the points of contact in almost every Wisconsin county as it manages the outbreak. And these health officers rely on the leadership and support of their respective county boards to, among other things, make key policy determinations, assist in making crucial personnel determinations (including the identification of "essential" personnel), and allocate needed emergency resources that may go beyond funds budgeted following traditional budgeting process. If the county boards of all 72 Wisconsin counties—and especially those without an administrator or executive[9]—are vacant for months during a time of crisis, it will critically handicap counties' ability to swiftly coordinate and act to contain the spread of the coronavirus and oversee the care of county residents who have succumbed to COVID-19.

The importance of continuity of government during this time of crisis is recognized through every layer of government. Recent guidance issued by the Department of Homeland Security Cybersecurity & Infrastructure Security Agency emphasized "[f]unctioning critical infrastructure is imperative during the response to the COVID-19 emergency for both public health and safety as well as community well-being. Certain critical infrastructure industries have a special

---

[9] Currently, 33 of Wisconsin's 72 counties operate with designated administrative coordinators under Wis. Stat. § 59.19, as opposed to administrators under Wis. Stat. § 59.18 or executives under Wis. Stat. § 59.17. Unlike administrators and executives, administrative coordinators have no statutorily-recognized management authority.

responsibility in these times to continue operations."  Christopher C. Krebs, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response (March 19, 2020).  According to the guidance, those with a "special responsibility" to continue operations include state and local partners.

Wisconsin counties take the responsibility to ensure continuity of government seriously and counties across the state are working around the clock to ensure the continued provision of vital services to their citizens. A county needs its elected officials to guide and assist staff in making key determinations surrounding those services. According to Washington County's Comprehensive Emergency Management Plan ("CEMP"), the objective is "to protect public health and safety and prevent loss of life, to preserve property and the environment, to assure continuity of government and government operations, to restore the community to normal, to mitigate/prevent the causes of damage, and prepare the County in advance of an emergency." In order to ensure continuity of government and government operations, the CEMP "provides for lines of succession for **elected** and appointed officials, and, assures that critical functions of government can be reconstituted and conducted with minimal interruption." (emphasis added). In other words, both elected and appointed officials are responsible for ensuring the functions of county government continue. Washington County, and other counties across Wisconsin, will be at a distinct disadvantage for purposes of ensuring continuity of government if the election is moved.

But there is more at stake in this case than ensuring a county's ability to act in this time of great public need, which is undoubtedly of paramount importance. County citizens and residents rely upon counties to deliver vital human and social services, child welfare and protection services, skilled nursing care, court services, law enforcement and emergency response services and many other functions. These services are all performed with oversight by a committee of the county

11

board. Those committees establish priorities and policies for the various service offerings and approve appropriations to support the activities. It is the county board, acting through its committees and its individual supervisors, that connects a county to the citizens it serves. Without that connection, there is an unworkable gap between the electors and their representatives in government. There should be no question that society in general, and this Court in particular, should view such an outcome as untenable.

For these reasons, moving the April 7, 2020 election is likely to cause greater harm than any harm Plaintiffs would suffer if relief is denied. Moving the election would call into question the continuity of county governments, thus raising questions as to the ability of county boards to take action to meet the ongoing COVID-19 crisis, as well as continue the uninterrupted provision of vital services to our state's citizens. The unquestioned continuity of county government depends on the election being held as scheduled on April 7, 2020. Thus, even if Plaintiffs could otherwise satisfy the necessary showing for a preliminary injunction, this Court should still deny Plaintiffs' request because of the balancing of harms.

## II.    The Plaintiffs Have Not Shown the Necessary Elements For a Restraining Order to Issue.

Ultimately, this Court need not engage the weighing of interests discussed above, because the Plaintiffs' have not shown all of the elements necessary to obtain a temporary restraining order. Specifically, the Plaintiffs have not shown a reasonable likelihood that they will succeed on the merits of their unprecedented claim that holding an election on April 7 will deprive them of their right to vote under the U.S. Constitution. In this respect, the Counties agree with position taken by the Wisconsin Legislature as proposed intervenor or amicus curiae in this dispute: the Plaintiffs

have failed to establish a constitutional burden on their right to vote under the *Anderson/Burdick* framework. The Counties also wish to raise the following points for the Court's consideration.

First, the *Anderson-Burdick* standard—like other areas of constitutional law—focuses on the burden imposed by state action, not non-state actors (in this case, an epidemic). *Harlan v. Scholz*, 866 F.3d 754, 759 (7th Cir. 2017) ("Under the *Anderson-Burdick* test, the court must apply a flexible standard that depends on the severity of *the burden imposed by the state law under consideration*." (emphasis added)). This is important because here the alleged burden on Plaintiffs' right to vote arises, not from state law requiring that the election be held on April 7, but from the COVID-19 pandemic. Even Plaintiffs appear to acknowledge this. 20-cv-284, Dkt. No. 18, p. 6 ("The severity of the burden *created by the pandemic* is unprecedented precisely because it constitutes a near-absolute infringement, forcing electors to make an impossible choice between exercising their right to vote versus sacrificing their health and lives."). Indeed, there is nothing inherently burdensome about holding an election on April 7.

It is true, as Plaintiffs note, that courts have recognized that a violation of the right to vote can occur when enforcing the law as written would require an elector "to forego one or the other of two fundamental rights." *Michaelson ex rel. Lewis v. Booth*, 437 F. Supp. 439, 444 (D.R.I. 1977). Indeed, Plaintiffs cite to *Michaelson ex rel. Lewis*, as an example of a case where a court ordered "the postponement of an election to prevent a severe or virtually complete infringement which entirely eclipses a fundamental right." 20-cv-284, Dkt. 18 at 9. *Michaelson ex rel. Lewis* actually demonstrates the fatal flaw in Plaintiffs' theory, however. In *Michaelson*, the court did acknowledge that the federal right to vote could be indirectly burdened if enforcing the election date required electors to choose between two constitutional rights. Here, however, Plaintiffs have

not identified a second constitutional right they would have to forego in order to participate in the April 7 election as scheduled.

Indeed, it seems that what Plaintiffs are really arguing in this case is that they not only have a right to vote, but they have a constitutional right to vote free from the risk or fear of infection by COVID-19. Plaintiffs, however, do not point to a single case even suggesting that the U.S. Constitution obligates states to hold elections under conditions in which voters are free from the risk of harm by public health threats such as the COVID-19 pandemic. And, there is ample reason to believe that no such right exists under the U.S. Constitution. Setting aside problems of enforcement—how, for example, would courts determine that a public health threat is so dire that conducting an election as scheduled violates the Constitution—it is well-established that "the Constitution does not impose a legally enforceable duty on state officers to protect people from private violence."[10] *Bank of Illinois v. Over*, 65 F.3d 76, 78 (7th Cir. 1995); *see also Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998) ("[T]he Due Process clause is a limitation on the state's power to act, not a guarantee of certain minimal levels of safety and security." (citing *DeShaney v. Winnebago Cty. Dep't of Social Services*, 489 U.S. 189, 195 (1989))). Similarly, the Constitution does not protect the public from governmental negligence. *Estate of Her v. Hoeppner*, 939 F.3d

---

[10] Two exceptions to this rule exist, but neither would be applicable here. An exception exists "when the state has a special relationship with a person, that is, if the state has custody of a person, thus cutting off alternative avenues of aid." *Estate of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019) (internal quotation marks omitted). That exception plainly does not apply here. There is also an exception "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998) (internal quotation marks omitted). This exception would not apply here for at least two reasons. First, "[d]angers to the public at large"—like the COVID-19 epidemic—"are insufficient for constitutional purposes." *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009). Second, this exception only applies if the government acts with "deliberate indifference" or "criminal recklessness." *Estate of Her*, 939 F.3d at 876. Here, there is simply no basis for concluding that the government is acting with such a state of mind toward Plaintiffs.

872, 877 (7th Cir. 2019) ("[M]ere negligence is categorically beneath the threshold of constitutional due process." (internal quotation marks omitted)). The Plaintiffs may disagree with holding the election as scheduled in light of the COVID-19 pandemic—and this Court may even agree with Plaintiffs that the better course would be to delay the election—but that does not mean Wisconsin is violating the U.S. Constitution by maintaining the April 7 election date. No state action is preventing Plaintiffs from going to the polls on April 7, and the Plaintiffs have not established that requiring them to vote on April 7 otherwise violates their constitutional rights by forcing them to choose between two fundamental rights. Plaintiffs' motion should be denied.

## III.   In the Event the WEC Does Not Adequately Represent the Counties' Interests, the Counties Should be Allowed to Intervene.

The Counties interpret the Court's March 28, 2020 Order in the '249 case as stating that additional intervenors are not necessary, where the goal of the proposed intervenor will be adequately represented by a party that is already in the case. The Counties anticipate that the WEC will submit a robust defense in the '284 case of the current election date.

However, to the extent the WEC fails to do so, the Counties submit that they be allowed to intervene as a party defendant in this matter. Pursuant to Fed. R. Civ. P. 24(a)(2) courts have set forth a four-factor test for intervention:

> (1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action.

*Illinois v. City of Chicago*, 912 F.3d 979, 984 (7th Cir. 2019), *cert. denied sub nom. Fraternal Order of Police Chicago Lodge No. 7 v. Illinois*, 140 S. Ct. 82, 205 L. Ed. 2d 30 (2019). As described *supra* the outcome of this case will dramatically affect Wisconsin counties' interest in

the timing and conduct of the planned April 7, 2020 election, such that the Counties are proper intervenors.

### A.  Wisconsin's Counties Have a Crucial Interest in the Outcome of This Action.

The Counties have a vested interest in the outcome of this case. A party has an interest in the outcome of a matter for the purposes of intervention, where the party's interest is "direct, significant, and legally protectable." *Lopez-Aguilar v. Marion Cty. Sheriff's Dept.*, 924 F. 3d 375, 391 (7th Cir. 2019). The Seventh Circuit has interpreted "statements of the Supreme Court as encouraging liberality in the definition of an interest." *Id.* at 392 (*quoting Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 204 (7th Cir. 1982)).

The prospect faced by the counties here—that their entire boards remain vacant for months during a time of crisis—is without precedent. There has never been a time in the history of our state where Wisconsin's counties wholly lacked a legislative branch. In general, county governments have been recognized as proper intervenors under Fed. R. Civ. P. 24(a)(2), where proposed injunctive relief would have a direct and harmful effect on the county's legally protectable interests. *See, e.g., Forest Conservation Council v. U.S. Forest Svc.*, 66 F.3d 1489, (9th Cir. 1995) (*abrogated on other grounds, The Wilderness Society v. U.S. Forest Svc.*, 630 F.3d 1173 (9th Cir. 2011) (county's economic and non-economic interests in proposed injunctive relief entitled it to intervention as of right).

The rights that the Counties seek to protect in this case—ensuring the continuation of government in a time of unprecedented emergency—is not merely ministerial in nature. Rather, it goes to the core purpose of county boards of supervisors. *Cf. One Wisconsin Institute, et al. v. Nichol, et al.*, 310 F.R.D. 394, 398-99 (W.D. Wis. 2015) (county clerks not entitled to intervention

16

as of right, because voter ID laws would affect only ministerial duties and powers, which do not rise to the level of legally protected interests).

### B. As a Practical Matter, the Disposition of this Action has the Potential of Impeding Wisconsin's Counties' Ability to Ensure Continuance of Governance.

Disposing of this matter without input from Wisconsin's counties will, as a practical matter, "impair or impede [their] ability to protect [their] interest." Fed. R. Civ. P. 24(a)(2). To meet this factor, a party need only show "that the disposition of the action 'may' impair or impede their ability to protect their interests." *Brumfield v.* Dodd, 749 F.3d 339, 344 (5th Cir. 2014). The "impediment" factor is a practical one, and may include considerations of a party's ability to preserve its right to litigate the issues on appeal. *See Flying J., Inc. v. Van Hollen*, 578 F.3d 569, 573 (7th Cir. 2009) (allowing intervention so that the party can appeal, so as to avoid "substantial inconvenience … with no offsetting gain.").

The Counties' ability to ensure continuity of governance and provide leadership in a time of crisis will undoubtedly be impeded, should the Court choose to postpone the election. While many counties have an administrator or executive who, theoretically, would be able to maintain some semblance of government in this time of crisis despite a vacant board of supervisors (albeit with none of the normal "checks" a legislative body enjoys in governance), the situation is worse for the nearly half of Wisconsin counties who do not have an administrator or executive.[11] Counties with no administrator or executive would be forced to function without any leadership from its elected governing body.

---

[11] Neither an executive nor an administrator enjoy unilateral appropriation authority. *See* Wis. Stats. §§ 59.60 and 65.90. As set forth below, appropriations and budgets will unquestionably be important in this time of statewide emergency.

17

Further, should the WEC fail to adequately represent Wisconsin counties' interests—either in this Court or in any appeal, the Counties should be allowed to intervene to preserve their appellate rights. *Flying J., Inc.*, 578 F.3d at 573.

### C. If the WEC does not defend the Election Date, No Other Party or Proposed Intervenor in This Case will Adequately Represent the Counties' Interests.

As noted above, the Counties anticipate that the WEC will vigorously oppose Plaintiffs' request to delay the election. However, if the WEC does not do so, there will be no other party in this matter that will represent Wisconsin counties' interests. The statutory scheme summarized *supra* is unique to counties, and there are no other counties in any of the consolidated cases, much less any party that can be depended on to raise the Counties' concerns.[12]

### D. This Motion is Timely.

This motion is timely. Timeliness is a four-factor analysis.  Courts must consider:

> (1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; (4) any other unusual circumstances.

*City of Chicago*, 912 F.3d at 984. This case was filed on March 26, 2020. The Counties are filing the instant motion mere days later. There is no chance of prejudice to the Plaintiffs' case posed by intervention, as the Court has yet to make any substantive ruling on the '284 Plaintiffs' TRO motion. As the Court observed under similar circumstances in the '249 case, "the motions are certainly timely."  ('249 Case, Dkt. No. 85, p.10.)

---

[12] The Cities of Milwaukee, Green Bay and Madison have all filed amicus briefs in this case. (Case No. 3:20-cv-00249, Docket Nos. 100, 104, 112). Of those amici, only the City of Milwaukee addresses continuity of governance as a concern. (Docket No. 100, p. 15.) However, Milwaukee's circumstance is materially different—there is no statute setting a date certain for incumbents' terms to expire, and its city charter explicitly allows their incumbents to stay in office until the replacement is elected.

### E.   Permissive Intervention is Also Appropriate.

Permissive intervention pursuant to Rule 24(b) is also appropriate, because Washington County's and the WCA's claims and defenses relating to continuity of government arise out of the same core set of facts as the parties—the effect of the coronavirus pandemic on Wisconsin's spring elections. Whichever way the Court rules on Plaintiffs' TRO motion, it will have a profound effect on the counties' unique interests in the continuance of government. This motion is timely and, far from prejudicing any party, the input of the counties can only further serve to flesh out all of the issues before the Court.

## <u>CONCLUSION</u>

For the foregoing reasons, the Counties respectfully request that the Court deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction in 20-cv-284.

Dated:          March 31, 2020

                Milwaukee, Wisconsin


                                    By:     s/Andrew T. Phillips

                                            Andrew T. Phillips (SBN 1022232)
                                            Matthew J. Thome  (SBN 1113463)
                                            von Briesen & Roper, s.c.
                                            411 East Wisconsin Avenue, Suite 1000
                                            Milwaukee, WI 53202
                                            Phillips Phone: (414) 287-1570
                                            Phillips Facsimile: (414) 238-6439
                                            Thome Phone: (414) 287-1433
                                            Thome Facsimile: (414) 238-6505
                                            aphillips@vonbriesen.com
                                            mthome@vonbriesen.com

                                            William E. Fischer (SBN 1045725)
                                            von Briesen & Roper, s.c.

19

2905 Universal Street, Suite 2
Oshkosh, WI 54904
Phone: (920) 232-4843
Facsimile: (920) 232-4883
wfischer@vonbriesen.com

*Attorneys for Proposed Amici Wisconsin Counties*
*Association and Washington County*

20