IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEMOCRATIC NATIONAL COMMITTEE
and DEMOCRATIC PARTY OF WISCONSIN,

                Plaintiffs,

    v.

MARGE BOSTELMANN, JULIE M. GLANCEY, ANN S.
JACOBS, DEAN KNUDSON, ROBERT F. SPINDELL, JR.
and MARK L. THOMSEN,

                Defendants,

    and

REPUBLICAN NATIONAL COMMITTEE
and REPUBLICAN PARTY OF WISCONSIN,

                Intervening Defendants.

OPINION AND ORDER

20-cv-249-wmc

-------------------------------------------------------------------------------------------------------------------------

SYLVIA GEAR, MALEKEH K. HAKAMI, PATRICIA
GINTER, CLAIRE WHELAN, WISCONSIN ALLIANCE
FOR RETIRED AMERICANS and LEAGUE OF WOMEN
VOTERS OF WISCONSIN,

                Plaintiffs,

    v.

MARGE BOSTELMANN, JULIE M. GLANCEY, ANN S.
JACOBS, DEAN KNUDSON, ROBERT F. SPINDELL, JR.,
MARK L. THOMSEN, and MEAGAN WOLFE,

                Defendants.

20-cv-278-wmc

-------------------------------------------------------------------------------------------------------------------------

REVERAND GREG LEWIS, SOULS TO THE
POLLS, VOCES DE LA FRONTERA, BLACK LEADERS
ORGANIZING FOR COMMUNITIES, AMERICAN
FEDERATION OF TEACHERS, LOCAL, 212, AFL-CIO,
SEIU WISCONSIN STATE COUNCIL and LEAGUE
OF WOMEN VOTERS OF WISCONSIN,

Plaintiffs,

v.

20-cv-284-wmc

MARGE BOSTELMANN, JULIE M. GLANCEY, ANN S.
JACOBS, DEAN KNUDSON, ROBERT F. SPINDELL, JR.,
MARK L. THOMSEN, and MEAGAN WOLFE,

Defendants.

In these three, consolidated cases, all filed in the last two weeks under the cloud of the emerging COVID-19 health crisis, plaintiffs[1] challenge a number of election-related, statutory requirements for the rapidly approaching April 7, 2020, election. Contrary to the view of at least a dozen other states, as well as the consensus of medical experts across the country as to the gathering of large groups of people, the State of Wisconsin appears determined to proceed with an in-person election on April 7, 2020. In the weeks leading up to the election, the extent of the risk of holding that election has become increasingly clear, and Wisconsin voters have begun to flock to the absentee ballot option in record numbers. As a result, state election officials are confronting a huge backlog in requests for absentee ballots made online, by mail or in person, including an unprecedented number of questions regarding how to satisfy certain registration requirements, properly request an

---

[1] For simplicity, all three groups of plaintiffs will be referred to simply as simply "plaintiffs" throughout this opinion unless otherwise indicated, while still recognizing that the three cases continue to retain their separate characters. *See Ivanov-McPhee v. Washington Nat. Ins. Co.*, 719 F.2d 927, 928 (7th Cir. 1983) ("[A]ctions which have been consolidated do not lose their separate identity.").

absentee ballot, and return a properly completed absentee ballot in time to be considered for the April 7 election. On top of the burdens this influx has created for the Wisconsin Election Commission, its Administrator, staff and local municipalities in the days leading up to the election, that same group has been improvising in real time a method to proceed safely and effectively with in-person voting in the face of increasing COVID-19 risks, loss of poll workers due to age, fears or sickness, the resulting consolidation of polling locations, and inadequate resources.

Despite these truly heroic efforts, the three most likely consequences of proceeding with the election on this basis are (1) a dramatic shortfall in the number of voters on election day as compared to recent primaries, even after accounting for the impressive increase in absentee voters, (2) a dramatic increase in the risk of cross-contamination of the coronavirus among in-person voters, poll workers and, ultimately, the general population in the State, or (3) a failure to achieve sufficient in-person voting to have a meaningful election *and* an increase in the spread of COVID-19. Nevertheless, the Wisconsin State Legislature and Governor apparently are hoping for a fourth possibility: that the efforts of the WEC Administrator, her staff, the municipalities and poll workers, as well as voters willing to ignore the obvious risk to themselves and others of proceeding with in-person voting, will thread the needle to produce a reasonable voter turnout and no increase in the dissemination of COVID-19.

However unlikely this outcome may be, or ill-advised in terms of the public health risks and the likelihood of a successful election, the only role of a federal district court is to take steps that help avoid the impingement on citizens' rights to exercise their voting

franchise as protected by the United States Constitution and federal statutes. That is what the court attempts to do in this opinion and the order below, understanding that a consequence of these measures may be to further the public health crisis in this State. Unfortunately, that is beyond the power of this court to control.

In a prior opinion and order in the '249 case, the court granted plaintiffs the Democratic National Committee and the Democratic Party of Wisconsin's (jointly, the "DNC/DPW") motion for temporary restraining order in part, extending the deadline by which an individual can register to vote electronically to March 30, 2020. The court denied the other requests, but signaled to plaintiffs that the court would consider their request for extension of the date by which absentee ballots may be counted toward the election and other relief in a motion for preliminary injunction. On March 27, 2020, plaintiffs filed a motion for preliminary injunction and supporting evidence, seeking an extension of the deadline for receipt of absentee ballots and a suspension of the witness signature requirement on those ballots, as well as reconsideration of the court's ruling on the by-mail absentee deadline and documentation requirements. ('249 dkt. #61.) In addition, on March 28, 2020, plaintiffs in the '278 and '284 cases filed motions for temporary restraining orders, requesting postponement of the April 7, 2020, election and other relief duplicative of the relief requested in the '249 motion for preliminary injunction. ('278 dkt. #8; '284 dkt. #17.)

In response to these motions, the court consolidated the three cases, and set briefing on the various motions. After reviewing the opposition briefs filed by defendants the Commissioners and Administrator of the Wisconsin Election Commission ("WEC") and

the intervening defendants the Republican National Committee and the Republican Party of Wisconsin (jointly, the "RNC/RPW"), as well as amici briefs, the court further conducted an evidentiary hearing and oral argument on April 1, 2020, at which the parties appeared by counsel and WEC Administrator Meagan Wolfe provided extensive testimony in response to the court's questions, as well as those posed by counsel.[2]

For the reasons that follow and provided on the record during the hearing on plaintiffs' motions, the court will grant plaintiffs' motions in part, and provide the following preliminary relief: (1) enjoin the enforcement of the requirement under Wis. Stat. § 6.87(6) that absentee ballots must be received by 8:00 p.m. on election day to be counted and extend the deadline for receipt of absentee ballots to 4:00 p.m. on April 13, 2020; (2) enjoin the enforcement of the requirement under Wis. Stat. § 6.86(1)(b) that absentee ballot requests must be received by April 2, 2020, and extend the deadline for receipt of absentee ballot requests by mail, fax or email (and if deemed administratively feasible in the sole discretion of the WEC Administrator, online) to 5:00 p.m. on April 3, 2020; and (3) enjoin the enforcement of Wis. Stat. § 6.87(2) as to absentee voters who have provided a written affirmation or other statement that they were unable to safely obtain a witness certification despite reasonable efforts to do so, provided that the ballots are otherwise valid.[3]

---

[2] Initially, the Commissioners were represented by the Attorney General of Wisconsin. But on March 26, 2020, the Governor appointed special counsel to represent them pursuant to Wis. Stat. § 14.11(2)(a).

[3] The court *will* reserve on the question as to whether the actual voter turnout, ability to vote on election day or overall conduct of the election and counting votes timely has undermined citizens' right to vote.

FACTS

**A. Overview of the WEC and Voting in Wisconsin**

The WEC is charged with overarching responsibility to administer and enforce Wisconsin's election laws. In administering elections, the WEC works with the state's 72 county clerks and 1,850 municipal clerks. The WEC issues clerk communications, training materials and forms for local clerks. In turn, local clerks are tasked with implementing any changes in policy or law in their community, including administering absentee ballot voting. About two-thirds of the clerks in Wisconsin municipalities are part-time.

After the polls close, election inspectors are charged with tabulating the votes received at the polling places; municipal clerks are to report the returns within two hours after tabulation; and the county clerks are to post the results within two hours after receiving the returns. Wis. Stat. §§ 7.51(1), (4), 7.60(1). Municipalities have two ways to count absentee ballots: (1) count absentee ballots at the polling places, Wis. Stat. §§ 6.88, 7.51; or (2) count absentee ballots at a central location by a municipal board of absentee ballot canvassers, Wis. Stat. § 7.52. Under either method, the election inspector or absentee ballot canvasser reviews the certification contained on the envelope, and if the certification is insufficient, the ballot is not counted. Wis. Stat. §§ 6.88(3)(b), 7.52(a).

For the upcoming April 7 election, municipal boards of canvass have until April 13 to certify the results to the county. The county boards of canvass also have 10 days after the election to certify their results to the WEC or April 17, 2020, for the upcoming election. Wis. Stat. § 7.60(5). The municipal boards of canvass must further publicly declare the results for municipal contests by the third Tuesday of April, or in the case of

the April 7 election, by April 21, 2020. Wis. Stat. § 7.53(2)(d). Finally, the WEC has until May 15, 2020, to certify the election results for state and federal contests. Wis. Stat. § 7.70(3)(a).

In addition to the presidential primaries, the April 7, 2020, election has the following state and local seats on the ballot: a Wisconsin Supreme Court justice; three Wisconsin Court of Appeals judges; 34 Wisconsin circuit court judges; 102 municipal court judges; 1,596 county positions; 763 city positions; 464 village positions; 391 town positions; 565 school board seats; and 12 sanitary district supervisory board positions. (Gov. Evers Amicus Br. (dkt. #151) 6.)

## B. Current State of COVID-19 Health Crisis

As of March 27, the date the DNC/DPW plaintiffs filed their motion for preliminary injunction, the state was reporting more than 710 cases of COVID-19 and at least 12 deaths. As of the date of this opinion and order, there are 1,550 confirmed cases in Wisconsin and 24 deaths.[4] Wis. Dep. of Health Servs., "Outbreaks in Wisconsin" (as of Apr. 1, 2020), available at https://www.dhs.wisconsin.gov/outbreaks/index.htm. While Wisconsin and other parts of the country are taking steps to "flatten the curve," it is clear that the outbreak in Wisconsin is still somewhat near the beginning of that curve, with evidence of increasing community spread. (Pls.' PFOFs ('284 dkt. #19) ¶¶ 56-57; *see also* Gov. Evers Amicus Br. ('249 dkt. #151) 8 ("[T]he COVID-19 epidemic in Wisconsin will

---

[4] Moreover, Wisconsin's Department of Health Services' chief medical officers and state epidemiologist for communicable diseases estimate that the actual number of Wisconsinites with COVID-19 is up to ten times higher than the number who have tested positive. (Gov. Evers Amicus Br. ('249 dkt. #151) 7 & n.12.)

get worse before it gets better," with the DHS Secretary-Designee estimating that "it could be '10-plus' days before the growth curve of COVID-19 flattens out in Wisconsin.").)

On Tuesday, March 24, Governor Evers issued a "Safer-at-Home Order," requiring all Wisconsinites to shelter in place to slow the spread of COVID-19 until April 24, 2020, or until a superseding order is issued. (Spiva Decl., Ex. 4 ('249 dkt. #63-4) (also known as "Emergency Order #12").) This order is consistent with the Centers for Disease Control and Prevention's ("CDC") recommendations that people in the at-risk category, which includes people who are 65 years old or older or who have underling health conditions and diseases, including chronic lung diseases, asthma, diabetes, serious heart conditions, and are otherwise immune-compromises, stay at home and avoid non-essential travel. (Pls.' PFOFs ('278 dkt. #16) ¶ 6.) According to U.S. Census Bureau 5-year estimates, 15 per cent of the 2,328,754 Wisconsin households include someone 65 years of age or older.[5]

### C. Increased Reliance on Absentee Ballots

State actors have increasingly focused on encouraging individuals to vote by absentee ballot, with Governor Evers recently calling on the Legislature to enable all registered voters to receive a ballot by mail and extend the time for mailed-in absentee ballots to be counted. (Pls.' PFOFs ('284 dkt. #19) ¶ 67.) On March 24, the Governor issued an "EMERGENCY ORDER #12: SAFER AT HOME ORDER," directing all Wisconsinites to stay at their home and places of residence, but a week later amended that

---

[5] Although the number of those households occupied by those *only* 65 years or older is unclear, 675,000 households in the state are one-person, and 862,900 are two-person households. (Dkt. #166-4, Ex. 54.) By extrapolation, plaintiffs represent that 250,000 of these are over 65. (Pls.' PFOF ('278 dkt. #16) ¶ 20.)

order to explain that "the Safer at Home Order is not intended to eliminate in-person absentee voting for the April 7, 2020, election" or "in person voting on the scheduled election date." (Gov. Evers Amicus Br. ('249 dkt. #151) 5 & n.8.) In turn, the WEC indicated that it cannot cancel or postpone the election, and that "any change may require court intervention, an act of the Legislature, or an order of the Governor." (Pls.' PFOFs ('284 dkt. #19) ¶ 88.)

As a result, Governor Evers, the WEC Administrator, and the Mayor of Milwaukee, among other public officials, are encouraging voters to vote via absentee ballot. Ironically, while encouraging voting by absentee ballot, the options for in-person voting, either before the election day by absentee ballot or on election day are at risk of being eliminated or have been eliminated. In the City of Madison, 67% of poll workers are over 60 years of age, falling within the at-risk category for COVID-19, and 32% of poll workers have canceled their assigned, in-person voting shifts. Madison also limited in-person absentee voting to curbside voting and eliminated voting at other early voting locations. Similarly, the City of Milwaukee has reported that it no longer has sufficient staff to operate its three, in-person early voting locations, also eliminating the ability to register in-person before the election, although as the intervening defendants point out, drive-up early voting remains available through April 5. Milwaukee Elections Commission Website, available at https://city.milwaukee.gov/election#.XoFPkpNKiqA.

As of the date of the DNC/DPW plaintiffs' motion, 699,431 absentee ballots have been requested statewide. As of the latest available data, that number has increased to 1,119,439, with today being the last remaining opportunity for individuals to request the

mailing of an absentee ballot. WEC, "Absentee Ballot Report - April 7, 2020 Spring Election" (Apr. 2, 2020), available at https://elections.wi.gov/node/6806. As a point of reference, in the four spring elections from 2016 to 2019, the number of absentee ballots issued ranged from a low of 103,533 in 2017 to a high of 249,503 in 2016. (Burden Rept. ('249 dkt. #63-1) 7.)[6] In a March 23, 2020, hearing on the court's prior temporary restraining order, WEC Administrator Wolfe, stated "we're also seeing unprecedented traffic for people requesting their absentee ballot." (Pls.' PFOFs ('249 dkt. #62-1) ¶ 8.) Anticipating this growth in demand, the WEC has distributed 1.2 million absentee ballot envelopes to municipal clerks throughout the state. At the hearing, WEC Administrator Wolfe testified that for the 2012 and 2016 spring elections, approximately 80-85% of the absentee ballots sent to voters were returned in time to be counted.

As a result of the significant uptick in absentee ballot requests, Madison City Clerk Maribeth Witzel-Behl represents that Madison has received an "unprecedented number of requests for absentee ballots"; Milwaukee City Clerk Neil Albrecht estimates that "absentee ballot requests this election are ten times the normal number"; and Hudson City Clerk Becky Eggen avers that "[t]his election cycle is by far the busiest I have experienced in terms of volume and speed of requests for absentee ballots." (*Id.* ¶¶ 9-11 (citing Witzel-Behl Decl. ('249 dkt. #77) ¶ 7; Albrecht Decl. ('249 dkt. #73) ¶ 5); Eggen Decl. ('249 dkt. #65) ¶ 2).)

In light of these unprecedented numbers, at least some clerks are having trouble

---

[6] Moreover, in previous spring elections, absentee ballots were about as likely to be returned in person as by mail, a highly unlikely scenario for this election given the health risks and reduced options for doing so. (Burden Rept. ('249 dkt. #63-1) 7-8.)

processing the applications for absentee ballots. The Madison Clerk explains that "[a]ttempting to meet the extraordinary demand for absentee ballots and other requests from voters has strained the capabilities of the Clerk's office," and "[t]he ever increasing volume of requests for absentee ballots is threatening to overwhelm the staff available." (Pls.' PFOFs ('249 dkt. #62-1) ¶ 20 (quoting Witzel-Behl Decl. ('249 dkt. #77) ¶¶ 6, 8).) As of March 27, Madison had a backlog of more than 12,000 absentee ballots requests to process, and as a result it was experiencing at least a week-long delay in sending out absentee ballots. As of March 27, the City of Hudson had 2,000 pending requests for absentee ballots. The difficulty of processing the high volume requests is not limited to these cities, but extends to other municipal election offices across the state. Although WEC Administrator Wolfe represented at the April 1, 2020, hearing that the backlog had improved in recent days, she was unable to provide any specifics.

While recognizing the challenges in processing absentee ballot requests, the WEC maintains that "[i]t is not clear that the timely processing of requests for absentee ballots is impossible." (Defs.' PFOFs ('249 dkt. #109) ¶ 38.) In particular, the WEC represents that as of March 31, 2020, of the 972,232 absentee ballot requests, 942,350 have been sent out, leaving only a backlog of 30,000 statewide. WEC, "Absentee Ballot Report - April 7, 2020 Spring Election" (Mar. 31, 2020), available at https://elections.wi.gov/node/6794. As of April 2, the backlog was approximately 21,590. WEC, "Absentee Ballot Report - April 7, 2020 Spring Election" (Apr. 2, 2020), available at https://elections.wi.gov/node/6806.

Nevertheless, in light of the challenges in processing requests and mailing out

absentee ballots, the Madison City Clerk avers that "the 8:00 p.m. election day deadline for receipt of absentee ballots is completely unworkable." (Pls.' PFOFs ('249 dkt. #62-1) ¶ 29 (quoting Witzel-Behl Decl. ('249 dkt. #77) ¶ 13).) Specifically, the United States Postal Service estimates that two to three days are necessary for a ballot to arrive on time, although as the WEC points out during the past several years, USPS has advised voters to mail completed ballots one week before the election to ensure that they are received on or before election day, and since the beginning of the COVID-19 health crisis, the USPS is operating more slowly. (Defs.' PFOFs ('249 dkt. #109) ¶¶ 8-9.)

As a result, the City Clerks for Madison and Milwaukee represent that "[t]here is no practical way that a person submitting a request for an absentee ballot on the deadline for submitting the request . . . will have the time to receive, vote and return their ballot by Election Day." (*Id.* ¶ 30 (quoting Cities' Amicus Br. ('249 dkt. #39) 5).) The Madison City Clerk estimates that more than 1,000 ballots will be received after the election day deadline; Milwaukee estimates that "thousands" will arrive late. Indeed, at the hearing, in light of the number of absentee ballot requests to date and with reference to the 2016 spring election as a point of comparison, Wolfe acknowledged that approximately 27,500 voters absentee ballots will be received *after* the receipt deadline of 8:00 p.m. on the day of the election, April 7, 2020, and, therefore, will not be counted. No doubt at least in part for this reason, the WEC informed the court on March 31, 2020, that it no longer objects to any absentee ballot postmarked by April 7, 2020, and received by 4:00 p.m. on April 13, 2020, being counted in the election. ('249 dkt. #152.) In their notice to the court, the WEC also represented that "If the votes received by 4:00 p.m. on April 13, 2020, are

12

counted it will not impact the ability to complete the canvass in a timely manner." (*Id.*)

At the hearing, WEC Administrator Wolfe and her counsel reiterated this position..

### D. Challenges to Absentee Voting Posed by Safer-At-Home Order

#### 1. Absentee Ballot Witness Signature Requirement

The Safer-At-Home Order did not explain how its provisions would implicate any of the state's requirements for voting, including the witness signature requirement, although as the intervening defendants point out, there are numerous exceptions to the order including for "essential governmental functions" and "essential travel." The envelopes in which absentee voters enclose and send in their ballots include the following language in the "Certification of Voter" box:

> I certify that I exhibited the enclosed ballot unmarked to the witness, that I then in (his) (her) presence and in the presence of no other person marked the ballot and enclosed and sealed the same in this envelope in such a manner that no one but myself and any person rendering assistance under s. 6.87 (5), Wis. Stats., if I requested assistance, could know how I voted.

Wis. Stat. § 6.87(2). (*See also* Defs.' PFOFs (dkt. #109) ¶ 16.) A box labeled "Certification of Witness" provides:

> I, the undersigned witness, subject to the penalties of s. 12.60 (1) (b), Wis. Stats., for false statements, certify that I am an adult U.S. citizen and that the above statements are true and the voting procedure was executed as there stated. I am not a candidate for any office on the enclosed ballot (except in the case of an incumbent municipal clerk). I did not solicit or advise the elector to vote for or against any candidate or measure.

*Id.* (*See also* Defs.' PFOFs (dkt. #109) ¶ 17.)

On March 26, 2020, the Madison City Clerk issued a statement indicating that

"there is no exception to the witnessing and signature requirement for mail-in ballots," and referring voters to non-profit organizations who can assist with witness signatures while maintaining social distancing. (Pls.' PFOFs ('278 dkt. #16) ¶ 18 (quoting Aguilera Decl., Ex. T ('278 dkt. #15-20)).) On March 29, the WEC also issued guidance suggesting several options for voters to meet this requirement and avoid direct interaction, including a friend or neighbor may watch the voter mark their ballot through a window, open door or other physical barrier, and even may do so by video chat, like Skype or Facetime, with the voter then placing the ballot outside for the witness to sign and mail. WEC, "Absentee Witness Signature Requirement Guidance" (Mar. 29, 2020), available at https://elections.wi.gov/node/6790. The WEC even suggested that the voter could ask an individual delivering groceries or food to witness the ballot. *Id.* At the hearing, WEC Administrator Wolfe acknowledged that some of the guidance, in particular that concerning use of video chat, may not work for some elderly voters without access to or familiarity with the technology, and that the guidance may not account for all safety concerns about proper treatment of paper to avoid the spread of COVID-19. For its part, the City of Milwaukee has established five places where voters can drop off their completed absentee ballots and get them witnessed by staff, although obviously individuals would have to leave their home to access these services.

There are 675,850 single member households in Wisconsin, a substantial number of which are over the age of 65, including the four individual plaintiffs in the '278 case. (Pls.' PFOFs ('278 dkt. #16) ¶ 20.) Plaintiffs also submit declarations from several other individuals living alone, and in high risk groups, who explain the challenges they face in

complying with the witness signature requirement for absentee ballots and averring that they have been unable to secure the necessary signatures. (Pls.' PFOFs ('249 dkt. #62-1) ¶¶ 36, 39 (citing declarations); Pls.' PFOFs ('278 dkt. #16) ¶¶ 21-31 (citing plaintiffs' declarations); Pls.' PFOFs ('284 dkt. #19) ¶ 76 (citing declaration).) Plaintiffs' expert further opines "for a person who lives alone, is immunocompromised and self-quarantining to protect their health, or who has contacted COVID-19 and is in quarantine to protect others, it may be nearly impossible to secure a witness signature in a timely fashion." (*Id.* ¶ 37 (quoting Burden Rept. ('249 dkt. #63-1) 9).) The Madison City Clerk also avers that her office has received "numerous requests daily from individuals who have received an absentee ballot, but live alone and have no person to witness the ballot . . . [and] are afraid to leave their homes in search of a witness." (*Id.* ¶ 38 (quoting Witzel-Behl Decl. ('249 dkt. #77) ¶ 11); *see also* Eggen Decl. ('249 decl. #65) ¶ 6).)[7]

### 2. Photo ID and Proof of Residency Requirements

Plaintiffs similarly contend that the Safer-At-Home Order, and specifically the requirement that all non-essential business close, poses challenges to individuals who need a copy of a photo ID or proof of residency in order to register to vote and request an absentee ballot online or by mail. While the intervening defendants point out that the Safer-At-Home order exempts business from closure that may provide photocopying services, a question remains whether voters, especially the elderly or other high-risk individuals, will feel safe venturing out to those businesses. Plaintiffs' expert again opines

---

[7] As of March 31, 2020, the Milwaukee Clerk also avers that the city has received 450 absentee ballots that are missing the necessary witness signature. (Albrecht Decl. ('249 dkt. #135).)

that "[w]ithout the assistance of an election official and perhaps other friends or family who are separated physically due to 'social distancing' measures taken in response to the virus pandemic, [the copying and mailing in a copy of a photo ID or proof of residency] will be an administrative and technological hurdle for some prospective voters," especially given that absentee voting is a "new and foreign process" for many Wisconsin voters, although recognizing that absentee voting has been in place in Wisconsin for some time. (Pls.' PFOFs ('249 dkt. #62-1) ¶¶ 43-44 (quoting Burden Rept. ('249 dkt. #63-1) 12.)

One individual specifically avers that because of her lack of access to a copier or scanner, she will not be able to vote in this election. (*Id.* ¶ 45 (citing Love Decl. (dkt. #68) ¶ 4.) Moreover, the Dane County Clerk avers that he has received "many calls from elderly voters who are unable to provide a copy of their photo ID as required to request an absentee ballot." (McDonell Decl. ('249 dkt. #74) ¶ 6.)[8] In response, he has advised these voters "to indicate on their absentee ballot requests that they are 'indefinitely confined' due to illness," and on March 25, 2020, he advised all Dane County voters that they "should continue to follow the law requiring a photo ID but that they may indicate as needed that they are indefinitely confined due to illness." (*Id.* ¶¶ 6-7.)

In response, the WEC issued guidance for indefinitely confined electors on March 29, 2020, which provides in pertinent part:

> 1. Designation of indefinitely confined status is for each individual voter to make based upon their current

---

[8] The intervening defendants dispute McDonell's account and other statements by clerks on hearsay grounds. At minimum, these statements are admissible for the impact they had on the declarants as voters. Fed. R. Evid. 803(3). To that extent, the court will at least credit the fact that some high risk voters have been paralyzed by the uncertain risks associated with venturing outside their homes.

circumstance. It does not require permanent or total inability to travel outside of the residence. The designation is appropriate for electors who are indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period.

2. Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness, infirmity or disability.

WEC, "Guidance for Indefinitely Confined Electors COVID-19" (Mar. 29, 2020),

available at https://elections.wi.gov/node/6788. This guidance goes on to explain:

We understand the concern over the use of indefinitely confined status and do not condone abuse of that option as it is an invaluable accommodation for many voters in Wisconsin. *During the current public health crisis, many voters of a certain age or in at-risk populations may meet that standard of indefinitely confined until the crisis abates.* We have told clerks if they do not believe a voter understood the declaration they made when requesting an absentee ballot, they can contact the voter for confirmation of their status. They should do so using appropriate discretion as voters are still entitled to privacy concerning their medical and disability status. Any request for confirmation of indefinitely confined status should not be accusatory in nature.

*Id.* (emphasis added).[9]

### E. Challenges to In-Person Registration and Voting

While the significant increase in absentee ballot requests should decrease

---

[9] In a March 31, 2020, order, the Wisconsin Supreme Court granted the Republican Party of Wisconsin's motion for temporary restraining order, directing the Dane County Clerk to "refrain from posting advice as the County Clerk for Dane County inconsistent with the above quote from the WEC guidance." *Jeffersom v. Dane Cty.*, No 2020AP557-OA (Mar. 31, 2020). ('249 dkt. #130.) In so holding, the Supreme Court effectively adopted the WEC's guidance of the term "indefinitely confined" as quoted above.

significantly the number of in-person voters on April 7, assuming the total votes for this election fall somewhere in the mid-range of the total number of votes in the 2012 spring election (approximately 1.1 million) and the 2016 spring election (approximately 2.1 million), WEC Administrator Wolfe testified during the hearing that roughly 500,000 people would still need to vote in-person on April 7. In light of the COVID-19 health crisis and the various government orders, municipal clerks have expressed concerns about safely administering in-person voting and registration either before election day or on April 7. In response, the WEC has issued various communications, acknowledging concerns, including shortages of absentee ballot envelopes, polling locations, poll workers, hand sanitizer and cleaning products, as well as the real possibility that the clerks themselves may not be able to serve in the days leading up to election day and the election day itself. (Pls.' PFOFs ('284 dkt. #19) ¶¶ 80-84.) Still, the WEC has directed municipal clerks to continue in-person registration and voting, while requiring at least six-feet of distance between voters and election workers.

As for election day, the WEC has directed that municipalities are required to conduct in-person election day voting and that local election officials and local elected officials are not authorized to terminate this option. (Defs.' PFOFs ('249 dkt. #157) ¶ 2.) After consulting the public health officials, the WEC recently provided guidance for polling stations on election day as well. (*Id.* ¶ 3; *see also* Wolfe Decl., Ex. F ('249 dkt. #106-6).) This guidance requires hand washing or sanitizing stations, wiping down tables, door handles, pens, etc., every ten minutes, ensuring at least six-feet distance between voters and between voters and election workers, and avoiding handling of photo IDs, among other

18

requirements. The WEC has purchased a large quantity of 70% ethyl alcohol liquid sanitizing product to provide clerks a disinfecting solution for use at polling sites, and is in the process of securing cleaning wipes. In addition, Governor Evers has indicated that he has agreed to use members of the Wisconsin Army National Guard to assist poll workers, although it is "anticipated that the assistance of the National Guard will not satisfy all of the current staffing needs." (Gov. Evers Amicus Br. ('249 dkt. #151) 9.)

Even so, WEC Administrator Wolfe testified at the hearing that in a recent survey, 111 municipalities indicated that they did not have the capacity to staff even one polling place. Moreover, plaintiffs in the '284 case submit more disturbing proposed findings of facts with respect to specific election preparations for the Cities of Milwaukee, Madison, Green Bay and Racine. In Milwaukee, the City has 592,000 residency, of which 439,000 are of voting age and approximately 298,000 are currently registered to vote. Approximately 40% of City residents are African-American; 17% are Hispanic/Latino; and 28% live in poverty, as compared to the state average of 13%. Milwaukee has 327 electoral wards and 180 polling stations, although 18 polling stations are unavailable due to risk of cross-contamination. In the 2016 spring presidential primary, Milwaukee documented 167,765 total ballots cast and processed 14,321 absentee ballots.

In preparation for the April 7, 2020, election, the City of Milwaukee will require some 300 staff members to assist in the processing of absentee ballots and 1,500 staff members for polling location operations. Due to the COVID-19 heath crisis, as of March 30, 2020, there are less than 400 election workers (without confirmation from all) and 50 central count workers available. An estimated 50% of the City's regular election workers

are over the age of 60, with approximately 33% over the age of 70. Milwaukee is concerned about training new poll workers due to the social distancing requirements. According to the City's Clerk, "[w]hether imposed *de jure* or *de facto*, the City of Milwaukee likely will be *unable* to conduct in-person voting in its 327 wards on April 7, leaving mail-in absentee voting as the only means currently [available] by which Milwaukee voters will be able to vote for the Spring Election scheduled to occur on April 7." (Pls.' PFOFs ('284 dkt. #19) ¶ 98 (citing Albrecht Decl. ('284 dkt. #12) ¶ 9) (emphasis added).) The WEC disputes this, pointing to its guidelines requiring municipalities to conduct in-person absentee and election day voting.

In addition, as of March 30, 2020, the City of Milwaukee has processed approximately 66,850 requests for absentee ballots. The Clerk estimates that if the City continues to receive approximately 5,000 requests per day until the last day such requests may be received, April 2, and assuming that 5% of the ballots mailed will not be returned, the City will process an additional 38,000 ballots for an estimated total of 90,000 ballots. Assuming in-person voting on election day is not possible, the Clerk estimates that the turnout for Milwaukee will be approximately 70,000 less than originally estimated.

In turn, the City of Madison has a population of approximately 255,650, with 213,725 of voting age, approximately 179,648 of which are registered to vote. The City has 152 voting wards and 92 polling stations, although 14 are not available due to COVID-19 health concerns, and the Madison Metropolitan School District is considering not allowing the City to use the 21 school facilities. Attempting to meet the demand for absentee ballots, other City of Madison employees have been reassigned to assist the City

Clerk, but even with that influx of employees, some staff have been working 12-17 hour days. As of March 24, the City has sent 40,275 absentee ballots by mail and 1,273 by email, by March 30, the total number of absentee ballots issued was over 69,000. Nonetheless, the City is having a difficult time processing the applications for absentee ballots, and it now has a backlog of over 12,000 requests. In the 2016 spring presidential primary, Madison voters cast 118,219 ballots, including 10,272 absentee ballots. The City is anticipating as many as 118,000 absentee ballots to be cast in the April 7 election.

As of March 24, 2020, 666 poll workers have also canceled their assigned shift at the polls in the City of Madison for the April 7 election. As such, 774 of the 1,500 morning shifts and 715 of the 1,500 evening shifts are vacant. In addition, approximately 67% of the City's poll workers were in the "at risk" category -- being over the age of 65. Accordingly, the City anticipates additional poll workers will opt not to work.[10]

As for Green Bay, as presented in the verified complaint in the Eastern District lawsuit, the City represents that it, too, is overwhelmed by the unprecedented demand for absentee ballots and has a backlog of over 4,000 requests with only six staff members, which includes employees from other departments, available to process the requests. As for election day, Green Bay currently lacks access to hand sanitizer or sanitation wipes, which are necessary to ensure cleanliness of polling places and limit potential exposure of

---

[10] Dane County filed an amicus brief, in which it argues that the April 7 election should be postponed, including a statement from its Director of Public Health Madison & Dane County, in which she advises that a failure to postpone the election "would put all Wisconsin communities at greater risk of illness due to COVID-19, and puts our health care systems at risk of becoming overwhelmed and depleted of resources." ('249 dkt. #150-3 (quoting Ex. C. (dkt. #150-5)).)

COVID-19.[11]  Moreover, 90% of its 278 poll workers are age 60 or older, and only 54 have agreed to work on election day.  Of the 54 poll workers who have agreed to work, only 11 are chief inspectors.  The City avers that with these staff shortages, proceeding with the April 7 election is "not only impractical, it is wholly irresponsible given that the integrity of the election will be jeopardized."  (Pls.' PFOFs ('284 dkt. #19) ¶ 125.)

Finally, with respect to Racine, like Milwaukee, it is more ethnically diverse than other cities in Wisconsin, with approximately 23% of its residents are African-American and 21% are Hispanic/Latino.  In addition, 20% of Racine residents lives below the poverty level.  Of Racine's more than 34,000 registered voters, the City typically sends approximately 1,500 absentee ballots.  As of March 26, 2020, Racine has sent 4,500 ballots, which while a significant number, represents a small percentage of Racine's voters. (Coolidge Decl. (dkt. #7) ¶ 6.)  For early voting, Racine has developed a process to ensure social distancing and attempt to limit exposure to COVD-19, but it does not believe these same protections will be viable on election day.  Of the 135 poll workers who routinely and reliably work elections, fewer than 25 are under the age of 60, and as of March 31, 2020, only 50 are willing to work the April 7 election.  Moreover, many of the chief election officials previously scheduled to work have also notified the City that they will not work the April 7 election.

In addition to considering the challenges faced by these four cities, plaintiffs in the

---

[11] In its complaint in the Eastern District of Wisconsin, the City of Green Bay and the City Clerk, described the typical, in-person voting process on election day, noting several places where poll workers and voters will be closer to one another than the recommended six-feet separation for proper social distancing.  (Pls.' PFOFs ('284 dkt. #19) ¶ 78.)

'284 case also contend that African-American and Latino voters are particularly burdened by the impact of the COVID-19 health crisis with respect to the April 7 election. Since the 2008 election in Wisconsin, between 10 to 15% of all registrations have occurred at a polling place on the election day. (Pls.' PFOFs ('284 dkt. #19) ¶ 74.) For Milwaukee, approximately 20% of the total turnout for spring elections involve same-day registrants. (*Id.* ¶ 159.) Plaintiffs in the '284 case further aver that a "significant number of African-American voters have historically participated in same-day registration at the polls on election day, and will be unable to do this year due to the COVID-19 pandemic." (*Id.* ¶ 153.) Furthermore, due to the digital divide, registering to vote online or requesting an absentee ballot online may present more of a barrier for low-income African-American and Latino voters.

The burdens posed by this election will also likely disproportionately impact elderly voters, who are most vulnerable to the COVID-19 threat. On March 25, Bryan Boland, a Canvass Lead for SEIUWI, one of the plaintiffs in the '284 case, spoke with 43 people aged 60 and older living in the western part of Wisconsin. (Pls.' PFOFs ('284 dkt. #19) ¶¶ 163-68 (citing Boland Decl. ('284 dkt. #2) ¶¶ 3-8); *see also* Lizotte Decl. ('284 dkt. #3) ¶¶ 3-10 (detailing additional concerns raised by voters ages 60 or older).) He avers that about half of the people that he spoke with were planning on voting in-person and would not request an absentee ballot, but a number of them recognized that if the coronavirus risks amplified, they might not be able to vote. A number of the people Boland spoke with also expressed difficulty in requesting a ballot on-line because of technical problems or lack

of a computer or smart phone.[12]

OPINION

The standard for determining whether a preliminary injunction or a temporary restraining order is appropriate is the same. *See Planned Parenthood of Wis., Inc. v. Van Hollen*, 963 F. Supp. 2d 858, 865 (W.D. Wis. 2013) (citing *Winnig v. Sellen*, 731 F. Supp. 2d 855, 857 (W.D. Wis. 2011)). Specifically, a plaintiff must first show "(1) that he will suffer irreparable harm absent preliminary injunctive relief during the pendency of his action; (2) inadequate remedies at law exist; and (3) he has a reasonable likelihood of success on the merits." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (citing *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015)). Then, if this initial showing is successfully made, "the court must engage in a balancing analysis, to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests." *Id.* (citing *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1057 (7th Cir. 2016)).

## I. Irreparable Harm & Inadequate Remedies at Law

The threatened loss of constitutional rights constitutes irreparable harm. *See Preston v. Thompson*, 589 F.2d 300, 303 n.4 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."); *Elrod v. Burns*, 427 U.S.

---

[12] The WEC offered detailed facts about how postponing the election altogether would cause technical / logistics issues with respect to conducting the Special Election in the 7th Congressional District in particular (dkt. #157 at ¶¶ 8-17), but since the court does not believe this power lies within its purview, the court will not recite those here.

347, 373 (1976) (where plaintiff had proven a probability of success on the merits, the threatened loss of First Amendment freedoms "unquestionably constitutes irreparable injury"). More specifically, courts have held that infringement on the fundamental right to vote amounts to an irreparable injury. *See Obama for Am. v. Husted*, 697 F.3d 423, 435 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (holding that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon").

Further, infringement on a citizens' constitutional right to vote cannot be redressed by money damages, and therefore traditional legal remedies would be inadequate in this case. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate."); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress."). Accordingly, at least to the extent that they have demonstrated a likely constitutional violation as discussed below, plaintiffs have satisfied the first two prongs of the initial showing -- irreparable harm and inadequate remedies at law.

## II. Likelihood of Success on the Merits & Balance of Equities

The court now turns to the heart of the matter -- whether plaintiffs have demonstrated a likelihood of success, and whether the balance of equities favors any of their requested relief. In the three motions, plaintiffs seek an order from the court restraining enforcement of the following six election-related requirements: (1) the current election day, April 7, 2020; (2) the current mail-in registration deadline under Wis. Stat.

§ 6.28(1); (3) the requirement that copies of proof of residence and voter ID accompany electronic and by-mail voter registration, under § 6.34; (4) the requirement that copies of photo identification accompany absentee ballot applications, under §§ 6.86, 6.87; (5) the requirement that absentee ballots be signed by a witness, under § 6.87(2); and (6) the requirement that polling places receive absentee ballots by 8:00 p.m. on election day to be counted, under § 6.87.

In these consolidated cases, the merits question is whether any of the challenged provisions impose an unconstitutional burden on the right to vote. The right to vote is fundamental, and any alleged infringement on this right "must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). This right, however, is not absolute, *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986), and "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes," *Storer v. Brown*, 415 U.S. 724, 730 (1974).

Challenges to election laws are governed by the framework set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428

(1992).[13] Under the *Anderson-Burdick* standard, the court must (1) "determine the extent of the burden imposed by the challenged provision"; (2) "evaluate the interest that the state offers to justify that burden"; and (3) "judge whether the interest justifies the burden." *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 904 (W.D. Wis. 2016) (citing *Anderson*, 460 U.S. 780; *Burdick*, 504 U.S. 428). When voting rights are severely restricted, a law "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). But even "slight" burdens must be "be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (quoting *Norman*, 502 U.S. at 288-89).

Even if plaintiffs are able to show that the challenged laws are likely unconstitutional, however, that does not automatically entitle them to the relief that they seek. Instead, the court must proceed "to weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one." *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017) (citing *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir. 2001)). "In addition, the court must ask whether the preliminary injunction is in the public interest." *Id.* (citing *Jones*, 842 F.3d at 1057). This latter consideration is

---

[13] A citizen's right to vote, and the *Anderson-Burdick* balancing test, is grounded in the First and Fourteenth Amendments. *See Burdick*, 504 U.S. at 434. So, while plaintiffs' separately argue that the challenged provisions violate the equal protection clause and the due process clause of the Fourteenth Amendment, (*see* Pls.' Br. ('249 dkt. #62) 18-22), these concerns are properly addressed within the more specific *Anderson-Burdick* framework. *See Harlan v. Scholz*, 866 F.3d 754, 759 (7th Cir. 2017) (the *Anderson-Burdick* framework addresses "the constitutional rules that apply to state election regulations"); *Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019) (the constitutionality of an election law is governed by the *Anderson-Burdick* standard).

particularly critical here, as the Supreme Court has cautioned that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion . . . .  As an election draws closer, that risk will increase."  *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).

## A. Postponement of Election Date

The court will begin with plaintiffs' broadest request:  that the court delay the April 7, 2020, election.  They assert that "if the election remains on April 7, it will disenfranchise hundreds of thousands or more Wisconsin voters."  (Pls.' Br. ('284 dkt. #18) 2.)  Although plaintiffs recognize that the decision to enjoin an impending election is serious, they maintain that such a measure is warranted given the immense burdens that will befall voters who attempt to exercise their franchise during the ongoing pandemic.  (*Id.* at 8.)

First, plaintiffs contend that the burden that will be placed on citizens' right to vote will not only be severe, but unprecedented.  (*Id.* at 6.)  Plaintiffs write that "[n]ever has an electorate in our state or country of this magnitude confronted the extreme burden of literally risking their health and lives in order to cast a vote."  (*Id.*)  Moreover, they predict that in-person voting will be either cancelled or dysfunctionally understaffed as a result of poll workers' decisions to stay home rather than risk their own health to operate the polls.  (*Id.* at 2, 6.)  Next, plaintiffs argue that the state has "no compelling interest justifying keeping the April 7 election date."  (*Id.* at 7.)  According to plaintiffs, the election of candidates "by a mere fraction of qualified electors, under circumstances where a public crisis barred voters from participating, undermines the Defendants' claims that adherence to the election schedule is essential to public confidence in the democratic process."  (*Id.* at 7-8.)  Indeed, plaintiffs suggest that the state itself has an interest in postponing the

election since it is in the state's interest to hold a "meaningful" election which does not exclude significant number of eligible voters from the polls. (*Id.* at 8.)

Defendants, for their part, argue against delaying the election. The Commissioners maintain that they are capable of conducting an in-person election on April 7, despite the fact that certain unorthodox measures will need to be taken, such as consolidating polling stations and even possibly calling on Wisconsin National Guard members to serve as poll workers. In particular, the Commissioners voice concern over the cascading effects that may be caused by a delay in the scheduled election, including problems with processing ballots for upcoming elections and staying in compliance with federal laws regarding electronic tabulating equipment. (Defs.' Opp'n (dkt. #155) 3-4.) More forcefully, the RNC/RPW argue that delaying the April 7 election would throw the state's election preparations into turmoil and would harm those candidates who have spent time and resources campaigning. (RNC/RPW Opp'n ('249 dkt. #138) 3-4.) Further, they note that such interference would be unprecedented, and urge that this court "should not be the first to grant that drastic relief." (*Id.* at 4.)[14]

On the one hand, it is undeniable that the asserted state interests are strong. "The public interest in the maintenance of order in the election process is not only important, it is compelling." *Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1335 (S.D. Fla. 2008). "Preventing

---

[14] The RNC/RPW also argue that plaintiffs' claims should be denied because the additional burdens placed on voters are due not to state action, but the COVID-19 pandemic itself. (*See* RNC/RPW Opp'n ('249 dkt. #96) 3; ('249 dkt. #138) 2-3.) This argument is quickly dismissed. The state action challenged here is the enforcement of Wisconsin's election laws; just as a state may not enforce an apportionment scheme that, although once constitutional, has through the passage of time resulted in uneven representation, *Reynolds*, 377 U.S. at 587, Wisconsin here cannot enforce laws that, even due to circumstances out of its control, impose unconstitutional burdens on voters.

ambiguity and confusion serves" this compelling state interest. *One Wisconsin Inst., Inc.*, 198 F. Supp. 3d at948. Moreover, more generally states have "a strong interest in their ability to enforce state election law requirements." *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 243 (6th Cir. 2011)

On the other hand, there is no doubt that the rapidly approaching election date in the midst of the COVID-19 pandemic means that citizens will face serious, and arguably unprecedented, burdens in exercising their right to vote in person. In-person absentee voting and pre-election, in-person registration has already been limited or even eliminated in some voting areas. An alarming number of poll workers have, understandably, cancelled their shifts, which is almost certain to lead to some degree of dysfunction on election day. Numerous polling stations have been ordered to close.

Although the Governor and other public officials have encouraged citizens to vote absentee, this is easier said than done. As plaintiffs have argued and as discussed below, the COVID-19 pandemic has raised concerns even for those seeking to vote absentee, particularly for those without access to the necessary technology. Further, unregistered voters at this point have no other option but to go in person to their clerk's office or polling place on election day in order to register and thereby vote. Finally, voters who did not or could not vote absentee will be forced on election day to choose between exercising their franchise and venturing into public spaces, contrary to the public message to "stay home" delivered by countless public officials during the course of this pandemic. And this dilemma must be considered not only as an individual burden, but as a collective public health concern as the state continues to recommend limiting in-person interactions as

much as possible. Indeed, most at risk will be poll workers themselves, who may well be exposed to large number of voters throughout the day, and, as described in the facts above, the majority of which fall within the 60+ age range that is most at risk for serious complications due to COVID-19.

In light of these competing interests, the court cannot say with confidence that the state's asserted interests -- although strong -- are so compelling as to overcome the severe burdens that voters are sure to face in the upcoming election. Therefore, plaintiffs have demonstrated at least *some* likelihood of success on the merits of this claim. Even so, plaintiffs must further show that the balance of equities supports their requested relief.

In the balancing phase, "the court must compare the potential irreparable harms faced by both parties to the suit -- the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted." *Girl Scouts*, 549 F.3d at 1100 (citing *Ty, Inc.*, 237 F.3d at 895). Here, failing to delay the election day may well subject voters to unconstitutional burdens on their right to vote. The possibility that any law might disenfranchise qualified voters "would caution any district judge to give careful consideration to the plaintiffs' challenges." *Purcell*, 549 U.S. at 4.

Yet an injunction delaying the election altogether is not without harm to defendants. As a general matter, "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). More specifically, the Commissioners have expressed serious concerns about the impacts of a delayed election. (*See* Defs.' Opp'n ('249 dkt. #155).) WEC Administrator Wolfe

has explained that "changes to one aspect of the elections system have downstream impacts on voters, subsequent processes, and the ability of election officials to comply with statutory requirements and deadlines." (Third Wolfe Decl. ('249 dkt. #156) ¶ 9.) In particular, she has expressed concern that a delay to the April 7 election would interfere with the May election to be held in the 7th Congressional District, causing problems with "overlapping voter registration deadlines, overlapping absentee ballot procedures and time periods, voting equipment programming, and official canvass procedures." (*Id.* ¶ 11.) Indeed, at the hearing, she testified that there are *no* other dates available that would not have some impact on another election to be held through September.

Crucially, "[w]hen conducting this balancing, it is also appropriate to take into account any public interest, which includes the ramifications of granting or denying the preliminary injunction on nonparties to the litigation." *Girl Scouts*, 549 F.3d at 1100 (citing *Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986); *Ty, Inc.*, 237 F.3d at 895). Here, the public interest cuts both in favor and against court involvement. As a general matter, "[e]nforcing a constitutional right is in the public interest." *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019). And, certainly, the public interest "favors permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 437.

That being recognized, a decision enjoining the election would not be an unequivocal benefit to all voters. As amicus Disability Rights Wisconsin points out, delaying the election day so that an all-mail election may be conducted, as has been suggested by some, may well adversely affect voters, including those with disabilities who

32

may require accommodations only possible via in-person voting. (Disability Rights Wis. Amicus Br. ('249 dkt. #121-1) 14.) Further, WEC Administrator Wolfe's testimony regarding the administrability of a delayed April 7 election suggest that such an order could potentially hamper registration efforts, undermine absentee voting, and confuse voters. Finally, a court "is entitled to and should consider the proximity of a forthcoming election" when considering the propriety of equitable relief. *Reynolds*, 377 U.S. at 585. This is because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion . . . . As an election draws closer, that risk will increase." *Purcell*, 540 U.S. at 4-5.

Plaintiffs argue that the pandemic "has prompted a burgeoning chorus of calls by the general public, public health experts, Mayors, Clerks, and local election commissions to postpone the April 7 election." (Pls.' Br. ('284 dkt. #18) 9.) And indeed the court has received numerous amicus briefs urging the court to take action. (*See, e.g.*, Dane Cty. Amicus Br. (dkt. #150); City of Green Bay Amicus Br. (dkt. #112); City of Milwaukee Amicus Br. (dkt. #100).) Yet there is also a "chorus of calls" to keep the April 7 election date, including those from the Governor (Gov. Evers Amicus Br. (dkt. #151)) and the Legislature (Wis. Legislature Amicus Br. ('249 dkt. #90)), who have both filed amicus briefs requesting that the court decline to stay the election. At the center of this maelstrom is the WEC, whose governing body was reconstituted relatively recently from a group of non-partisan judges to six Commissioners appointed equally by the two major political parties. As a consequence, the WEC's Administrator Meagan Wolfe has been expressly charged with the near impossible task of accomplishing a viable *and* safe election through

a combination of processing an unprecedented number of absentee ballots and an in-person election. If there is a hero to this story, it is the Administrator, her staff and municipal workers, all of whom continue to improvise election practices.

In doing so, the WEC retained the services of a medical expert approximately 3 weeks ago to advise how both can be accomplished under the threat of a COVID-19 outbreak and continued to consult with the Wisconsin State Emergency Operations Center ("SEOC") established by the Governor on March 12, 2020, as the magnitude of the COVID-19 threat began to emerge. Among the exhibits provided this court is a copy of a memorandum prepared by the Administrator, which outlines the steps that have been taken so far to accomplish that task, some of which has been disseminated out to municipalities for implementation by its clerks and poll workers. On a rolling basis, the Administrator and her staff have been trying to update that advice and gather supplies for use by poll workers on election day. Indeed, during yesterday's hearing, Administrator Wolfe learned for the first time that 25,000 masks were going to be provided at central locations for pick up by municipalities to be used during the local election next Tuesday. Until that moment, the advice by the Commissioner to municipalities was that masks would be unnecessary, apparently based on the previous advice of the medical expert and the fact that the CDC has not yet adopted the wearing of masks as a practice for the general public.

Because the only direction from an equally split group of Commissioners to the Administrator and her staff is to do the best they can in conducting a safe, in-person election, it appears that no medical expert has been retained by the Commission to advise

as to whether an in-person election *can* be conducted safely under any circumstances, nor even more remarkably does it appear that medical experts at SEOC have been asked to opine on this subject, despite the obvious risks of further dissemination of the coronavirus on election day, including the handling of recently submitted absentee ballots. The Administrator and her staff, as well as local municipalities and others are to be commended for their remarkable efforts to accomplish an in-person election that may well be unwise, not just for poll workers, but for voters and the general public given the crucial moment this state seems to be confronting in the COVID-19 growth curve.

This leaves the broader concern as to the propriety of a federal court taking the extraordinary step of delaying a state-wide election at the last minute, and the federalism problems that are necessarily implicated, which weigh heavily in favor of denying the plaintiffs' broadest, requested relief. Plaintiffs argue that "it is not uncommon for federal courts to enjoin state authorities from holding elections when doing so would violate the rights of voters that are protected by the Constitution." (Pls.' Reply ('249 dkt. #162) 2-3.) However, none of the cases cited by plaintiffs authorize what plaintiffs are asking the court to do in this circumstance: delay the date of an impending, state-wide election.

In contrast, the Supreme Court has endorsed district court decisions to refrain from action, even in the face of undisputed constitutional violations. In *Ely v. Klahr*, 403 U.S. 108 (1971), the Supreme Court upheld a district court's decision not to enjoin an election even under an unconstitutional apportionment plan. *Id.* at 113-14. Faced with an election that was "close at hand," the district court explained that an injunction delaying the vote would "involve serious risk of confusion and chaos." *Id.* at 133. In allowing the election

to proceed, the Supreme Court recognized that the district court "chose what it considered the lesser of two evils," and affirmed the judgment of the court. *Id.* at 113-14; *see also Reynolds*, 377 U.S. at 586 (holding that the district court "acted in a most proper and commendable manner" in declining to enjoin Alabama's impending primary election, even under an unconstitutional apportionment scheme).

Without doubt, the April 7 election day will create unprecedented burdens not just for aspiring voters, but also for poll workers, clerks, and indeed the state. As much as the court would prefer that the Wisconsin Legislature and Governor consider the public health ahead of any political considerations, that does not appear in the cards. Nor is it appropriate for a federal district court to act as the state's chief health official by taking that step for them.

At most, the court can only act in good faith to allow the WEC, local municipalities and poll workers to take what steps they can to vindicate the constitutional right to vote. Accordingly, the court must conclude that plaintiffs have not met their burden of showing that the balance of equities favors enjoining the upcoming election day. As the Supreme Court held in *Purcell*, "[g]iven the imminence of the election and the inadequate time to resolve the factual disputes, our action today shall of necessity allow the election to proceed without an injunction." 549 U.S. at 5-6.

### B. Extension of Deadline for Receipt of Absentee Ballots

Plaintiffs next request that the court extend the deadline by which absentee ballots may be received. Under current law, clerks will not count an absentee ballot that is received after 8:00 p.m. on election day. Wis. Stat. § 6.87(6). Plaintiffs argue that this statutory

36

deadline imposes an undue burden on voters because "it is a certainty that thousands of ballots will arrive after the April 7, 2020 deadline due to no fault of the voter." (Pls.' Br. ('249 dkt. #62) 12.)

In support, plaintiffs point to *Doe v. Walker*, 746 F. Supp. 2d 667 (D. Maryland 2010), in which the district court found that the statutory deadline for the receipt of absentee ballots imposed a severe burden on absent uniformed services and overseas voters that was not justified by the state's interest in finality and certainty in elections. *Id.* at 678-80. The court found that due to long international mail delivery times, "even the most diligent absent uniformed services or overseas voter might be unable to return his ballot" in time to be counted. *Id.* at 678-79.[15]

Initially, the Commissioners maintained that the court should deny plaintiffs' requests for any extension. (*See* Defs.' Opp'n ('249 dkt. #107) 9.) Later, however, the Commissioners submitted a notice to the court stating that they "do not object to any absentee ballot postmarked by April 7, 2020 and received by April 13, 2020 by 4:00 p.m. being counted in the Spring Election." (Defs.' Notice Mar. 31, 2020 ('249 dkt. #152) 1.) They further represented that "[i]f the votes received by 4:00 p.m. on April 13, 2020 are

---

[15] Plaintiffs also cite to *In re Holmes*, 788 A.2d 291 (N.J. Super. Ct. 2002), but this case is largely unhelpful. There, anthrax attacks had caused a particular postal facility to close shortly before an election, delaying their receipt by the Board of Elections. *Id.* at 293. The court ordered that the ballots cast on or before election day but trapped in the facility and not received until after election day, should be counted. *Id.* The court's holding, however, was based on its interpretation of the state election law that set the deadline; the holding did not rely on or even discuss the federal constitutional analysis applicable to plaintiffs' argument, making it of limited use here. *See generally id.* at 292-95. Similarly, plaintiffs' citation to *United States v. Cunningham*, No. CIV. A. 3:08CV709, 2009 WL 3350028 (E.D. Va. Oct. 15, 2009), is unhelpful as that court bases its decision to extend the deadline by which absentee ballots should be received entirely on the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20401, *et seq.*

counted it will not impact the ability to complete the canvass in a timely manner." (*Id.*)

The RNC/RPW and the Wisconsin Legislature contend generally that deadlines ensure the orderly administration of elections and also provide certainty and reliability that minimizes disorder. (*See* RNC/RPW Opp'n ('249 dkt. #96) 2-3 (citing *Diaz*, 541 F. Supp. 2d at1335; Wis. Legislature Amicus Br. ('249 dkt. #90) 24 (citing *Crawford*, 553 U.S. at 196).) The RNC/RPW also argue that plaintiffs' requested relief should be rejected because voters "face no imminent harm until those ballots are cast, do not arrive on time, are not counted, and are deemed material to the outcome." (RNC/RPW Opp'n ('249 dkt. #96) 6.) Similarly, the Wisconsin Legislature suggests that the court "wait until after election day to determine whether any remedy is necessary or appropriate." (Wis. Legislature Amicus Br. ('249 dkt. #90) 25.)

At the outset, the Legislature's and RNC/RPW's invitation to postpone deciding this issue must be declined. The record now contains sufficient evidence to show that the asserted harm is imminent, and a timely resolution is necessary if there is any hope of vindicating the voting rights of Wisconsin citizens in an April 7 election. Indeed, the evidence is nearly overwhelming that the WEC, local election units and poll workers will need additional time to address the avalanche of absentee ballots, still arriving daily, much less to do so safely.

Turning then to the merits, the court first considers the burden that the absentee receipt deadline will place on voters. Here, as in *Doe*, 746 F. Supp. 2d at 678-79, the evidence presented by the parties and amici demonstrates that even the most diligent voter may be unable to return his or her ballot in time to be counted. Wisconsin clerks are facing

a record number of absentee ballot requests, and despite diligent efforts, as of April 2, 2020, they are still working on sending out a backlog of over 21,000 absentee ballot applications. Both the Madison and Milwaukee City Clerks have represented that "[t]here is no practical way that a person submitting a request for an absentee ballot on the deadline for submitting the request . . . will have the time to receive, vote and return their ballot by Election Day." (Pls.' PFOF ('249 dkt. #62-1) ¶ 30 (quoting Cities' Amicus Br. ('249 dkt. #39) 5).) Under these circumstances, the court finds that the burden placed on absentee voters is severe. Thus, defendants must demonstrate that the state has a compelling interest in enforcing the challenged law. *See Norman*, 502 U.S. at 280. They have not done so here.

Certainly, deadlines do generally provide certainty and reliability, and protect the orderly administration of elections. Yet election deadlines have already been disrupted, with the evidence showing that many voters who *timely* request an absentee ballot will be unable to receive, vote, and return their ballot before the receipt deadline. The state's interest in deadlines surely also extends to preserving the rights of those voters who themselves relied on those deadlines. More to the point, the state's general interest in the absentee receipt deadline is not so compelling as to overcome the burden faced by voters who, through no fault of their own, will be disenfranchised by the enforcement of the law.

Most persuasive is, of course, the fact that the WEC itself does not oppose extending the deadline and specifically averred that a receipt deadline of 4 p.m. on April 13, 2020, would "not impact the ability to complete the canvass in a timely manner." (Defs.' Notice Mar. 31, 2020 ('249 dkt. #152).) Thus, the court concludes that plaintiffs have shown a

likelihood of success on the merits of their challenge to the absentee ballot receipt deadline. Moreover, the balance of harms favors preliminary injunctive relief. Specifically, an injunction moving the receipt deadline from 8 p.m. on April 7 to 4 p.m. on April 13 sufficiently accommodates canvassing deadlines while preserving citizens' rights.[16]

Similarly, the court will *not* add a postmarked-by date requirement; it is simply moving the statutory absentee receipt deadline. No persuasive evidence suggests that further altering statutory requirements will impose tangible benefits or harms, and indeed the amicus briefs from various local governments suggest that an extension of the deadline would be heartily welcomed by many local officials. (*See, e.g.*, City of Madison and Milwaukee Amicus Br. (dkt. #39); Dane Cty. Amicus Br. (dkt. #150).) Moreover, the WEC Administrator testified that the process of eliminating anyone who proceeded to vote in person after mailing an absentee ballot is already in place as part of the standard post-election canvassing of absentee ballots, and is not likely to create a substantial burden in this election. Finally, this relief is more generally in the public interest, which "favors permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 437.

In light of the court's decision to extend the deadline for receipt of absentee ballots, the court will also extend slightly the receipt-deadline for absentee ballot requests.[17] As

---

[16] As such, this deadline addresses the concern raised in the Wisconsin Counties Association and Washington County's amicus brief, expressing concern about the expiration of county board supervisor's terms on the third Monday or Tuesday of April. ('249 dkt. #133.)

[17] The court assumes that because the MyVote Wisconsin website still allows requests of absentee ballots online at the time this opinion issues, the WEC will be able to simply extend the clock until April 3, 2020, without having to engage in complex or risky computer changes. To the extent this assumption is incorrect, the WEC Administrator is empowered in her discretion not to implement this relief online, although municipalities are still required to accept requests locally through

described above, the general deadline for which an absentee ballot request must be received is today, April 2, 2020.  In an effort to expand absentee voting to as many Wisconsin individuals as possible and reduce the number of people who will face the difficult choice of voting in-person on April 7, the court will extend the deadline by one day, until 5:00 p.m., April 3, 2020.   This slight extension aligns with the deadline by which indefinitely confined and military voters' requests must be received.  *See* Wis. Stat. § 6.86(1)(c), (2). Moreover, the increased flexibility on the back-end, extending the receipt deadline to April 13, should allow individuals whose absentee ballot request by 5:00 p.m. on Friday, April 3, 2020, to receive the ballot via mail, complete it, and return it via mail in time to meet the April 13, 2020, deadline.

### C.  Relief from Requirement of Witness Signature for Absentee Ballots

According to plaintiffs, the requirement that an absentee ballot be signed by a witness should also be enjoined because it imposes an unconstitutional burden under the current circumstances and is currently being applied in a way that violates the equal protection clause.  Plaintiffs argue that for voters who do not have another adult U.S. citizen in their household, the witness requirement compels them to interact with a non-household member and "that interaction -- both the witnessing and signing of the ballot -- would require the individuals to come within six feet of each other" in violation of the Governor's Safer-at-Home Order.  (Pls.' Br. ('249 dkt. #62) 13.)  Even aside from the Governor's order, plaintiffs urge that interacting with another person to receive the

tomorrow, April 3, 2020.

necessary signature creates serious health risks due to the ongoing pandemic, especially for those who are elderly or immunocompromised. (*Id.* at 13; Pls.' Br. ('278 dkt. #17) 6-7.)

In support, plaintiffs have submitted a number of declarations by aspiring voters who have testified that they have been unable to secure a witness signature for their absentee ballot. (*See* Wilson Decl. ('249 dkt. #75); Larson Decl. ('249 dkt. #67); Keel Decl. ('249 dkt. #66); Trapp Decl. ('249 dkt. #70); Gear Decl. ('278 dkt. #9); Ginter Decl. ('278 dkt. #10); Hakami Decl. ('278 dkt. #11); Whelan Decl. ('278 dkt. #12); Ott Decl. ('278 dkt. #13).) For example, Ben Wilson stated that he was "facing difficulty in finding a witness" because he lived alone and felt that "[k]nocking on a neighbor's door or asking a gas station clerk would have me violate social distancing guidelines." (Wilson Decl. (dkt. #75) ¶¶ 4-5.) Similarly, Jeff Trapp explained that he was "finding it difficult to get a witness" for his ballot, conceding that he "could sit on [his] doorstep and ask someone passing by," but that he "really [did] not want to put someone else in the position of possible contact with the virus." (Trapp Decl. (dkt. #70) ¶ 4.) Thus, plaintiffs conclude, the signature "requirement severely burdens individuals' voting rights because, absent disobeying state law and severely compromising their health, it results in disenfranchisement." (Pls.' Br. ('249 dkt. #62) 14; *see also* Pls.' Br. ('278 dkt. #17).)

In contrast, plaintiffs maintain that the state has no compelling interest in enforcing this requirement, and therefore the severe burden cannot be justified. Plaintiffs contend that "the witness requirement is an incredibly weak, borderline ineffectual, anti-fraud tool." (Pls.' Br. ('278 dkt. #17) 7.) Moreover, according to plaintiffs, the state itself has an interest in encouraging individuals to observe social distancing guidelines, and the witness

requirement undermines the state's own interest in protecting the public health. (*Id.* at 9-10.)[18]

The RNC/RPW and Wisconsin Legislature oppose enjoining the witness requirement at all, arguing first that the burden on voters is not so severe as plaintiffs suggest. First, they point out that, if a voter can satisfy an election requirement with "reasonable effort," then that requirement does not qualify as a substantial burden. (RNC/RPW Opp'n ('249 dkt. #96) 5; Wis. Legislature Amicus Br. ('249 dkt. #90) 20-21 (citing *Frank*, 819 F.3d at 386-87).) In particular, they argue that a voter can complete the requirement while abiding by the Governor's orders and social distancing guidelines by, for example, having a witness observe through a window or even a videocall, then passing the ballot under a closed door to be signed and returned. (Wis. Legislature Amicus Br. ('249 dkt. #90) 20-21.)

Second, the RNC/RPW and Wisconsin Legislature argue that any burdens imposed by the witness requirement are overcome by legitimate state interests. They both point to *Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004), in which the Seventh Circuit explained that voting fraud is a "serious problem" and is "facilitated by absentee voting." (RNC/RPW Opp'n ('249 dkt. #96) 2 (quoting *Griffin*, 385 F.3d at 1130-31); Wis. Legislature Amicus Br. ('249 dkt. #90) 18 (quoting *Griffin*, 385 F.3d at 1130-31).) As to the specific

---

[18] Plaintiffs also suggested that the requirement is not narrowly tailored because the state's interests may be satisfied by other, less risky means. In particular, plaintiffs argued that the remote presence of a witness -- either through a live audio or video feed -- sufficiently accommodates the state's asserted interests. (Pls.' Br. ('249 dkt. #62) 14-15, 20-21.) On March 29, 2020, however, the WEC issued guidance specifically confirming that a voter may complete their ballot in the remote presence of a witness. While the witness will still have to sign the physical certificate, this can be accomplished without a direct interaction with the age or health compromised voter.

witnessing requirement, they contend that it helps to prevent voter fraud "by adding an additional layer of protection, ensuring that the person filling out the absentee ballot is the actual voter listed on the ballot, and preventing undue influence or coercion." (Wis. Legislature Amicus Br. ('249 dkt. #90) 18.)

While generally arguing that the court should not enjoin the witnessing requirement, the Commissioners do not explicitly explain how the burdens imposed by the requirement are justified by state interests. (Defs.' Opp'n ('249 dkt. #107) 9.) Instead, they simply provide the court with the guidance developed by the WEC "for meeting the witness requirement . . . while either self-isolating or in quarantine." (*Id.* at 17.)

It is undeniable that the COVID-19 pandemic and social distancing orders will make it harder for some aspiring absentee voters to satisfy the witness requirement. At the same time, for many voters, this requirement may easily be met by a fellow household member, with whom the strict social distancing guidelines discussed by plaintiffs do not apply. And even for those who do not reside with an adult U.S. citizen, in general the additional barriers they face may be overcome with some reasonable effort. In particular, the guidance published by the WEC suggests a variety of witnessing options for voters. (Aguilera Supp. Decl., Ex. W (dkt. #105-1) 2.) For example, the WEC suggests that a "family member, friend or neighbor" or even a "mail delivery person[]" or "food delivery person[]" "may watch the voter mark their ballot through a window, open door or other physical barrier." (*Id.*) They also note that the "process can be done via video chat like Skype or Facetime with the ballot left outside of the door or in a mailbox for the witness to sign and provide their address after the fact." (*Id.*) These options do not require the

voter or their witness to violate the Governor's Safer-at-Home Order, which allows individuals to interact so long as they "maintain social distancing of at least six (6) feet." (Spiva Decl., Ex. 4 ('249 dkt. #63-4) 2.)

Understood in this way, the state's asserted interests in the witness requirement as a tool against voter fraud justify the general application of the requirement. *See Crawford*, U.S. at 191 (preventing voter fraud is an important state interest); *Griffin*, 385 F.3d at 1130-31 (same); *Frank*, 768 F.3d at 750 (same). As such, plaintiffs have not met the "heavy burden of persuasion" needed to enjoin the requirement "in all its applications." *Crawford*, 553 U.S. at 200.

Even so, given the current unknowns regarding COVID-19 infection and transmittal risks, plaintiffs have shown that at least some isolated voters, and in particular those who are immunocompromised or elderly, will likely not be able to secure a witness certification safely even with reasonable efforts, or at minimum have reasonable concerns about their ability to do so and, therefore, may be particularly burdened by this requirement. To be clear, while this requirement may impose severe burdens on some limited subset of voters, that burden does not justify a wholesale rejection of the requirement. *See Crawford*, 553 U.S. at 199-200 (a conclusion that a burden "may not be justified as to a few voters" is not sufficient to strike down an election law). However, it may entitle those particular voters facing unreasonably high burdens to specific relief. In *Frank v. Walker*, 819 F.3d 384 (7th Cir. 2016), the Seventh Circuit considered a similar question related to Wisconsin's requirement that a voter present a valid photo ID in order to vote. After arguing unsuccessfully that the photo ID requirement should be struck down entirely, plaintiffs in

*Frank* returned to court with a different argument: that "high hurdles for *some* persons eligible to vote entitle those *particular* persons to relief." *Id.* at 386 (emphasis added). The court reasoned that "[p]laintiffs' approach is potentially sound if even a single person eligible to vote is unable to get acceptable photo ID with reasonable effort. The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily." *Id.*

Here, the particularly high hurdles faced by this subset of voters are not overcome by the state's general anti-fraud goals, and some limited relief is therefore appropriate. In particular, the court will order defendants to accept an unwitnessed ballot that contains a written affirmation or other statement by an absentee voter that due to the COVID-19 pandemic, he or she was unable to safely obtain a witness certification despite his or her reasonable efforts to do so, provided that the ballot is otherwise valid. No magic words are required by a voter to successfully make this affirmation, and it will be left up to the individual discretion of clerks as to whether to accept a voter's excuse for not completing the witness certification requirement based on the written affirmation by the individual voter.

Moreover, the balance of harms favors this approach. Plaintiffs have adequately demonstrated that the harm some voters are likely to face includes unjustified burdens in the exercise of their right to vote. On the other side, the WEC already has the ability to communicate this new exception rapidly to the various clerks across the state. While the additional burden on the election process is not minimized, it is overcome by voters' right to exercise their franchise without undue burdens, especially as the court has given local

canvassers additional time to complete the review of absentee ballots and to follow up as to any written affirmation or statement they believe to be suspect, just as is already done with respect to the exceptions for Wisconsin IDs as discussed immediately below.

### D. Relief from Proof of Identification Provision

Third, plaintiffs argue that the court should enjoin the statutory requirement that a photo ID be submitted with an absentee ballot. Wisconsin law provides that an individual requesting an absentee ballot for the first time must submit proof of a valid photo ID. Wis. Stat. § 6.86. Plaintiffs contend that many aspiring voters do not have in their homes the means necessary to submit the required proof, such as a copier, scanner, printer, and/or smartphone. Further, plaintiffs point out that while under normal conditions, individuals might be able to go to a library or copyshop to access these machines, due to the Safer-at-Home Order issued on March 24, 2020, most if not all of these locations have closed. Moreover, plaintiffs contend that even if such locations were still open, the Safer-at-Home order prohibits individuals from venturing outside of their homes in an attempt to find a machine that would allow them to submit their photo ID. The burden imposed by the proof of ID requirement for first-time absentee voters, plaintiffs argue, is severe because it requires voters without access to the necessary technology to disobey a statewide order to satisfy the requirement.

According to plaintiffs, any asserted state interest in preventing voter fraud or ensuring electoral integrity cannot justify the severe burden currently imposed by the requirement. First, plaintiffs suggest that the state's interests may be satisfied by less risky means, such as having a voter complete a certificate -- subject to penalties for false

statements -- affirming his or her identity.  Second, plaintiffs point out that "state law already recognizes that there may be a need for exceptions to these types of rules, finding that voters who are 'indefinitely confined' due to age, illness, infirmity, or disability do not have to comply with the absentee photo ID requirements."  (Pls.' Br. ('249 dkt. #62) 17.)

The RNC/RPW and Wisconsin Legislature oppose enjoining the absentee ID requirement, arguing first that the burden on voters is not so severe as plaintiffs suggest. They point out that, if a voter can satisfy an election requirement with "reasonable effort," then that requirement does not qualify as a substantial burden.  (RNC/RPW Opp'n ('249 dkt. #96) 5; Wis. Legislature Amicus Br. ('249 dkt. #90) 15 (citing *Frank*, 819 F.3d at 386-87; *Crawford*, 553 U.S. at 198).)  Here, according to the RNC/RPW and the Legislature, a voter could use their smartphone to upload proof of their ID or with reasonable effort could locate a person who could help them to do so, all while abiding by the Governor's Stay-at-Home Order which permits interacting with others while staying six feet apart.  (RNC/RPW Opp'n ('249 dkt. #96) 5-6; Wis. Legislature Amicus Br. ('249 dkt. #90) 15-16.)  They further argue that any potential burdens are outweighed by the state's interest in deterring fraud, which is particularly acute in the absentee ballot context. (RNC/RPW Opp'n ('249 dkt. #96) 3; Wis. Legislature Amicus Br. ('249 dkt. #90) 9.)

Again, under current conditions, there is little question that for some voters satisfying the proof of ID requirement will become more difficult, especially if fearful of any contact with others because of age or other high risk factor.  At the same time, the court recognizes that for many if not most voters the requirement may be satisfied easily, and even for voters who face barriers those may be overcome with only reasonable effort.

(*See* Strang Decl. ('249 dkt. #76) ¶¶ 6, 9 (testifying that he initially had difficulty in attempting to provide proof of identification in requesting his absentee ballot, but that he was able to successfully upload his photo ID after spending 40 to 45 minutes on the effort).)  Further, two days ago the Wisconsin Supreme Court issued an order in *Jefferson v. Dane County*, 2020AP557-OA, adopting the WEC's guidance of the term "indefinitely confined."  The guidance provides in relevant part that the "[d]esignation of indefinitely confined status is for each individual voter to make based upon their current circumstances. It does not require permanent or total inability to travel outside of the residence."  In light of these developments, the court is satisfied that the current proof of ID requirement, as being applied under the WEC guidance and state court order, does not impose an undue burden on the right to vote, and accordingly will deny plaintiffs' requested relief as to this requirement.

### E.  Extension of Mail-In Registration Deadline and Relief from Proof of Residence Provision

Plaintiffs also argue that the court should extend the by-mail registration deadline until April 2, 2020.  (Pls.' Br. ('249 dkt. #62) 18.)  The court will not dwell long on this question, because even if plaintiffs were to demonstrate a strong likelihood of success on the merits, the balance of equities does not favor the injunction they seek.  Even given the best efforts of the court to expedite this case, as well as the diligent advocacy of all parties involved, the evidentiary hearing was held on April 1, 2020, and this court's opinion and order is being issued the following day, on April 2, 2020.  Plaintiffs' requested injunction as to the by-mail registration deadline would open the registration window for less than

one day.  Given this timeline, it is implausible that the order could be implemented in a way that would provide relief to any meaningful number of voters, but it *would* be sure to add additional burdens on an already overwhelmed state election apparatus.  Accordingly, plaintiffs' request as to the by-mail registration deadline will be denied.  Finally, plaintiffs ask the court to enjoin the requirement that copies of proof of residence be submitted with their mailed registration application.  Because voters are no longer able to register by-mail for the upcoming election, this claim will be denied as moot.

### III. Oral Motion for Stay

One final note.  At the end of yesterday's hearing, counsel for the intervening defendants RNC and Republican Party of Wisconsin requested that if the court grants plaintiffs' request for preliminary relief, the court also stay its order for a limited amount of time to allow the intervening defendants to seek emergency relief from the Seventh Circuit Court of Appeals under Federal Rule of Civil Procedure 62(c).  While the court is sympathetic to the intervening defendants' request, the relief being granted is not of the sweeping nature sought by plaintiffs and the court is also cognizant of the impending election, and the immediate steps the WEC and local clerks will need to take to implement the court's narrow injunction, along with the numerous other changes being made in real time by the WEC Administrator, her staff, local counties and municipalities, and poll workers in response to the current COVID-19 crisis.  Regardless, the most significant relief provided at this time does not kick in until the evening of April 7, 2020, when, under the court's order, local municipalities may continue to count absentee ballots received after

8:00 p.m.[19] As such, the preliminary injunction implicitly contains a window of time during which the intervening defendants may seek an emergency appeal and relief from the injunction. The court, therefore, will deny defendants' oral motion for a stay. At the same time, both defendants WEC and its Administrator, as well as intervening defendants, are encouraged to return to this court if some modification of the preliminary injunction is necessary to accomplish the goals set out in this opinion.

ORDER

IT IS ORDERED that:

1) In Case No. 20-cv-249, plaintiffs' motion for preliminary injunction and motion for reconsideration ('249 dkt. #61) is GRANTED IN PART AND DENIED IN PART as set forth below in the order.

2) In Case No. 20-cv-278, plaintiffs' motion for temporary restraining order ('278 dkt. #8) is GRANTED IN PART AND DENIED IN PART as set forth below in the order.

3) In Case No. 20-cv-284, plaintiffs' motion for temporary restraining order ('278 dkt. #17) is GRANTED IN PART AND DENIED IN PART as set forth below in the order.

4) Wisconsin Legislature's motion for leave to file an amicus curiae brief in opposition to the motions for preliminary injunction and temporary restraining order ('249 dkt. #89) is GRANTED.

5) Honest Elections Project's motion for leave to file amicus brief ('249 dkt. #94) is GRANTED.

---

[19] The extension of the deadline by which individuals may request absentee ballots is a more immediate action, but even then, it is unlikely that the requests for absentee ballots received on April 3, 2020, would be processed, mailed, received by the voter, completed, and returned before April 7, 2020, and, therefore, in appealing the extension of the deadline for receipt of absentee ballots, the intervening defendants necessarily would also be able to appeal the extension of the deadline for requesting an absentee ballot online.

6) The City of Milwaukee's motion for leave to file an amicus brief ('249 dkt. #98) is GRANTED.

7) The City of Green Bay's motion for leave to file an amicus brief ('249 dkt. #111) is GRANTED.

8) American Civil Liberties Union of Wisconsin, Disability Rights Wisconsin, Inc., and Wisconsin Conservation Voters' motion to file amici curiae brief (dkt. #121) is GRANTED.

9) Governor Tony Evers' motion for leave to file amicus brief (dkt. #125) is GRANTED.

10) City of Racine's motion for leave to file amicus brief (dkt. #129) is GRANTED.

11) Washington County and Wisconsin Counties Association's motion for leave to file amicus brief (dkt. #131) is GRANTED.

12) Plaintiffs Democratic National Committee and Democratic Party of Wisconsin's motion for leave to file a reply brief (dkt. #153) is GRANTED.

13) Plaintiffs American Federal of Teachers Local, 212, AFL-CIO, Black Leaders Organizing for Communities, League of Women Voters of Wisconsin, Greg Lewis, SEIU Wisconsin State Council, Souls to the Polls, Voces De La Frontera's motion to supplement brief addressing remedies (dkt. #161) is GRANTED.

14) Defendants the Commissioners of the Wisconsin Election Commission and its Administrator are ENJOINED as follows:

   a) Defendants are enjoined from enforcing the requirement under Wis. Stat. § 6.87(6) that absentee ballots must be received by 8:00 p.m. on election day to be counted. The deadline for receipt of absentee ballots is extended to 4:00 p.m. on April 13, 2020.

   b) Defendants are enjoined from enforcing the requirement under Wis. Stat. § 6.86(1)(b) that absentee ballot requests must be received by April 2, 2020. The deadline for receipt of absentee ballot requests by mail, fax or email (and if deemed administratively feasible in the sole discretion of the WEC Administrator, online) is extended to 5:00 p.m. on April 3, 2020.

   c) Defendants are enjoined from enforcing Wis. Stat. § 6.87(2) as to absentee voters who have provided a written affirmation or other statement that they were unable to safely obtain a witness certification despite reasonable efforts to do so, provided that the ballots are otherwise valid.

15) Intervening defendants' oral motion to stay this order and preliminary injunction is DENIED.

Entered this 2nd day of April, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge