UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

_____

Democratic National Committee and
Democratic Party of Wisconsin,

        Plaintiffs,

  v.

Marge Bostelmann, Julie M. Glancey,
Ann S. Jacobs, Dean Knudson, Robert F.
Spindell, Jr., and Mark L. Thomsen, in
their official capacities as Wisconsin
Elections Commissioners,

        Defendants,

  and

Republican National Committee,
Republican Party of Wisconsin, and the
Wisconsin State Legislature,

        Intervenor-Defendants

Case No. 3:20-cv-249-wmc
(consolidated with Case Nos.
3:20-cv-278-wmc,
3:20-cv-284-wmc,
3:20-cv-340-wmc and
3:20-cv-459-wmc)

_____

**DECLARATION OF RONALD STROMAN IN RESPONSE TO DEFENDANTS'
RESPONSES TO THE MOTION FOR PRELIMINARY INJUNCTION OF THE
DEMOCRATIC NATIONAL COMMITTEE AND DEMOCRATIC PARTY OF
WISCONSIN**

I, Ronald Stroman, make this declaration in response to Defendants' Responses to

Plaintiffs' Democratic National Committee and Democratic Party of Wisconsin Motion for

Preliminary Injunction.

    1.    I am a resident of Washington, D.C. With the COVID-19 pandemic and the

resulting dramatic shift to voting by mail across most of the country, election officials in most

states, including in Wisconsin, are facing unprecedented challenges in conducting this year's

elections. Voting by mail has increased exponentially in the elections that Wisconsin and other states have conducted so far in 2020, and it is highly probable that this shift toward voters casting ballots by mail will be even more pronounced in the November 3rd General Election, including in Wisconsin. This surge in voting by mail imposes significant strains on state election systems, most of which are not designed for the expected volume of mail ballots, and on the United States Postal Service (USPS), which has never before been required to provide mail service to support elections in which majorities of voters will vote by mail.

2. I served for nine years as the Deputy Postmaster General of the USPS, the second highest ranking official in USPS, from 2011 until June 1, 2020. The USPS has more than 600,000 employees and approximately $70 billion in annual operating revenue. Some of my priorities as Deputy Postmaster General related to voting by mail include: (1) improving the quality of the information that USPS provided to state and local election officials on absentee voting by mail; (2) improving the communication between USPS, election officials and the election mail community; (3) improving the internal training for USPS employees on election mail; and (4) developing a system for the rapid resolution of election mail issues. I worked closely with state and local election officials across the country for approximately five years to implement these improvements in the voting by mail system.

3. As Deputy Postmaster General, my work in coordinating with the election mail community included coordinating with the National Association of State Election Directors (NASED) to develop best practices for administering vote by mail in federal, state, and local elections. NASED's members are election directors from across the country, many of whom have worked in election administration at the state and local levels for decades. In the process of working with these officials, I became very familiar with state laws governing voting by mail. In

addition to having expertise in issues involving mail and the USPS, I am a lawyer, having been admitted to the Bar of Pennsylvania in 1978. My training and experience as a lawyer, including working as Assistant Counsel on the House Judiciary Committee, has provided me with unique insights into the relationship between states' voting laws involving voting by mail and the operations and service standards of the USPS.

4. My work on voting by mail as the Deputy Postmaster General has also provided me with a detailed understanding of the resources and procedures that election officials and the USPS must have to support voting by mail. Specifically, election officials and the USPS must devote the resources and establish the procedures necessary to ensure that: (1) voters receive vote by mail ballots in a timely manner; (2) voters are able to return their mail ballots in time for them to be counted; (3) ballots are not lost in the mail; and (4) ballots are properly verified by election officials and included in final vote tabulations.

5. In my role as Deputy Postmaster General, I became familiar with Wisconsin's laws and regulations governing voting by mail, and I have worked on issues involving Wisconsin's vote by mail process to support voting by mail in the state. I also am familiar with the significant problems that Wisconsin election officials and the USPS experienced in connection with the state's Spring Election held on April 7, 2020. Some of those problems are described in a report of July 7, 2020 issued by the USPS' Office of the Inspector General (OIG), attached hereto as Attachment 1. The audit of the Spring Election that is reflected in the OIG Report was conducted between April and July, encompassing a period during which I was still Deputy Postmaster General. I was aware of the issues that were being addressed in the audit while I was still with the USPS, and I have reviewed the final report and am familiar with its findings.

6. The myriad problems described in the OIG Report reflect long-standing vote by mail problems and the extraordinary strains that the surge in voting by mail during the Spring Election placed on Wisconsin election officials and the USPS. As described in the report, the Wisconsin Election Commission (WEC) received more than 1.3 million requests for absentee ballots for that election, and voters returned nearly one million of those ballots by mail. This represented an increase of 440% in absentee ballots returned by mail as compared to the 2016 Spring Election and was, by far, the largest volume of ballots cast by mail in any Wisconsin election.

7. The evidence that election officials were overwhelmed by the volume of mailed ballots in the 2020 Spring Election is well-documented and summarized in part in the OIG Report. The evidence includes: (1) 81,713 mailed ballots that arrived at election offices after Election Day; (2) three tubs of absentee ballots that were found in the USPS's Milwaukee Processing & Distribution Center after the polls had closed on Election Day because a third-party mailer presented them to USPS around 6:00 p.m. on Election Day; and (3) 2,693 absentee ballots that Milwaukee voters had requested and that, according to election records, had been sent on March 22 and 23, were not actually sent because of a system failure. In addition, problems occurred when USPS returned absentee ballots to the Fox Point Clerk's Office three different times, without explanation, instead of delivering them to voters, and hundreds of mailed absentee ballots were not postmarked by the USPS, leaving election officials uncertain about whether to count them as lawfully cast votes.

8. The problems described above are just a few examples of the many ways in which the Spring Election went awry. These examples reveal a system that was overwhelmed by the volume of absentee ballots requested and returned by mail. The pressing question now for

Wisconsin election officials, Wisconsin voters, and the nation is whether the problems the State experienced in the Spring Election were unique to that election given that the COVID-19 pandemic had suddenly spiked and left election officials and the USPS minimal time to prepare. Or, was the Spring Election a sign of what is to come in November, with election officials being overwhelmed again by an unprecedented volume of mail ballots and the extraordinary challenges of conducting an election during a once-in-a-century pandemic? As I explain below, my experience with voting by mail and my extensive work with election officials leads me to conclude that Wisconsin's Spring Election is a predictor of what may occur in Wisconsin's November General Election, absent necessary changes, such as again extending the Ballot Receipt Deadline so that ballots postmarked on or before Election Day are counted if they arrive in election offices within a reasonable time -- at least one week -- after Election Day. Without this change, many thousands of voters will be at high risk of having their ballots arrive after Election Day and not being counted.

9. While all the issues investigated by the OIG that I describe above involve the apparent disenfranchisement of significant numbers of voters, most concerning was the fact that nearly 82,000 mailed ballots cast by voters were delivered to election offices after Election Day. Under Wisconsin's Ballot Receipt Deadline, which requires ballots to be received by 8:00 p.m. on Election Day to be counted, Wis. Stat. § 6.87(6), these ballots would not have counted in the Spring Election had this Court not intervened to extend the receipt deadline from April 7 to April 13 for absentee ballots received by April 13 and postmarked on or before April 7. As described in the WEC's reports on the Spring Election, the Court's order extending the deadline saved the votes of 79,054 Wisconsinites whose mail ballots otherwise would not have counted (another 2,659 ballots arrived after April 13 and were not counted).

10. Based on Wisconsin's Ballot Receipt Deadline, the deadline for Wisconsin voters to request absentee ballots, and USPS's service standards for mail delivery, **I believe it is highly likely that in the November General Election, the absentee ballots of at least tens of thousands of voters will arrive at election offices after Election Day and will not be counted unless the Ballot Receipt Deadline is extended**. Several factors lead me to this conclusion, each of which I describe in the following paragraphs.

11. *First*, I understand that because of the ongoing COVID-19 pandemic, the WEC is taking steps to encourage voting by mail in the General Election and, to that end, has directed election officials to send voting materials to approximately 2.7 million registered Wisconsin voters that will include a form a voter can complete to request an absentee ballot and guidance on how to vote by mail. Based on my review of deposition testimony in this case, I understand that the WEC is expecting a large increase in the volume of absentee voting, with the Chair of the WEC projecting that as many as two million ballots will be returned by mail in the General Election. *This potential volume is approximately twice the number of absentee ballots that voters mailed in the Spring Election*.

12. *Second*, based on my experience as Deputy Postmaster General, I am familiar with the time it takes for USPS to process and deliver absentee ballots to voters, and from voters back to boards of election. The USPS has an Election Mail target of 96 percent on-time delivery. While this is a high target for some types of mail, even if this target is achieved, 4 percent of mailed ballots—which could represent at least tens of thousands of ballots in the November election—will be at high risk of untimely delivery.

13. *Third*, the USPS has service standards for the two types mail used for election-related materials First Class Mail and Marketing Mail. The service standard for First Class Mail

is two to five days, while the service standard for Marketing Mail is three to ten days. There is an irreconcilable conflict between these USPS service standards and Wisconsin's voting laws that will almost certainly lead to the disenfranchisement of large numbers of Wisconsin voters unless the Ballot Receipt Deadline is extended, as it was in the Spring Election. Specifically, Wisconsin law allows voters to request absentee ballots up to five days before Election Day, Wis. Stat. § 6.86 (1)(b), and local election officials have an obligation to mail an absentee ballot to a voter within one business day after receiving a request. Wis. Stat. § 7.15 (1) (cm). It is nearly impossible for a voter who lawfully requests an absentee ballot within one week of an election to receive the ballot in the mail, complete it and have that ballot delivered by a mail carrier to a board of elections by Election Day.

   14. A few examples demonstrate this difficulty. Let's consider a very optimistic scenario of a voter submitting an email request for an absentee ballot on October 27, 2020, which is one week before Election Day. If an election official responds promptly and mails the ballot within the one-day period required by Wisconsin law, the ballot could be accepted by the USPS as early as October 28. Let's assume the Board of Elections is using First Class Mail and the ballot is delivered to the voter's residence on Friday, October 30. The voter promptly reviews the candidates and any ballot initiatives, fills out the ballot and mails it Saturday afternoon, after the Saturday USPS critical entry time. The mail carrier won't pick up that ballot until Monday, November 2. With the USPS service standard of two to five days, the earliest that ballot would be delivered is Wednesday November 3, the day after Election Day. This scenario assumes everything goes perfectly, and a voter is within two days reach of USPS. Now, let's say it takes five days to get a ballot to a voter, a day for the voter to fill out a ballot, and five days for that ballot to be delivered back to the Board of Elections, all within the USPS service standards.

Under this scenario, we have added on six more days. This does not even consider other possible delays. It is why the USPS is suggesting that voters mail ballots back a week in advance of Election Day.

15. In the scenarios described above, through no fault of her own, a voter who requested a ballot within the time period permitted by Wisconsin law and who relied on the mail to receive and return her ballot would, under Wisconsin's Election Day Receipt Deadline, have her absentee ballot discarded and not counted.

16. *Fourth,* the high probability of broad disenfranchisement resulting from the state's Ballot Receipt Deadline is increased by the significant challenges the USPS is facing. For example, in various cities during the COVID-19 pandemic, the USPS has had significant challenges with employee availability. As employees tested positive for COVID-19, in some locations, large numbers of employees were out on leave. This led to a slowing of mail delivery because with limited staffing, the Postal Service began prioritizing the delivery of packages to ensure the timely delivery of life-saving pharmaceuticals and personal protective equipment. With health-care experts predicting a possible second wave of COVID-19 in the fall, along with the seasonal flu, employee availability could be a significant issue.

17. The USPS also has experienced a dramatic decline in mail volume over the last decade. In addition, since the middle of March of this year, the Postal Service has seen about a 25 percent decline in mail volume over the same period as last year, as a result of the COVID-19 pandemic. In responding to this decline, it appears the USPS has chosen to cut costs by ending employee overtime, and requiring all trucks to leave plants on time, regardless of whether all mail is loaded onto the trucks. This new policy will likely delay mail delivery. If the policy is still in effect in October and November, it could delay the delivery of mail-in ballots.

- 9 -

18. All of the factors I describe above give me great concern that large numbers of Wisconsin voters who vote by mail in the November election will be disenfranchised by the state's Ballot Receipt Deadline. As Wisconsin saw in the Spring Election, there is a relatively straightforward fix for this problem: extending the date for the receipt of ballots by at least a week after Election Day and requiring election officials to accept all ballots postmarked on or before Election Day. This solution is even more feasible now than it was during the Spring Election given that the WEC has now adopted the use of "intelligent mail bar codes" for absentee ballot envelopes. The use of these bar codes will allow election officials to determine when a ballot entered the mail stream and function as the equivalent of a postmark, thereby eliminating the problem of ballot envelopes that lack postmarks or legible postmarks.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Dated this 28th day of July, 2020.

s/ Ronald Stroman
_____
Ronald Stroman