IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEMOCRATIC NATIONAL COMMITTEE,
et al.,

                         Plaintiffs,                   OPINION AND ORDER

    v.

                                                20-cv-249-wmc

MARGE BOSTELMANN, et al.,

                         Defendants,

    and

WISCONSIN LEGISLATURE,
REPUBLICAN NATIONAL COMMITTEE,
and REPUBLICAN PARTY OF WISCONSIN,

                         Intervening-Defendants.

---

SYLVIA GEAR, et al.,

                         Plaintiffs,

    v.

                                                20-cv-278-wmc

MARGE BOSTELMANN, et al.,

                         Defendants,

    and

WISCONSIN LEGISLATURE,
REPUBLICAN NATIONAL COMMITTEE,
and REPUBLICAN PARTY OF WISCONSIN,

                         Intervening-Defendants.

---

CHRYSTAL EDWARDS, et al.,

                            Plaintiffs,

       v.                                                         20-cv-340-wmc

ROBIN VOS, et al.,

                            Defendants,

       and

REPUBLICAN NATIONAL COMMITTEE,
and REPUBLICAN PARTY OF WISCONSIN,

                          Intervening-Defendants.

---

JILL SWENSON, et al.,

                            Plaintiffs,

       v.                                                         20-cv-459-wmc

MARGE BOSTELMANN, et al.,

                            Defendants,

       and

WISCONSIN LEGISLATURE,
REPUBLICAN NATIONAL COMMITTEE,
and REPUBLICAN PARTY OF WISCONSIN,

                          Intervening-Defendants.

---

In these four, consolidated lawsuits, various organizations and individuals have moved for preliminary injunctive relief concerning the conduct of the Wisconsin general election on November 3, 2020. While the Commissioners and Administrator of the Wisconsin Election Commission ("WEC") oppose the motions only to the extent the requested relief would exceed the WEC's statutory authority, the Wisconsin Legislature,

the Republican National Committee and the Republican Party of Wisconsin have intervened to offer a more robust opposition to those motions.[1]   In addition to these pending motions for preliminary injunction, defendants and intervening defendants have also moved to dismiss three of the four cases.

For the reasons that follow, the court will largely reject defendants' grounds to dismiss.  As for the requests for preliminary relief, election workers' and voters' experiences during Wisconsin's primary election in April, which took place at the outset of the COVID-19 crisis, have convinced the court that some, limited relief from statutory deadlines for mail-in registration and absentee voting is again necessary to avoid an untenable impingement on Wisconsin citizens' right to vote, including the near certainty of disenfranchising tens of thousands of voters relying on the state's absentee ballot process.  Indeed, any objective view of the record before this court leads to the inevitable conclusion that: (1) an unprecedented number of absentee ballots, which turned the predominance of in-person voting on its head in April, will again overwhelm the WEC and local officials despite their best efforts to prepare; (2) but for an extension of the deadlines for registering to vote electronically and for receipt of absentee ballots, tens of thousands of Wisconsin voters would have been disenfranchised in April; and (3) absent similar relief, will be again in November.  Consistent with the fully briefed motions, evidence presented, and the hearing held on August 5, 2020, therefore, the court will grant in part and deny in part the

---

[1] In the *Edwards* case, the Wisconsin State Assembly, Senate and members of the Wisconsin Legislature were also named as direct defendants along with the WEC Commissioners.

parties' motions for reasons more fully explained below, including entering a preliminary injunction providing the following relief:

- extending the deadline under Wisconsin Statute § 6.28(1), for online and mail-in registration from October 14, to October 21, 2020;

- directing the WEC to include on the MyVote and WisVote websites (and on any additional materials that may be printed explaining the "indefinitely confined" option) the language provided in their March 2020 guidance, which explains that the indefinitely confined exception "does not require permanent or total inability to travel outside of the residence";

- extending the receipt deadline for absentee ballots under Wisconsin Statute § 6.87(6) until November 9, 2020, but requiring that the ballots be mailed and postmarked on or before election day, November 3, 2020;

- enjoining Wisconsin Statute § 6.87(3)(a), which limits delivery of absentee ballots to mail only for domestic civilian voters, allowing online access to replacement absentee ballots or emailing replacement ballots for the period from October 22 to October 29, 2020, as to those voters who timely requested an absentee ballot, the request was approved, and the ballot was mailed, but the voter did not receive the ballot; and

- enjoining Wisconsin Statute § 7.30(2), which requires that each election official be an elector of the county in which the municipality is located, allowing election officials to be residents of other counties within Wisconsin for the upcoming November 2020 election.

In recognition of the likelihood of appellate review, however, this order is STAYED for one week, and NO voter can depend on any extension of deadlines for electronic and mail-in registration and for receipt of absentee ballots unless finally upheld on appeal.  In the meantime, lest they effectively lose their right to do so by the vagaries of COVID-19, mail processing or other, unforeseen developments leading up to the November election, the court joins the WEC in urging especially new Wisconsin voters to register by mail on or before October 14, 2020, and all voters to do so by absentee ballot as soon as possible.[2]

---

[2] In a vain effort (in both senses of that word) at forestalling the inevitable judge-appointment and

FACTS

**A. Election Laws in Wisconsin**

**1. Registering to vote**

A citizen wishing to vote in Wisconsin must first register in the ward or district in which they reside.  To do so, the voter must complete a registration form and provide "an identifying document that establishes proof of residence."[3]  Wis. Stat. § 6.34(2).  The deadline for registering by mail or online is the third Wednesday preceding the election, Wis. Stat. § 6.28, which for the upcoming November 2020 election is October 14, 2020.  A voter may also register in person at their local municipal clerk's office up to the Friday before the election, Wis. Stat. § 6.29(1)-(2), which for the November election is October 30.  Finally, a voter may register in person on election day itself at their designated polling place.  Wis. Stat. § 6.55(2).

**2. Voting by mail**

Absentee voting in Wisconsin is available to any registered voter who "for any reason is unable or unwilling to appear" at the polls.  Wis. Stat. § 6.85.  To obtain an

---

bias dialogue so prevalent in what remains of the independent press, among commentators and on the internet, let me stress, as I did with the parties during the August hearing, the limited relief awarded today is without regard to (or even knowledge of) who may be helped, except the average Wisconsin voter, be they party-affiliated or independent.  Having grown up in Northern Wisconsin with friends across the political spectrum (and in some cases back again), my only interest, as it should be for all citizens, is ensuring a fair election by giving the overtaxed, small WEC staff and local election officials what flexibility the law allows to vindicate the right to vote during a pandemic.

[3] Military and overseas voters are exempt from this proof of residence requirement.  Wis. Stat. § 6.34(2).  Also, proof of residence is not required if the voter registers online *and* provides the number of a current and valid Wisconsin operator's license or state ID card, together with his or her name and date of birth, provided this information is verified.  Wis. Stat. § 6.34(2m).

absentee ballot, a registered voter must submit an absentee ballot request form, along with a copy of an acceptable photo ID. Wis. Stat. § 6.86.[4] Voters who are "indefinitely confined because of age, physical illness or infirmity" are exempt from this photo ID requirement, but such a voter must still provide a signed statement by the individual who witnesses and certifies the voter's ballot "in lieu of providing proof of identification." Wis. Stat. § 6.87(4)(b)2.

On March 29, 2020, the WEC issued guidance on the proper use of indefinitely confined status, explaining that: "Designation of indefinitely confined status is for each individual voter to make based upon their current circumstances. It does not require permanent or total inability to travel outside of the residence." Wisconsin Election Commission, *Guidance for Indefinitely Confined Electors COVID-19* (Mar. 29, 2020), https://elections.wi.gov/node/6788. Two days later, the Wisconsin Supreme Court issued a decision that preliminarily endorsed the WEC guidance, finding that it "provides the clarification on the purpose and proper use of the indefinitely confined status that is required at this time." *Jefferson v. Dane Cty*, No. 2020AP557-OA (Wis. Mar. 31, 2020).[5]

Whether submitted online, by fax or by mail, an absentee ballot application must

---

[4] For certain voters without an acceptable photo ID, there is also an "ID Petition Process" that has been the subject of substantial litigation unrelated to the current pandemic. *See Luft v. Evers*, 963 F.3d 665, 678 (7th Cir. 2020).

[5] However, litigation on that issue is ongoing, with oral argument before the Wisconsin Supreme Court scheduled for September 29, 2020. *See* Wis. Supreme Court Pending Cases (last accessed Sept. 3, 2020), https://www.wicourts.gov/sc/sccase/DisplayDocument.pdf?content=pdf&seqNo=285226. Because all of the issues certified for review by the Wisconsin Supreme Court in *Jefferson* relate exclusively to Wisconsin law, none overlap or conflict with the federal constitutional and statutory claims at issue in the instant case.

be received *no* later than 5 p.m. on the fifth day immediately preceding the election, Wis. Stat. § 6.86(1)(ac), (b), which means for the November election on or before 5 p.m. on October 29, 2020. Clerks must begin to send out absentee ballots no later than the 47th day before a general election, at which point the absentee ballot itself must be mailed to a qualified voter within one business day of the receipt of an absentee ballot request. Wis. Stat. § 7.15(1)(cm).

If a clerk is "reliably informed" that the absentee requester is a *military or overseas voter*, the clerk may also fax or transmit an electronic copy of the ballot in lieu of mailing it. Wis. Stat. § 6.87(3)(d). Indeed, up until very recently, due to a 2016 injunction by this court, clerks had the discretion to email ballots to *all* voters. *See One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 946-48 (W.D. Wis. 2016) (enjoining "the provision prohibiting municipal clerks from sending absentee ballots by fax or email [because it] violates the First and Fourteenth Amendments"). On June 29, 2020, however, the Seventh Circuit vacated this injunction, meaning that non-military/overseas voters may now receive an absentee ballot only by mail. *See Luft v. Evers*, 963 F.3d 665, 676-77 (7th Cir. 2020).

Once received, to cast an absentee ballot by mail, the voter must (1) complete the ballot in the presence of a witness, (2) enclose the ballot in the envelope provided, (3) sign the envelope and obtain a signature from the witness and (4) return the ballot for actual receipt no later than 8 p.m. on election day. Wis. Stat. § 6.87(2), (4)(b), (6). In light of the COVID-19 pandemic, the WEC further issued guidance on March 29, suggesting several options for voters to meet the witness signature requirement safely. *See* WEC, "Absentee   Witness   Signature   Requirement   Guidance"   (Mar.   29,   2020),

https://elections.wi.gov/node/6790. This guide outlines a multi-step process to acquire a signature while observing social distancing and other best health practices. *Id.* For example, the guide suggests that a voter could recruit a friend or neighbor to watch the voter mark their ballot through a window or over video chat, with the voter then placing the ballot outside for the witness to sign as well. *Id.* To return an absentee ballot, a voter may then mail it, hand deliver it to the clerk's office or other designated site, *or* bring it to their polling place on election day. Some, though not all, localities also offer absentee ballot "drop boxes." *See* WEC, "Absentee Ballot Return Options - COVID-19" (Mar. 31, 2020), https://elections.wi.gov/node/6798. In that instance, another person may deliver the ballot on behalf of the voter. *Id.* Finally, "[i]f a municipal clerk receives an absentee ballot with an improperly completed certificate or with no certificate, the clerk may return the ballot to the elector . . . whenever time permits the elector to correct the defect and return the ballot." Wis. Stat. § 6.87(9).[6]

### 3. Voting in person

A registered voter may also vote absentee in-person, by simultaneously requesting and casting an absentee ballot at the clerk's office or other designated location beginning two weeks before election day through the Sunday preceding that election, in this election meaning Sunday, November 1. Wis. Stat. §§ 6.85(1)(a)2, 6.855, 6.86(1)(b). Once an absentee ballot is received by a clerk, the ballot is sealed in a carrier envelope until election

---

[6] Wisconsin law also permits a voter to receive up to *three* replacement ballots if they spoil or erroneously prepare their ballot, provided they return the defective ballot. Wis. Stat. §§ 6.80(2)(c), 6.86(5).

day, at which point the ballots are canvassed like any other absentee ballot.  Wis. Stat. §§ 6.88, 7.51-52.

Of course, on election day, a voter may cast a regular ballot in person at their designated, local polling station.  *See* Wis. Stat. §§ 6.77, 6.79.  These polls are staffed by various election officials and poll workers, all of whom are required by Wisconsin law to be "qualified elector[s] of a county in which the municipality where the official serves is located."  Wis. Stat. § 7.30(2)(a).  As noted above, Wisconsin also offers same-day registration, so an unregistered voter or a voter who needs to change their registration may arrive, register and cast a ballot at the polls in person, all on election day.  Wis. Stat. § 6.55(2).

Historically, Wisconsin voters have relied heavily on this election day registration process.  For example, between 2008 and 2016, 10 to 15% of all registrations took place on election day.  As Administrator Wolfe testified, Wisconsin has a "cultural tradition" of same-day registration, with approximately 80% of voter records having been impacted in some way by same-day registration.  (8/5/20 Hr'g Tr. (dkt. #532) 57-58.)[7]

### B. The COVID-19 Pandemic's Impacts on Wisconsin's April and August Elections

#### 1. Growing problem and related litigation

Since early 2020, Wisconsin and most of the rest of the world has been impacted

---

[7] Unless otherwise noted, the docket entries are to the 20-cv-249 docket.

to varying degrees by the novel coronavirus.[8]   On February 6, the first case of COVID-19 was diagnosed in Wisconsin, and as of September 17, 94,746 confirmed cases have been recorded in the state.  Much is still unknown about the virus and the COVID-19 illness that it causes, but experts appear to agree that COVID-19 is mainly spread via person-to-person, respiratory droplets, and it is more likely to spread between people who are in close contact with one another for a sustained period.  A person may also become infected by "touching a surface or object that has the virus on it and then touching their own nose, mouth, or possibly their eyes."  (Edwards Pls.' PFOFs (dkt. #417) ¶ 27 (quoting Goode Decl., Ex. I (CDC, Targeting COVID-19's Spread) (dkt. #415-9).)  Certain individuals, such as those who are elderly, immunocompromised or suffer comorbidities, are at a greater risk for complications from COVID-19.

As the virus first started to spread in Wisconsin in February and March, even greater uncertainty surrounded the extent, seriousness and nature of COVID-19.  By March 12, Governor Evers had issued a statewide health emergency; and on March 24, the Secretary of Wisconsin's Department of Health Services had issued a "Safer at Home" order, which banned all public and private gatherings, closed nonessential businesses, and required that everyone maintain social distancing of at least six feet from any other person.

Obviously, all this occurred within just a few weeks of Wisconsin's April 7, 2020, primary election.  In mid-March, certain WEC Commissioners began expressing concern about the state's ability to conduct a fair and safe election; local clerks reported that they

---

[8] Technically, SARS-CoV-2 is the name of what has become known as the "coronavirus," while COVID-19 is the name of the illness caused by that virus.

were running out of absentee ballot materials and felt overwhelmed by the volume of absentee ballot requests; and various mayors urged that the election be delayed.  Between March 18 and March 26, three lawsuits were also filed with this court requesting various relief relating to Wisconsin's impending primary election.

Shortly after, this court granted the following narrow, preliminary relief:  (1) extending the online registration deadline by 12 days to March 30; (2) extending by one day the window to request an absentee ballot; (3) adjusting the witness certification requirement under Wis. Stat. § 6.87(2); and (4) extending the absentee ballot receipt deadline by six days to April 13 at 4 p.m.  *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249 (W.D. Wis. Mar. 20, 2020); *Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249 (W.D. Wis. April 2, 2020).  Most of this relief was challenged by emergency appeal to the Seventh Circuit (extension of the registration deadline being the exception).  That court declined to stay relief granted as to the extension of absentee-ballot-requests and receipt deadlines by mail, but granted a stay as to the adjustment to the witness signature requirement.  *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, -1546, -1545, at * 3-4 (7th Cir. April 3, 2020).  A further, emergency appeal was accepted by the U.S. Supreme Court, which sought a stay of this court's injunction only to the extent that it permitted ballots postmarked after election day (April 7) to be counted if actually received by April 13.  Brief of Petitioner, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U. S. ___ (2020) (No. ___ ).  The Supreme Court granted the stay, ordering that a voter's absentee ballot must be either postmarked by election day and received by April 13 or hand-delivered by election day.  *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. ___

(2020) (per curiam).

## 2. Effort to fulfill absentee ballot applications

Meanwhile, the WEC and local clerks were undertaking admirable (and in some cases, heroic) efforts to administer absentee voting and prepare the polls for in-person voting on April 7 in the midst of the pandemic.  Despite these efforts, unprecedented challenges confronted clerks and poll workers before and on election day.  To begin, clerks received a flood of absentee ballot requests, ultimately receiving a total of 1,282,762 absentee ballot applications.[9]  A post-election report by the WEC explained that some inadequately staffed offices were "nearly overwhelmed" by this number of applications.  (Swenson Pls.' PFOFs ('459, dkt. #42) ¶ 56 (citing Goodman Decl., Ex. 18 (WEC May 20 Meeting Materials) ('459 dkt. #43-18) 6).)  At one point, clerks even ran out of absentee certificate envelopes, although this shortage was ultimately rectified.  Plaintiffs have produced numerous declarations from voters who testified that they timely -- often two or three weeks before the election -- requested an absentee ballot but never received it *or* received it after election day; some of these voters chose to vote in person, but others were unwilling or unable to go to the polls due to safety concerns with COVID-19, long lines or other problems.  (*See* Swenson Pls.' PFOFs ('459, dkt. #42) ¶¶ 51, 164, 176 (citing declarations); DNC Pls.' PFOFs (dkt. #419) ¶ 73 (citing declarations); Edwards Pls.' PFOFs (dkt. #417) ¶¶ 67-162, 177-81) (citing declarations); Gear Pls.' PFOFs (dkt. #422) ¶¶ 37, 43, 81, 157-677 (citing declarations).)

---

[9] In comparison, only 167,832 absentee ballots were sent in the April 2019 election.

Moreover, between April 3 and April 6 (the day before the election), local officials were still in the process of mailing more than 92,000 absentee ballots to voters, virtually all of which the WEC acknowledges were sent too late to be filled out and mailed back by election day.[10]  On top of this group, data from the WEC as of April 7 indicates that at least an additional 9,388 ballots were applied for timely but were never even sent out.  The WEC advises that due to a reporting lag this number was lower, but does not indicate by how much.

At least some of these problems were rooted in mail delivery issues, which led to some absentee ballots reaching voters or clerks late or not at all.  For example, a WEC staff member received a call from a United States Postal Service ("USPS") official in Chicago on April 8, who reported that "three tubs" of absentee ballots from the Appleton/Oshkosh area had been found undelivered in a post office in Chicago, although the Legislative defendants and the RNC/RPC point out that these tubs were dropped off at USPS at the end of the day on April 7 (*see* Leg. Defs.' & RNC/RPW Resp. to DNC Pls.' PFOFs (dkt. #450) ¶ 84).   Similarly, in Fox Point, a bin containing about 175 unopened and undelivered ballots was inexplicably returned to the clerk's office on the morning of election day.

Voters also reported problems with satisfying the requirements for requesting and

---

[10] Administrator Wolfe testified that it may take 14 days for an absentee ballot to make its way through the mail from a clerk's office to a voter and back again, and even under ideal conditions with a two-day first class mail delivery time, a mailed ballot would take at least four to six days to turn around.  (Swenson Pls.' Supp. PFOFs (dkt. #494) ¶ 62 (citing Wolfe Dep. (dkt. #247) 51:1-21).)

casting their absentee ballots.  For example, some voters testified that they had difficulties uploading their photo ID to the online system or otherwise providing the required ID needed to request an absentee ballot.[11]  (DNC Pls.' PFOFs (dkt. #419) ¶ 68 (citing declarations).)

### 3. Efforts to count absentee ballots

Further, while the WEC issued guidance regarding the safe execution of the witness signature requirement before voting and returning an absentee ballot itself, plaintiffs' expert opined that this complicated advice was not easy to follow.  (Swenson Pls.' PFOFs ('459, dkt. #42) ¶ 81 (citing Remington Expert Report ('459 dkt. #44)).)  For example, plaintiff Jill Swenson testified that she spent two weeks trying to find someone to witness her ballot in a safe manner, ultimately to no avail.  (*See* Swenson Decl. ('459 dkt. #47) ¶¶ 11-13.)  Relying on this court's preliminary injunction modifying the witness signature requirement in light of such issues, Swenson eventually mailed her ballot without a witness signature, only to find out later that this court's order was stayed on appeal.  (*Id*.)  Other voters also testified that they did not cast their absentee ballot, or they cast their ballot without the proper certification, due to COVID-19-related safety concerns regarding the witness requirement.  (*See* DNC Pls.' PFOFs (dkt. #419) ¶¶ 157-60 (citing declarations).)[12] In addition, although many ballots arrived with no postmarks, two postmarks or unclear

---

[11] Defendants do not dispute that *some* voters testified to difficulties with uploading their photo ID to the online system (or could otherwise not provide the required ID needed to request an absentee ballot), but as discussed further in the opinion below, none of the declarations persuasively establish that the ID requirement was or will be difficult to satisfy for most desiring to vote absentee.

[12] As was conceded in the hearing, none of the plaintiffs produced any evidence of a voter who was ultimately unable to meet the proof of residence requirement.

postmarks, on this issue, the guidance issued by the WEC simply left it up to each municipality to determine whether a ballot was timely.

In the end, 120,989 voters who requested absentee ballots did not return them as of election day, although what portion of these voters ended up voting in-person on election day or why they did not is unknown.  Even for those absentee ballots that did reach clerks' offices, more than 14,000 ballots were rejected due to an "insufficient" witness certification and "thousands" were rejected for other reasons.  (Swenson Pls.' PFOFs ('459, dkt. #42) ¶ 90.)  However, the WEC maintains that "the final election data conclusively indicate[d] that the election did not produce an unusual number [of] unreturned or rejected [absentee] ballots," adjusting for the larger number of absentee votes submitted. (WEC Resp. to Swenson Pls.' PFOFs (dkt. #439) ¶ 74.)

All told, absentee ballots represented 73.8% of all ballots counted.  Approximately 61.8% of absentee ballots were mailed in, while the remaining 12% were cast in-person absentee or hand-delivered, meaning only roughly 26.2% were cast on election day. Absentee votes never comprised more 20% of all ballots in recent past elections, and often, they represented less than 10% of ballots cast.  The WEC itself stated in a report that the increase in absentee voting "created resource issues for a system primarily designed to support polling place voting."   (Swenson Pls.' PFOFs ('459, dkt. #42) ¶ 50 (quoting Goodman Decl., Ex. 18 (WEC May 20 Meeting Materials) ('459, dkt. #43-18) 19-21).)

## 4.  Election day voting

As for voting on the actual election day itself, April 7, 2020, severe shortages of poll workers caused significant problems in some jurisdictions.  In particular, because of the age

and health concerns of poll workers who declined to volunteer, Milwaukee was only able

to open *five* of its usual 180 polling sites, and Green Bay reduced its usual 31 polling sites

to just *two*.  In part due to this consolidation, some individuals had to wait in long lines,

sometimes for hours before being allowed to vote.  While Governor Evers authorized the

Wisconsin National Guard to serve as poll workers, he only did so on April 2, less than

one week before the election.  In addition, while the WEC was able to send sanitation and

personal protective equipment ("PPE") to all polling sites, some supplies were limited or

inadequate.  Some poll workers even reported that they had to rely on vodka as a sanitizer.

Moreover, the WEC did not issue any particular mandate requiring specific public health

measures to be taken by clerks or poll workers.  Finally, voters and poll workers reported

various perceived safety problems, including:  (1) cramped polling locations that made it

difficult to maintain social distancing; (2) no enforcement of social distancing by poll

workers; (3) a lack of or improper mask-wearing by voters and poll workers; (4) poll

workers' reuse of paper towels to clean voter booths between voters; (5) a lack of sanitized

pens; and (6) poll set-ups requiring poll workers to sit approximately two feet from each

other.

Plaintiffs also cite to various declarations to highlight the difficulties faced by some

citizens who sought to vote in-person in the April election.  (*See* DNC Pls.' PFOFs (dkt.

#419) ¶¶ 62-66 (citing declarations).)   For example, although Jeannie Berry-Matos

requested and received an absentee ballot, it was for the wrong ward; unable to correct the

error in time, she then was forced to vote in person on April 7 at Washington High School

in Milwaukee.  (DNC Pls.' PFOFs (dkt. #419) ¶ 62 (citing Berry-Matos Decl. (dkt.

#263)).)   When Berry-Matos arrived, she found a line stretching several blocks, no available close parking, no poll workers enforcing social distancing, and no way to sanitize her pen or her photo ID.  (*Id.*)  All in all, it took her an hour and thirty-five minutes to vote in person.  (*Id.*)  Other voters who requested but did not receive absentee ballots similarly showed up at the polls to vote, but concerned about safety and confronted with long lines, they ultimately did not cast their vote.  (DNC Pls.' PFOFs (dkt. #419) ¶¶ 63-66 (citing Wortham Decl. (dkt. #367); Moore Decl. (dkt. #330); Washington Decl. (dkt. #363)); *see also* Gear Pls.' PFOFs (dkt. #422) ¶¶ 236-38, 468-70, 599-602, 627 (citing declarations).)

Overall, 1,555,263 votes were cast in the April election.  This court's injunction extending the absentee ballot physical receipt deadline from April 7 to April 13 appears to have resulted in approximately 80,000 ballots being counted that would have otherwise been rejected as untimely.  (DNC Pls.' PFOFs (dkt. #419) ¶ 10.)  In addition, the court's injunction extending the registration deadline arguably resulted in an estimated 57,187 voters successfully registering in advance.  (*Id.* ¶ 197.)  Of course, absent the court's injunction some portion of those voters may have opted to register to vote in person on election day just before voting, rather than sending their absentee ballot by mail.

Plaintiffs point to expert reports concluding that COVID-19 and its effects reduced voter turnout in the election.  (*See* Swenson Pls.' PFOFs ('459 dkt. #41) ¶ 131 (citing Fowler Expert Report ('459 dkt. #46)); DNC Pls.' PFOFs (dkt. #419) ¶ 111 (citing Burden Decl. (dkt. #418)).)  Still, 34.3% of eligible voters cast a ballot in the April election; in comparison, the turnout for previous spring primary elections was 27.2% (2019), 22.3%

(2018), 15.9% (2017), 47.4% (2016), 26.1% (2012), and 34.9% (2008).

### 5. COVID-19 impacts on in-person voting

As for the relationship between Wisconsin's April election and COVID-19 transmission in the state, the parties point to arguably conflicting reports on this subject. Plaintiffs note that a Wisconsin Department of Health Services analysis traced 71 cases of COVID-19 to in-person voting in April. (Edwards Pls.' PFOFs (dkt. #417) ¶ 4; DNC Pls.' PFOFs (dkt. #419) ¶ 6.) Similarly, expert witness Meagan Murry, M.D., an epidemiologist at Harvard School of Public Health, reported "71 confirmed cases of Covid-19 among people who may have been infected during the election." (Swenson Pls.' Supp. PFOFs (dkt. #494) ¶ 5 (quoting Murry Decl. (dkt. #370) ¶ 60).) They also reference a working paper, which concludes that in-person voting led to approximately 700 additional COVID-19 cases in Wisconsin. (Edwards Pls.' PFOFs (dkt. #417) ¶ 4.)

The Legislative defendants and the RNC/RPW, for their part, point to two reports concluding that the April election was *not* associated with an increase in COVID-19 infection rates. (Leg. Defs.' & RNC/RPC's Resp. to Swenson Pls.' PFOFs (dkt. #451) ¶¶ 7, 36 (citing Tseytlin Decl., Exs. 18, 19 (dkt. ##458-18, -19).)[13]   The Legislative

---

[13] In particular, defendants cite to a report authored in part by two individuals affiliated with the World Health Organization Collaborating Centre for Infectious Disease Epidemiology and Control, which purported to analyze confirmed COVID-19 cases in the weeks surrounding the April 7 election, and found that the election was not associated with an increase in COVID-19 infection rates. (Tseytlin Decl., Ex. 18 (dkt. #458-18).) They also cite to a second report authored by individuals affiliated with the Larkin Community Hospitals in Miami, the Department of Math and Statistics at the University of South Alabama, and the Froedtert & The Medical College of Wisconsin in Milwaukee. (Tseytlin Decl., Ex. 19 (dkt. #458-19).) This report concluded that: "There was no increase in COVID-19 new case daily rates observed for Wisconsin or its 3 largest counties following the election on April 7, 2020, as compared to the US, during the post-incubation interval period." (*Id.*)

defendants and the RNC/RPW also point out that the Wisconsin DHS explained that it is "not clear how many of the infections may have been caused by the spring election because many of the people had other exposures."  (Leg. Defs.' & RNC/RPW's Resp. to Edwards Pls.' PFOFs (dkt. #485) ¶ 3.)

After the court's evidentiary hearing in this case, Wisconsin also held another primary election on August 11.  Evidence presented by the parties prior to the election suggested that certain localities again had to consolidate polling locations due to poll worker shortages.  For example, Sun Prairie expected to consolidate eight polling places down to one.  The WEC told municipalities "not to plan on" assistance from the National Guard (Swenson Supp. Pls.' PFOFs (dkt. #494) ¶ 94), but the parties represented that Governor Evers ultimately did deploy the Guard to assist with the election on August 5, less than one week before the election.  In the end, both the April and August elections suggest that in-person voting can be conducted safely if the majority of votes are cast in advance, sufficient poll workers, polling places, and PPE are available, and social distancing and masking protocols are followed.  Of course, the aged, those with comorbidities or those lacking confidence in the ability of local officials and the public to get all those factors right are understandably less confident in that assessment.

### C. Plans for the November Election in Light of the Ongoing COVID-19 Pandemic

While the exact trajectory of COVID-19 in Wisconsin is unknown, the unrebutted public health evidence in the record demonstrates that COVID-19 will continue to persist, and may worsen, through November.  Recent outbreaks, particularly among Wisconsin

college students, and the onset of flu season continue to complicate assessments.  For example, concern remains that the significant new infections reported on reopened college campuses may spread into the community.  David Wahlberg, *UW-Madison threatens 'more drastic action' as experts say COVID-19 outbreak impacting broader community*, Wis. State Journal (Sept. 16, 2020), https://madison.com/wsj/news/local/education/university/uw-madison-threatens-more-drastic-action-as-experts-say-covid-19-outbreak-impacting-broader-community/article_dd00c9cc-5dc9-5924-99ca-40c94a0f6738.html.  Indeed, with flu season yet to arrive, Wisconsin has already broken numerous new case records this month, with over 2,000 new cases reported on September 17, 2020, up from a daily average of 1,004 just one week prior.  *See* WPR Staff, *Wisconsin Sets New Daily Record with 2,034 Coronavirus Cases Reported Thursday*, Wis. Public Radio (Sept. 17, 2020), https://www.wpr.org/wisconsin-sets-new-daily-record-2-034-coronavirus-cases-reported-thursday.  Regardless, given the significantly higher voter turnout expected for the November election in comparison with April, there is little doubt that the WEC, clerks and voters will again face unique challenges in the upcoming election.  As a result, the WEC is already urging as many people as possible to vote absentee in the hopes of avoiding large lines, shortages and attendant health risks on election day.

Moreover, the evidence suggests that Wisconsin voters will again rely heavily on the absentee voting system for the November election, with the WEC expecting some 1.8 to 2 million voters to request an absentee ballot, again smashing all records and turning historic voter patterns on their head.  Unfortunately, Madison City Clerk Maribeth Witzel-Behl testified that at least her office "has not been given the resources and money necessary to

20

meet the anticipated demand for mail-in absentee ballots in November," and "with other departments going back to work, [her] staff now only has a few dozen League of Women Voters volunteers available to help." (Gear Pls.' Supp. PFOFs (dkt. #506) ¶ 20 (quoting Witzel-Behl Decl. (dkt. #382) ¶ 6).)

As previously discussed, the absentee ballot system in Wisconsin is also heavily reliant on the USPS, which has and continues to face its own challenges. WEC Administrator Wolfe in particular acknowledged "significant concerns about the performance of the postal service in connection with the April 7 election." (DNC Pls.' PFOFs (dkt. #419) ¶¶ 140, 142 (quoting Wolfe Dep. (dkt. #247) 89:10-15).) In addition, a report by the USPS Inspector General's Office found that voters requesting ballots five days before the election -- the deadline set by Wisconsin statutes -- face a "high risk" that their ballot will not be delivered, completed and returned in time to be counted. (Swenson Pls.' Supp. PFOFs (dkt. #494) ¶ 61 (quoting Second Goodman Decl., Ex. 17 (Timeliness of Ballot Mail) (dkt. #495-17) 6-7).) USPS also faces budget shortfalls, as well as challenges caused by increasing COVID-19 rates among postal workers themselves. Moreover, just a few weeks ago, the new Postmaster General established "major operational changes . . . that could slow down mail delivery," including restricting the ability for USPS employees to work overtime. (DNC Pls.' Supp. PFOFs (dkt. #501) ¶¶ 7-8.)

As to fulfilling the witness signature requirement, over 600,000 Wisconsinites live alone and even more live with an individual who is unqualified to be a witness. Prospective absentee voters in that situation will need to find someone outside of their household to witness their ballot before returning it. According to plaintiffs' expert, a "significant"

portion of voters who do not live with a qualified witness are senior citizens, who also face special risks of complications from COVID-19. (DNC Pls.' PFOFs (dkt. #419) ¶ 153 (citing Fowler Rep. ('459 dkt. #46) 12-13).) Relatedly, another expert produced by plaintiffs opined that the WEC's guidance on the witness signature requirement "may be difficult to understand by the homebound individual and witness" and "may be impractical in certain situations, such as for persons living in multi-level or multi-unit apartment complexes." (Swenson Pls.' PFOFs ('459 dkt. #42) ¶ 81 (citing Remington Rep. ('459 dkt. #44)).) That being said, notwithstanding a few, individual affiants who had experienced difficulties securing a witness signature requirement or submitting proof of ID for the April election, the Legislature points out that plaintiffs produced no evidence of voters who are still unable to meet the challenged requirements *for November*.[14]

In-person voting in November is also likely to be strained by a shortage of poll workers, despite more time to plan for that shortage than was available for the spring election. On the one hand, Milwaukee officials testified that they hope to be able to open all 180 polling sites (up from five in April), and Green Bay expects to have at least 13 polling locations (up from two in April). On the other hand, clerks are still reporting poll worker shortages for November. Similarly, WEC Administrator Wolfe testified that

---

[14] The DNC plaintiffs also contend that: "many workplaces, public libraries, and copy shops may remain or become closed given the pandemic's acceleration in the U.S., many voters will continue to face substantial burdens in obtaining the copies or scans they need to complete their absentee ballot applications and will continue to be prevented from voting. In addition, even if those establishments were open, many voters are fearful of leaving their homes because of the health risks of the coronavirus pandemic and the restrictions imposed under their respective County's health orders." (DNC Pls.' PFOFs (dkt. #419) ¶ 164.) Again, however, the only evidence they cite in support is voter declarations expressing fear of in-person voting due to COVID-19, rather than a personal inability to arrange an effective witnessing of their ballot.

"despite the advance warning [and] the greater time to plan for people who will opt-out because of COVID-19 risks, local municipalities are still having problems filling all their polling stations."  (8/5/20 Hr'g Tr. (dkt. #532) 82.)  Because of this, Wolfe explained a lack of poll workers was the thing she "worr[ies] about the most" for the upcoming November election.  (*Id.* at 83.)

More fundamentally, plaintiffs have produced a credible expert report that concludes in-person voting in November will continue to pose "a significant risk to human health" due to the COVID-19 pandemic.  (Swenson Pls.' PFOFs ('459 dkt. #42) ¶ 7 (citing Remington Expert Report ('459 dkt. #44)).)  While not disputing this risk, the WEC counters with the general observation  that the risk of transmission is "greatly reduced" if people are wearing masks and practicing social distancing.  (WEC Resp. to Swenson Pls.' PFOFs (dkt. #439) ¶ 7.)  The Legislative defendants and the RNC/RPC further dispute any suggestion that in-person voting in November will be unsafe, again pointing to the two studies concluding that the April election was not associated with an increase in COVID-19 infection rates.  (*See* (Leg. & RNC/RPW's Resp. to Swenson Pls.' PFOFs (dkt. #451) ¶¶ 7, 36 (citing Tseytlin Decl., Ex. 18, 19 (dkt. ##458-18, -19)).)  At minimum, the evidence continues to suggest that a large election day turnout will stretch safety protocols and increase risk of transmission particularly to poll workers, which is why the WEC has continued to promote voting by mail.

Regardless of the objective risks, plaintiffs have also produced declarations from various voters who aver that if unable to vote by mail, they will not vote in-person in November.  (*See* Gear Pls.' PFOFs (dkt. #422) ¶¶ 186, 215, 279, 323, 355, 387, 407 (citing

23

various voter declarations)).)  Others declare that they intend to vote by mail in November, but would like a "back-up" option, because of their previous personal experiences in not receiving an absentee ballot for the April election despite requesting it timely.  (*See id.* ¶¶ 445, 474, 501, 576, 633, 669 (citing various voter declarations).)

In preparation for these anticipated challenges in administering the November election, the WEC has taken a number of steps.  Of particular note, the WEC mailed absentee ballot *applications* to nearly all registered voters.  The application itself contains an information sheet, which among other things generally describes the "indefinitely confined" exception to the photo ID requirement, but does not indicate what constitutes "indefinitely confined" under Wisconsin law.  Instead, the instructions warn a prospective voter may be fined $1,000 or imprisoned up to 6 months for falsely asserting that they are indefinitely confined.  This mailer went out on September 1st.

In addition to encouraging Wisconsinites to vote absentee, the WEC has also:  (1) directed staff to spend federal CARES Act grant money to distribute sanitation supplies to all 72 counties in Wisconsin; (2) planned to implement intelligent mail barcodes ("IMB") to facilitate more detailed absentee-ballot tracking; (3) planned to spend up to $4.1 million on a CARES Act sub-grant to local election officials to help pay for increased elections costs caused by the pandemic; (4) made upgrades to the MyVote website; (5) issued guidance to local officials about providing drop boxes for the safe and easy return of absentee ballots; (6) made CARES Act subgrant money available for the purchase of additional, absentee ballot drop boxes; (7) urged localities to solicit election inspectors, create recruitment tools for local officials, and promote the need for poll workers; (8) produced content to educate

voters on "unfamiliar aspects of voting" for use by local election officials, voter groups, and the public; (9) worked with public health officials to produce public health guidance documents for clerks, poll workers, and the public; and (10) developed a webinar series for local officials to provide training on election procedures, including COVID-19-specific training.  Just as in April, what the WEC has not done is ease any of the statutory deadlines, having again concluded on a 3-3 vote that it lacks the authority to do so even in the face of the anticipated effects of the COVID-19 pandemic.

OPINION

## I.  Motions to Dismiss

As an initial matter, the court will address certain issues raised in defendants' pending motions to dismiss, considering first various jurisdictional challenges and then arguments that some of plaintiffs' claims must be dismissed for failure to state a claim on which relief may be granted. [15]

---

[15] Specifically, the WEC moved to dismiss the Swenson plaintiffs' complaint (*see* WEC's Mot. to Dismiss ('340, dkt. #14)), and the Legislative defendants moved to dismiss the Gear, Edwards and Swenson plaintiffs' operative complaints (*see* Leg. Defs.' Mot. to Dismiss Gear Compl. ('278 dkt. #382); Leg. Defs.' Mot to Dismiss Edwards Compl. ('340 dkt. #12); Leg. Defs.' Mot to Dismiss Swenson Compl. ('459 dkt. ##27, 272)).  Although the WEC also initially moved to dismiss the Gear plaintiffs' original complaint, after the Gear plaintiffs' filed a proposed, first amended complaint, plaintiffs filed a joint stipulation with the WEC, which withdrew the WEC's pending motion to dismiss the first amended complaint, while reserving its right to answer, move or otherwise plead in response to the second amended complaint.  (Joint Stipulation (dkt. #230).) Finally, although the Legislative defendants did not formally move to dismiss the DNC plaintiffs' second amended complaint (the court having previously denied their motion to dismiss the DNC plaintiffs' first amended complaint (6/10/20 Op. & Order (dkt. #217)), they argued in their briefing that "especially after *Luft*, the DNC Second Amended Complaint must be dismissed for many of the same reasons supporting dismissal of the operative complaints in Gear and Swenson."  (Leg. Defs.' Omnibus Br. (dkt. #454) 5 n.3.)

### A.  Jurisdictional Challenges

In evaluating challenges to its subject matter jurisdiction, this court "must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff." *Rueth v. EPA*, 13 F.3d 227, 229 (7th Cir. 1993) (quoting *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993)).  Still, the court may "properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co.*, 999 F.2d at 191.

The WEC argues that no actual controversy exists between that entity and plaintiffs' since the WEC neither opposes nor supports plaintiffs' requests for injunctive relief (WEC Br. ('340, dkt. #15) 4-5), and for a case to be justiciable, there must be an actual dispute between adverse litigants.  (*See id.* (citing *Oneida Tribe of Indians v. Wisconsin,* 951 F.2d 757, 760 (7th Cir. 1991).)  However, as the U.S. Supreme Court held in *United States v. Windsor*, 570 U.S. 744 (2013), "even where 'the Government largely agree[s] with the opposing party on the merits of the controversy,' there is sufficient adverseness and an 'adequate basis for jurisdiction in the fact that the Government intended to enforce the challenged law against that party.'" *Id.* at 759 (quoting *INS v. Chadha*, 462 U.S. 919, 940 n.12 (1983)).  Similarly, in this litigation, the WEC has indicated its intention to enforce Wisconsin's current elections laws unless otherwise directed by a state or federal court. Thus, regardless of its failure to dispute plaintiffs' requested relief affirmatively, sufficient adverseness exists between the parties to create a justiciable dispute.  Of course, by virtue of the intervention by multiple other defendants who *are* actively disputing plaintiffs' right

26

to any of the relief requested, there is little question that there is an actual dispute between the parties needing resolution by this court.

Next, both the WEC and the Legislative defendants attack plaintiffs' claims on standing grounds. To establish standing, "[t]he plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 125 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Again, the WEC maintains that it has "no power to enact any changes to the election laws in regard to the Spring Election, and it has no authority to change the law relative to the conduct of future elections." (WEC Br. ('340, dkt. #15) 6.) After *Windsor*, however, this is just the same "case or controversy" argument in different clothing, since the WEC's administration of Wisconsin's elections, including the enforcement of its current election laws, is the cause of plaintiffs' alleged injuries. Moreover, the WEC has the authority to implement a federal court order relating to election law to redress these alleged injuries. That the WEC maintains it lacks any *independent* authority under state law to make the changes requested by plaintiffs poses no jurisdictional barrier. If anything, it demonstrates the WEC is an indispensable party for plaintiffs to achieve the remedies they seek.

Relatedly, the Legislative defendants argue that many of plaintiffs' claims challenge independent actions of third-parties who were not named as defendants -- specifically, the USPS and local election officials -- and thus plaintiffs' lack standing to bring those claims. (Leg. Defs.' Omnibus Br. (dkt. #454) 100.) Certainly, actions of both the USPS and local

27

election officials appear to have contributed and may contribute to plaintiffs' alleged injuries, and those third-parties may also have some power to redress those injuries, but this does not mean the WEC's actions or inactions were not *also* causes of plaintiffs' injuries.  What matters for standing is that:  (1) defendant's conduct was *one* of the multiple causes; and (2) defendant can at least partially redress the wrong.  *See WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015) ("So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury."); *Orangeburg v. Fed. Energy Reg. Comm'n*, 862 F.3d 1071, 1077-84 (D.C. Cir. 2017) ("FERC contends that the causation element is not satisfied because Orangeburg's injury is actually caused by NCUC, an absent third party, not the Commission. To be sure, NCUC -- a non-party -- is a key player in the causal story. But the existence of, perhaps, an equally important player in the story does not erase FERC's role.").

Similarly, here, the actions of the USPS and local election officials may be equally important players in the conduct of the November election but that does not erase the WEC's overall statutory responsibility for the administration of Wisconsin's elections. Wis. Stat. § 5.05(1).  Regardless, it is the WEC's role and specific authority to promulgate rules and guidance to localities in order to implement Wisconsin law (including any court order) related to elections and their proper administration under § 5.05(1)(f) that is in dispute.  Moreover, should this court enter a binding order, the WEC will be required to issue updated rules, procedures, or formal advisory opinions under § 5.05(5t) to ensure its implementation.  This is more than enough to establish standing.

The Legislative defendants further lodge a narrower standing challenge against just one of the Swenson plaintiffs' ADA claims.  (*See* Leg. Defs.' Omnibus Br. (dkt. #454) 105-08.)  Specifically, they contend the Swenson plaintiffs lack standing to pursue a claim that the WEC's failure to provide accessible online ballots impermissibly discriminates against voters with vision or other print disabilities because none of the Swenson plaintiffs have such a disability.  (*See id.*)  As the Swenson plaintiffs point out, however, they have produced evidence that Disability Rights Wisconsin (one of the named plaintiffs in the Swenson complaint) has *itself* been injured by the alleged violation of the ADA, as it has had to divert its own resources to assist voters with those disabilities to both get access to and cast absentee ballots.  (*See* Swenson Pls.' Reply (dkt. #493) 21.)  Because Disabilities Rights Wisconsin has alleged a concrete and particularized injury to its own interests, and advocate for the interests of others with relevant disabilities, the Swenson plaintiffs have established standing to pursue their claim regarding accessible online ballots.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-80 (1982) (holding that organization that had to divert resources to mitigate effects of allegedly discriminatory practices had standing bring suit).

Finally, the Legislative defendants contend that plaintiffs' claims are unripe and should be dismissed under the *Burford* abstention doctrine.  Little time need be spent on these contentions because the court previously addressed nearly identical arguments in an earlier opinion and order.  (*See* 6/10/20 Op. & Order (dkt. #217).)  The court finds no reason to depart from its earlier conclusion that plaintiffs' claims are ripe and fit for judicial review, presenting an "actual and concrete conflict premised on the near-certain

29

enforcement of the challenged provisions in the context of the present and ongoing COVID-19 health care crisis" and because plaintiffs are "likely to suffer adverse consequences if the court were to require a later challenge." (*Id.* at 7-8.)  Further, as previously explained, the *Burford* abstention doctrine is not applicable to any of the cases or controversies before this court because Wisconsin state courts "are not specialized tribunals with a special relationship with voting rights issues" and because *Burford* abstention is often "inappropriate in federal constitutional challenges to state elections laws." (*Id.* at 17-18.)

### B. Failure to State a Claim

Dismissal under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  To survive a motion to dismiss, a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Certain of plaintiffs' claims are plainly barred by immunity doctrines, and thus, fail to state a claim.  First, to the extent that any plaintiffs seek money damages pursuant to § 1983, such relief is barred by state sovereign immunity.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 66 (1989).  Second, the Edwards plaintiffs' claims against Wisconsin State Assembly Speaker Robin Vos and Wisconsin State Senate Majority Leader Scott Fitzgerald are foreclosed by the doctrine of legislative immunity, which provides absolute immunity from liability for an official's legitimate legislative activity.  *See Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998); *Tenney v. Brandhove*, 341 U.S. 367, 376

(1951). The Edwards plaintiffs' complaint faults Speaker Vos and Majority Leader Fitzgerald for failing to take action to postpone the April election or otherwise enact measures regarding Wisconsin's elections in the face of the pandemic, but any decision not to act qualifies as legislative activity protected by absolute immunity. *See NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 192 (2nd Cir. 2019) (decision not to introduce resolutions before city council was protected legislative activity).

The Edwards plaintiffs' only response to defendants' invocation of legislative immunity is to assert without legal authority that it applies only to state law claims. (*See* Edwards Pls.' Br. ('340, dkt. #25) 16.) To the contrary, the immunity doctrine is a creature of federal common law and applies to federal civil claims. *See Bogan*, 523 U.S. at 48 (explaining that the U.S. Constitution and federal common law "protect[s] legislators from liability for their legislative activities"); *NRP Holdings LLC*, 916 F.3d at 190 (describing the doctrine of absolute legislative immunity as a matter of common law created by the U.S. Supreme Court and applicable to federal civil claims).

Oddly, having asserted immunity on their behalf, the Legislative defendants nevertheless urge the court to permit Speaker Vos and Majority Leader Fitzgerald to remain as parties to defend state law. (Leg. Defs.' Br. ('340, dkt. #13) 30-31.) In doing so, they, too, cite to no legal basis for a defendant to be found immune from suit yet remain as a party. (*See id.*) Even if there were some legal basis to allow the defendants to remain, this court has previously held that an individual "legislator's personal support [of a law he or she enacted] does not give him or her an interest sufficient to support intervention." *See One Wis. Inst., Inc. v. Nichol*, 310 F.R.D. 394, 397 (W.D. Wis. 2015) (citing *Buquer v. City*

31

*of Indianapolis*, No. 11–cv–00708, 2013 WL 1332137, at *3 (S.D. Ind. Mar. 28, 2013),

*Am. Ass'n of People With Disabilities v. Herrera*, 257 F.R.D. 236, 251 (D.N.M. 2008)).

Indeed, to their credit, defendants themselves readily admit that the Edwards plaintiffs

have "name[d] the Wisconsin Assembly and the Wisconsin Senate as parties, meaning

there is no practical need to retain Speaker Vos and Majority Leader Fitzgerald as

additional named Defendants here."  (Leg. Defs.' Br. ('340, dkt. #13) 31.)  Having been

presented no legal or practical reason to grant immunity but retain Speaker Vos and

Majority Leader Fitzgerald as defendants, the court will dismiss them from this case.[16]


## II.  Motions for Preliminary Injunction[17]

To make out a prima facie case for a preliminary injunction, a party must show (1)

---

[16] Defendants also move to dismiss the Edwards plaintiffs' claim for monetary damages under the ADA.  A required element of a compensatory damages claim for intentional discrimination under Title II of the ADA is deliberate indifference.  *See Lacy v. Cook Cty., Ill.*, 897 F.3d 847, 862-63 (7th Cir. 2018).  This requires both "knowledge that a harm to a federally protected right is substantially likely" and "a failure to act upon that likelihood."  *Id.* at 863 (quoting *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)).  The WEC and Legislative defendants both argue that the Edwards plaintiffs do not assert a cognizable claim for ADA damages because they failed to allege deliberate indifference explicitly.  (WEC Defs.' Mot. to Dismiss Br. ('340, dkt. #15) 8; Leg. Defs.' Mot. to Dismiss Br. ('340, dkt. #14) 24.)  Reading the Edwards plaintiffs' complaint in the light most favorable to them, as this court must at the pleading stage, it is reasonable to infer this claim based on their allegations that defendants have (1) knowledge of the past and planned enforcement of Wisconsin's election laws, as well as the dangers posed by the COVID-19 pandemic, and (2) have and are continuing to fail to act on that likelihood.  Thus, plaintiffs have alleged sufficient facts to support their implicit claim for deliberate indifference and survive the defendants' motions to dismiss.  Of course, whether or not there was or is likely to be a violation of the ADA, much less a deliberate one, remains to be proven.  Finally, as to defendants' remaining grounds for dismissal based on plaintiffs' failure to plead sufficient allegations to support their claims as a matter of law, the court will address these arguments in its substantive consideration of each of plaintiffs' claims in the discussion that follows.

[17] In addition to the parties' briefs, the court received two amicus briefs from Common Cause (dkt. #251) and the American Diabetes Association ('340 dkt. #23). The policy of the Seventh Circuit is to "grant permission to file an amicus brief only when:  (1) a party is not adequately represented (usually, is not represented at all); or (2) when the would-be amicus has a direct interest in another

irreparable harm, (2) inadequate traditional legal remedies, and (3) some likelihood of success on the merits. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If all three threshold requirements are met, the court must then engage in a balancing analysis, weighing "the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one." *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017). The court must also "ask whether the preliminary injunction is in the public interest." *Id.* "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).

## A. *Anderson-Burdick* Analysis

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), the Supreme Court set forth a balancing test to determine whether an election law unconstitutionally burdens a citizen's right to vote. Under the *Anderson-Burdick* test, a court must weigh "the character and magnitude of the asserted injury to the rights" against "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).[18]

---

case, and the case in which he seeks permission to file an amicus curiae brief, may by operation of stare decisis or res judicata materially affect that interest; or (3) when the amicus has a unique perspective, or information, that can assist the court of appeals beyond what the parties are able to do." *Nat'l Org. for Women, Inc. v. Scheidler*, 223 F.3d 615, 617 (7th Cir. 2000). Following that same policy, the court concludes that these parties fall into the latter category, will grant their respective motions, and has considered their proposed briefs.

[18] As a group, plaintiffs also invoke four additional, legal claims: (1) Title II of the Americans with

The Seventh Circuit recently applied and elaborated on this merits test in its long-awaited decision in *Luft v. Evers*, 963 F.3d 655, considering a series of challenges to Wisconsin's election laws, including some of the provisions at issue in this litigation. Fundamentally, the *Luft* court cautioned that the burden of a specifically challenged election provision must be considered against "the state's election code as a whole" -- that is, by "looking at the whole electoral system," rather than "evaluat[ing] each clause in isolation." *Id*. at 671. *Luft* further "stressed" that "Wisconsin's system as a whole is accommodating." *Id.* at 674. At the same time, the court reaffirmed its earlier holding that "the right to vote is personal" and, therefore, "the state must accommodate voters" who cannot meet the state's voting requirements "with reasonable effort." *Id.* at 669.

Having already addressed at length the scope of the state's constitutional obligation to accommodate voting rights during the COVID-19 pandemic in its April 2, 2020, decision (4/2/20 Op. & Order (dkt. #170) 26-28), which was largely left unchallenged on appeal to the Seventh Circuit, *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, -1546, -1545, (7th Cir. April 3, 2020), and U.S. Supreme Court, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. ____ (2020) (per curiam), the court simply adopts it

---

Disabilities Act, 42 U.S.C. § 12132; (2) the *Mathews v. Eldridge*, 424 U.S. 319 (1976), procedural due process balancing test; (3) the Equal Protection Clause's guarantee against arbitrary election administration; and (4) section 11(b) of the Voting Rights Act ("VRA"). The latter three legal claims either prove a poor fit for the relief plaintiffs are seeking, or plaintiffs fail to describe how these standards would advance their claims beyond the *Anderson-Burdick* test. Thus, for reasons addressed at the close of this opinion, the court concludes that plaintiffs have failed to demonstrate any likelihood of success on the merits as to those claims for relief beyond that available under the *Anderson-Burdick* test. Finally, three of the cases before the court also pursue claims for injunctive relief under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. At the hearing, plaintiffs specifically relied on the ADA to advance two of the requests for relief, to enjoin or modify the witness signature requirement and to provide an accessible, online absentee ballot. The court addresses those challenges where relevant below.

again by reference.  Instead, in considering plaintiffs' requests for injunctive relief with respect to the November election, the court will stress the three, core concerns that drives its analysis here.

*First*, the court is mindful, as it must be, that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion," and "[a]s an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). In weighing the individual requests for relief, the court must consider the risk that any of its actions may create confusion on the part of voters, either directly or indirectly, by creating additional burdens on the WEC and local election officials.  To ameliorate that risk, the court has generally attempted to issue a decision far enough in advance to allow an appeal of the court's decision, provide sufficient time for the WEC and local election officials to implement any modifications to existing election laws, and to communicate those changes to voters.  Issuing the decision now, six weeks out, rather than two weeks as in the April election, does not come without its tradeoffs:  the court must make certain, reasonable projections about what the pandemic and other events relevant to voting will be like by late October and early November.  Of course, the court would prefer to be making these decisions with a more complete understanding of the record of voter behavior during that time, but that luxury does not exist.  On the other hand, the court has a much better understanding of the likely impacts of the pandemic on voting behavior, as well as the State of Wisconsin's capacity to address them, than it did in March.

*Second*, the court will focus solely on how the COVID-19 pandemic presents unique challenges to Wisconsin's election system and burdens Wisconsin voters.  The court is not

interested in plaintiffs' general challenges to Wisconsin elections, because those challenges have now been largely addressed in *Luft* or, to the extent left open, remain subject to further proceedings before Judge Peterson.  On the other hand, the court rejects the Legislature's attempts to paint plaintiffs' claims as purely facial challenges, arguing that specific individuals who face insurmountable burdens due to the COVID-19 pandemic could bring as-applied challenges for relief at a later date.  Still, recognizing that the line between a facial and an as-applied challenge can be hazy, *see Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012), plaintiffs' claims here are only viable to the extent they constitute as-applied challenges and, in particular, are compelling after fairly extrapolating from relevant voters' and local election officials' experiences during the pandemic in April to prove near certain burdens in November, particularly with respect to the availability of mail-in absentee, early absentee and in-person voting options.

To the extent that  some of the relief requested -- for example, the extension of certain deadlines -- is substantial likely to provide needed relief to Wisconsin voters and poll workers burdened by the pandemic's impact, and even likely to "severely restrict" an individual's right to vote, the state may still articulate "compelling interests" for the challenged election laws and prove those laws have been "narrowly tailored."  *Luft*, 963 F.3d at 672.  As to other requested relief, plaintiffs seek "safety nets" to ensure that the state is protecting the "personal" nature of the right to vote.  *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) ("*Frank II*"); *Luft*, 963 F.3d at 677-78 (reaffirming *Frank II* holding that "voting rights are personal," requiring "that each eligible person must have a path to cast a vote").  Regardless of how it is characterized, the relief requested by plaintiffs

36

must be consistent with the Seventh Circuit's decisions in *Luft* and *Frank II*.  The rub, as described in detail below, is whether plaintiffs have submitted sufficient evidence from which this court must conclude that certain individuals are unlikely to be able to exercise their right to vote despite reasonable effort.

*Third*, while the court will take up each of plaintiffs' requested items of relief, after *Luft*, the court must consider each request in light of the election system as a whole.  Here, the court principally considers the interplay between the WEC's, local officials' and voters' expressed preference for absentee voting by mail in this election compared to the historic, overwhelming preference for in-person voting.  Obviously, ensuring that mail-in, absentee voting is a tenable option for the majority of the electorate who are expected to vote this way in November, whether based on the WEC's  strongly-stated preference or on personal risk assessments, will decrease the number of individuals who will need to vote in-person. In turn, this will help ensure that there are adequate and safe, in-person voting sites for individuals unable or uninterested in voting by mail, whether because of a personal preference to exercise their right to vote in person or because of difficulties in providing the necessary photo ID, obtaining a required witness signature, or negotiating the U.S. mail system., Even so,, to the extent the State has had more time to address those issues before this election and chosen not to address them by virtue of a lack of political will or simple inertia, the court will only grant relief where this failure to act in the face of the pandemic is substantially likely to severely restrict the right to vote.

With those considerations in mind, the court addresses plaintiffs' requests for preliminary injunctive relief in the following, four categories:  registration, absentee voting,

in-person voting, and miscellaneous relief.

### 1. Registration

#### a. Extending Registration Deadlines

The DNC plaintiffs seek an order enjoining Wisconsin Statute § 6.28(1), which requires a mail-in registration to be received by the clerk or postmarked no later than the third Wednesday preceding the election (here, October 14), and requires electronic registrations to be received by 11:59 p.m. on the third Wednesday preceding the election. DNC argues that the court should extend both deadlines to the Friday before the election, October 30, to align with the deadline for registering in person before election day. As the DNC points out, the court granted similar, preliminary relief to that requested by plaintiffs here before the April election, extending the mail-in postmark date and electronic registration receipt deadline by 12 days to the Friday before the election. (3/20/20 Op. & Order (dkt. #37) 10-15.)

However, the six weeks leading up to this election are different than the week or two before the April 7 election, when the pandemic was a new phenomenon and demanded swift adjustments to the timetable to accommodate voting from the safety of one's home, rather than venturing out into the public. As defendants persuasively argue, individuals are now sufficiently on notice of the pandemic's risks, its impacts on their daily lives, and measures that can be taken to reduce those risks. So, to the extent individuals wish to register electronically or by mail to facilitate later voting by mail, defendants argue that voters must plan accordingly and complete their electronic and mail-in registrations by the established deadline of October 14.

Of course, what the Legislature originally afforded as a convenience to in-person registration and voting has, at least for this election, become a necessity for some, as well as an important tool for WEC and local officials to reduce the number of people voting in person on the day of the election.  Even more to the point, as WEC Administrator Wolfe testified at the hearing, registering in person on the day of the election not only risks longer lines, but increases the amount of time individuals are inside polling stations, as well as requiring person-to-person engagement in two separate processes, which are further prolonged by the additional, COVID-19 protections of social distancing and masking. (8/5/20 Hr'g Tr. (dkt. #532) 60-61, 98-100.)  Facilitating early registration electronically and by mail will not only limits sustained interactions on election day, but will allow some, significant number of unwary individuals sufficient time to request absentee ballots and vote by mail (or by drop-off), rather than voting in person before or on the day of the election.  For these reasons, WEC Administrator Wolfe testified at the hearing, the tradition of having a significant number of individuals register in person on the day of the election is incompatible with the goal of -- and projected, significant demand for -- voting by mail via absentee ballot.  (*Id.* at 57.)  Cutting off electronic and mail-in registrations three weeks before the election will not just thwart efforts to encourage Wisconsin voters to vote by mail via absentee ballots, but increase the burdens and risks on those choosing to vote in person.  This is especially true in light of Wisconsin's "cultural tradition" of registering on election day, with more than 80% of registered voters having engaged in that process in the past.  (*Id.* at 58.)

Still, the recognized health benefits of driving the electorate to mail-in registration

and absentee voting is probably insufficient alone to justify this court modifying an established deadline for doing so.  The difference in April, and again this November, is the sheer number of new registrations and absentee voters who will rely on the U.S. mail to do so, especially as compared to past elections, and the risks of severely restricting that  option during the pandemic for those who will come to the realization that the window has closed too soon for them to register and request an absentee ballot.  Unless some relief is provided to the October 14 deadline, the likelihood of thousands of voters missing this window and choosing not to vote in person is quite high, and while that eventuality may be present in any election, the risks expand to tens of thousands of voters in the midst of  the pandemic.  For these reasons, plaintiffs have demonstrated that discontinuing electronic and mail registration options precipitously on October 14 will likely restrict many Wisconsin citizens' freedom to exercise their right to vote, at least without having to take unnecessary risks of COVID-19 exposure by registering in person, and for some significant minority of citizens, will severely restrict that right because of age, comorbidities or other health concerns.  *See Luft*, 963 F.3d at 671–72 ("Only when voting rights have been severely restricted must states have compelling interests and narrowly tailored rules.") (citations omitted).

In contrast, the only interest in enforcing the October 14 deadline articulated by the defendants is providing sufficient time for election officials to prepare voter records.  As WEC Administrator Wolfe testified at the hearing, however, this deadline could be extended an additional week until October 21, 2020, while still providing sufficient time for local election officials to print poll books.  (8/5/20 Hr'g Tr. (dkt. #532) 62.)  Indeed,

the record reflects that local election officials were able to accommodate the court's April 2020 extension of electronic registration by 12 days before the April election without significant impact of local officials' ability to manage in-person voting.  (*Id.* at 63-64; *see also* DNC Pls.' PFOFs (dkt. #419) ¶ 194. )

Accordingly, the court concludes that plaintiffs have sufficiently demonstrated that the current electronic and mail-in registration deadline of October 14, 2020, will substantially (and in a smaller, but significant group, severely) restrict the right to vote during the ongoing pandemic, particularly after considering the likely impact of increased, in-person registration on the orderly, safe functioning of voting on Election Day. Moreover, by moving the deadline only one week to October 21st, rather than the two-week extension requested by plaintiffs, the court has amply accounted for any arguable state interest in allowing sufficient time to prepare voter records.  Finally, with this accommodation, the court finds that the balance of interests weighs heavily in favor of plaintiffs as to this narrow relief.

### b.  Proof-of-Residence Requirement

The DNC plaintiffs also seek an order enjoining the proof-of-residence requirement under Wisconsin Statute § 6.34(2) for individuals who attest under penalty of perjury that they cannot meet the requirement after reasonable efforts.  During the evidentiary hearing, the DNC plaintiffs acknowledged that they do not have any declarations establishing an actual instance of a voter being unable to meet this requirement.  (8/5/20 Hr'g Tr. (dkt. #532) 200.)  In light of the record evidence, this is unsurprising, since it is fairly easy to satisfy the requirement.  For those requesting an absentee ballot electronically, a driver's

license also satisfies the proof-of-residence requirement.  (8/5/20 Hr'g Tr. (dkt. #532) 80 (Wolfe testifying that "[i]f someone registers to vote online, they do not need to provide proof of residence because the match with their DMV record fulfills that requirement").) If a person wishes to register by mail or early in person, a utility bill would suffice, and the voter would not even need to provide a copy of it.  For some individuals, this requirement still may constitute a burden -- for example, as the DNC plaintiffs argued at the hearing, there may be college students not on a lease or on utility accounts -- but this is *always* the case and not specific to the pandemic.[19]  Finally, as the Seventh Circuit recognized in *Luft*, there is a significant state interest in ensuring that individuals are voting in their proper districts.  *Luft*, 963 F.3d at 676.  On this record, therefore, the court concludes that plaintiffs are not likely to succeed in demonstrating that the proof-of-residence requirement substantially burdens the right to vote or that this burden outweighs the State's interests, even in light of the circumstances surrounding the COVID-19 pandemic.

### 2.  Absentee Voting

#### a.  Counting of Absentee Ballots

Next, the Edwards and Swenson plaintiffs seek an order enjoining Wisconsin Statute §§ 6.88, 7.51-.52, which require that absentee ballots not be counted before election day.  Plaintiffs argue that this requirement thwarts local election officials' ability to address defects in absentee ballots -- particularly a voter's failure to comply with the

---

[19] While the DNC plaintiffs propose use of "an affidavit" as a possible "safety net," *Frank II*, 819 F.3d at 387, they fall short of proposing specific language, much less describing how this exception would be administered.  Regardless, the court is concerned about adding any additional burdens on the WEC's electronic registration process or on the stretched resources of local election officials.

witness certification requirement.  If the court were to enjoin this requirement and allow counting before the election day, then local election officials could find defects, contact voters and give them a chance to fix them before it is too late.

The court is not persuaded by this argument.  As the Legislature explains, Wisconsin law already provides procedures for absentee ballot voters to correct errors.  Indeed, the errors typically will occur on the outside of the envelope, and therefore, it need not be opened, nor must the ballot be counted for an election official to alert a voter of a witness certification error or some other defect.  Regardless, the court agrees with the Legislature that plaintiffs' proposed solution is a poor fit for the general problem of absentee ballot errors.  Finally, plaintiffs' argument is insufficiently tied to the particular circumstances surrounding the pandemic.  Indeed, to the extent that plaintiffs pursue this injunction to facilitate efficient counting of absentee ballots, the court's extension of the absentee ballot receipt deadline sufficiently addresses this concern.  If anything, by precluding early counting of absentee ballots during a period when they are likely to comprise 60 to 75% of all ballots cast, the state's interest in securing the tallying process until after the election is closed is stronger.  On this record, the court finds no basis to grant relief.

### b.  Witness Signature Requirement

All four plaintiffs next seek an order enjoining the witness signature requirement under Wisconsin Statute § 6.87(2), although the plaintiffs again suggest various replacements for this requirement.  In essence, the DNC plaintiffs seek to enjoin this requirement for those individuals who (1) attest under penalty of perjury that they cannot meet the requirement after reasonable efforts, (2) sign a form and provide contact

43

information, and (3) cooperate with local election officials who may follow-up. The DNC argues that this process would satisfy *Frank II* and *Luft*. The Edwards plaintiffs similarly request that the court allow the small population of people who cannot secure a witness to sign a sworn statement to that effect. Next, the Gear plaintiffs propose an order following the Seventh Circuit's opinion reviewing this court's April preliminary injunction by allowing voters to write in the name and address of a witness but not require a signature. Finally, the Swenson plaintiffs argue that self-certification should be sufficient to satisfy the State's interest.

In support of their various requests for relief from a witness signature, plaintiffs submit substantive evidence in the form of affidavits from individuals who recount difficulties they encountered in obtaining or attempting to obtain a witness signature during the April election. (*See, e.g.*, DNC Pls.' PFOFs (dkt. #419) ¶¶ 157-60 (citing declarations).) Plaintiffs also assert that the proposed alternatives in the April election (e.g., have someone witness it via a video call or through a window) obviously did not work in light of the roughly *14,000* ballots that were rejected because of insufficient witness certifications, and further suggest that some portion of the 135,000 unreturned ballots were not submitted because voters could not secure a witness.

While acknowledging the possible burden that the witness signature requirement will place on some voters, the Seventh Circuit reversed this court's entry of preliminary relief from this requirement for the April 2020 election. *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, -1546, -1545, (7th Cir. April 3, 2020). Moreover, it did so even though the arguable need was greater then, given (1) the compressed period for election

officials to adjust to the COVID-19 restrictions, (2) increased uncertainty as to how the virus spreads and risks of contracting it, and (3) the dramatic increase in first-time absentee applications and voters. Further, the Seventh Circuit faulted this court for giving inadequate weight to the State's interests behind the witness requirement and vacated that portion of this court's preliminary injunction, rather than merely modifying it to require a more robust affidavit or a witness, but no signature. Finally, the Supreme Court recently signaled its own reticence to set aside such state law requirements by staying the effect of an Eleventh Circuit decision blocking photo-ID and witness-signature requirements for absentee ballots. *See Merrill v. People First of Ala.*, No. 19A1063 (U.S. July 2, 2020).

To the extent, the Seventh Circuit left room for other possible workarounds to the witness-signature requirement, the WEC has again proposed a number of options for any voters having difficulty meeting the requirement for safety or other reasons all of which would allow a voter to maintain a safe distance from the witness. *See* WEC, "Absentee Witness Signature Requirement Guidance" (Mar. 29, 2020), https://elections.wi.gov/node/6790. Given a greater understanding as to the efficacy of masks and social distancing in substantially lowering the risk of transmitting the virus (and the seemingly reduced risks of its transmittal on surfaces than by aerosols), these options also appear more viable and safe for individuals wishing to vote via absentee ballot than they did in April; albeit for some, the requirement may still present a significant hurdle. Finally, under *Purcell*, there remains the challenge of fashioning and implementing an effective exception to this requirement in the shorter period for voting via absentee ballot in terms of: drafting an appropriate form, publicizing the option, managing its distribution

to voters who cannot meet the requirement, and effecting the return of that form.

Viewing the election system as a whole, including the flexibility surrounding this requirement, coupled with additional options for voting in person, either early or on the day of the election, the court concludes that plaintiffs have failed to demonstrate a sufficient likelihood of success in proving that the burden placed on some voters by this requirement outweighs the State's interests and possible disruption in the orderly processing of an unprecedented number of absentee ballots. Accordingly, the court will deny this request for relief under *Anderson-Burdick*.

As noted above, some of the plaintiffs assert claims under the ADA as well. At the hearing, the Swenson plaintiffs specifically argued that relief from the witness signature requirement was warranted in light of the ADA. To establish a violation of the ADA, a plaintiff "must prove that he is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. § 12132). A defendant's "failure to make reasonable modifications in policies, practices, or procedures can constitute discrimination under Title II." *Lacy v. Cook Cty.*, 897 F.3d 847, 853 (7th Cir. 2018) (citing 28 C.F.R. § 35.130(b)(7)(i)3). An accommodation is reasonable if "it is both efficacious and proportional to the costs to implement it." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). The ADA, however, does not require a modification that would "fundamentally alter the nature of the service, program, or activity." *P.F. by A.F. v. Taylor*,

914 F.3d 467, 472 (7th Cir. 2019) (quoting 28 C.F.R. § 35.130(b)(7)(i)).

Here, for the same reason that the court concluded the risks of administering an affidavit, self-certifying or other program outweigh the burden on voting rights, the court also concludes that the recommended accommodation is not reasonable under the ADA, because it is not "efficacious and proportional to the costs to implement it." *Oconomowoc Residential Programs*, 300 F.3d at 784.  As such, plaintiffs have not shown a likelihood of success in proving that the witness signature requirement violates the ADA.

### c. Receipt Deadline of Absentee Ballots

Next, the DNC plaintiffs and the Swenson plaintiffs seek an order enjoining the requirement that absentee ballots must be received by election day under Wisconsin Statute § 6.87(6), urging instead that the ballots again be postmarked by election day to be counted.  In its prior opinion and order, the court extended the deadline for receipt of mailed-in absentee ballots until the Monday after the election day.  On appeal, the Seventh Circuit upheld this same extension, as did the U.S. Supreme Court, except for requiring that the return envelope be postmarked before or on election day.

The reasons for the court's extension of the deadline for receipt of mailed-in absentee votes for the April 2020 election applies with almost equal force to the upcoming November 2020 election.  The WEC is now projecting 1.8 to 2 million individuals will vote via absentee ballot, exceeding the number of absentees by a factor of three for any prior general, presidential elections *and* exceeding by as much as a million the number of absentee voters that overwhelmed election officials during the April 2020 election.  As the court discussed during the August 5th hearing, Wisconsin's election system also allows

individuals to request ballots up to five days before the election.  While this deadline has worked for the most part during a normal election cycle, the same statutory deadline is likely to disenfranchise a significant number of voters in the November election given the projected, record volume of absentee ballots.  On top of the sheer volume of absentee ballot requests that election officials found difficult to manage, the record also establishes that the USPS's delivery of mail has slowed due to budget constraints or other reasons, and will undoubtedly be overwhelmed again with ballots in November, as they were in April.

Regardless of cause, plaintiffs have established significant problems with fulfilling absentee ballot requests timely, and even greater problems in getting them back in time to be counted.  Indeed, those problems would have resulted in the disenfranchisement of some 80,000 voters during the April election but for this court's entry of a preliminary injunction, and there is *no* evidence to suggest that the fundamental causes of these problems have resolved *or* will be resolved in advance of the November election.  To the contrary, the WEC acknowledges that the unprecedented numbers of absentee voters will again be very challenging for local election officials to manage in the compressed time frame under current law despite their best efforts to prepare for and manage this influx, and they have no reason to expect any better performance by the USPS.[20]

---

[20] This is not to denigrate the ongoing efforts of the small staff at WEC and efforts of local election officials, nor of postal workers, just to reflect the systemic issues that will arise in a system never meant to accommodate massive mail-in voting.  Indeed, in addition to its efforts to encourage staffing up locally, WEC worked with USPS to add bar codes to absentee ballots, but without increased USPS personnel or automated tracking equipment, this is unlikely to change the speed of receipt of applications or absentee ballots, much less receipt of executed ballots.  At best, it may help to better track how thousands of applications and votes became misplaced long after completion of the November election.

48

In response, the Legislature argues that individuals should request ballots now, so that they can receive, complete and mail them back well in advance of the statutory deadline, which requires receipt on or before election day.  The court whole-heartedly agrees that Wisconsin voters should proactively manage their voting plans, request absentee ballots online or by mail *now* (or as soon as possible thereafter), if they wish to vote by absentee ballot, and then diligently complete and return them well in advance of the election.  *Everyone* -- the WEC, the Legislature, other elected officials, and the political parties and affiliated groups -- should be advocating for and to a large extent are advocating for such action, although the latter entities are more targeted at best and subject mischief at worst.  Nonetheless, given the sheer volume expected this November, there remains little doubt that tens of thousands of seemingly prudent, if unwary, would-be voters will not request an absentee ballot far enough in advance to allow them to receive it, vote, and return it for receipt by mail before the election day deadline despite acting well in advance of the deadline for requiring a ballot.

While the Legislature would opt to disregard the voting rights of these so-called procrastinators, Wisconsin's election system sets them up for failure in light of the near certain impacts of this ongoing pandemic.  If anything, the undisputed record demonstrates that unwary voters who otherwise reasonably wait up to two weeks before the October 29, 2020, deadline, to request an absentee ballot by mail face a significant risk of being disenfranchised because their executed, mailed ballot will not be received by officials on or before the current election day deadline.  Moreover, it is particularly unreasonable to expect undecided voters to exercise their voting franchise by absentee ballot well before the

end of the presidential campaign, especially when the Wisconsin's statutory deadline is giving them a false sense of confidence in timely receipt.

Not really disputing the magnitude of this risk in light of the vast, unprecedented number of absentee ballots received after the deadline in April, the Legislature instead argues that a similar extension this time will somehow undermine the state's interests in having prompt election results.  Even this argument rings hollow during a pandemic, but it also ignores that some fourteen states, other than Wisconsin and the District of Columbia, follow a postmark-by-election-day rule (or a close variant) and count ballots that arrive in the days following the election, so long as they are timely postmarked.  (DNC Pls.' Supp. PFOFs (dkt. #501) ¶ 19.)   As such, Wisconsin will not be an anomaly. Furthermore, by including a postmark-by-election-day requirement, there is no concern that initial election results will influence a voter's decision.  Moreover, unlike in April, the court will not require election officials to refrain from publishing results until after the extended absentee ballot deadline, since that requirement was only added because of this court's original decision *not* to include a postmark deadline.  With the guidance of the United States Supreme Court that a postmark deadline is warranted, any concern about early release of election results is mitigated.

Finally, while not addressed by defendants, plaintiffs offered evidence that the election day receipt requirement actually furthered the state's interest in completing its canvass during the April election.  Regardless, WEC Administrator Wolfe testified that election officials were able to meet all post-election canvassing deadlines notwithstanding this court's six-day extension of the deadline in April, and the extension gave election

50

officials time to tabulate and report election results more efficiently and accurately. (DNC Pls.' PFOFs (dkt. #419) ¶ 195.) Nor have defendants identified any other predicted or unforeseen anomalies arise because of this extension. On the contrary, as previously discussed, there is strong evidence that as many as 80,000 voters' rights were vindicated by the extension in the primary election, and a reasonable extrapolation for the general election could well exceed 100,000.

Thus, on this record, the court concludes that plaintiffs have shown a likelihood of success in demonstrating the risk of disenfranchisement of thousands of Wisconsin voters due to the election day receipt deadline outweighs any state interest during this pandemic. Accordingly, the court will grant this request, extending the receipt deadline for absentee ballots until November 9, 2020, but requiring that the ballots be mailed and postmarked on or before election day, November 3, 2020.[21]

---

[21] The court is mindful that the addition of a postmark requirement by the U.S. Supreme Court created some unintended consequences in April 2020, since a small proportion of the absentee ballots returned by mail lacked a legible postmark, apparently as a result of processing anomalies at local post offices. The court was hopeful that the planned use of intelligent mail barcodes ("IMB") would assuage this concern, although it appears that the presence of IMBs on most return envelopes is uncertain, if not unlikely. To the extent the use of IMBs does not resolve this issue, the WEC will again need to provide guidance to local election officials, as it did for the April election. Given the political deadlock among WEC Commissioners and the apparent lack of state law guidance on this subject -- as well as the fact that this postmark requirement is federally mandated and the apparent importance of equal treatment of ballots after *Bush v. Gore*, 531 U.S. 98 (2000) -- it is this court's view that local election officials should generally err toward counting otherwise legitimate absentee ballots lacking a definitive postmark if received by mail after election day but no later than November 9, 2020, as long as the ballot is signed and witnessed on or before November 3, 2020, unless there is some reason to believe that the ballot was actually placed in the mail after election day. *See Shiflett v. U.S. Postal Serv.*, 839 F.2d 669, 672 (Fed. Cir. 1988) (discussing prior version of regulation when timing was triggered by mailing of appeal to the Merit Systems Protection Board, explaining that "[t]he date of a filing by mail shall be determined by the postmark date; if no postmark date is evident on the mailing, it shall be presumed to have been mailed 5 days prior to receipt"); *Wells v. Peake*, No. 07-913, 2008 WL 5111436, at *3 (Vet. App. Nov. 26, 2008) (relying on prior regulation where timing of appeal was triggered by its mailing, to

### d. Electronic Receipt of Absentee Ballots

The Gear, Edwards and Swenson plaintiffs further request an injunction preventing enforcement of Wisconsin Statute § 6.87(3)(a), which limits delivery of absentee ballots to mail only for domestic civilian voters, while military and overseas civilian voters can receive an absentee ballot by fax or email delivery, or can even access a ballot electronically, then download and print it.  Wis. Stat. § 6.87(3)(d).  As explained above, Judge Peterson invalidated this ban on email delivery of absentee ballots for domestic civilians in *One Wisconsin Institute*, 198 F. Supp. at 946-48, but that order was reversed by the Seventh Circuit's decision in *Luft*.  Regardless, for the roughly four-year period of time that this court's order was in place, local election officials were given the option to email or fax absentee ballots to voters to ensure timely and efficient delivery.

Plaintiffs' renewed request for this relief is limited to those voters who timely request an absentee ballot (having already timely submitted their photo ID and registered by mail), had their requests processed *and* an absentee ballot mailed to them, but because of issues with the USPS (or for some other reason), the voters did not actually receive an absentee ballot by mail in a timely fashion.  The record is replete with such examples from the April 2020 election.  (*See* Swenson Pls.' PFOFs ('459, dkt. #42) ¶¶ 51, 164, 176 (citing declarations); DNC Pls.' PFOFs (dkt. #419) ¶ 73 (citing declarations); Edwards Pls.' PFOFs (dkt. #417) ¶¶ 67-162, 177-81) (citing declarations); Gear Pls.' PFOFs (dkt. #422)

---

explain that "[s]ince there was no postmark, the BVA applied 38 C.F.R. § 20.305(a), which presumes the postmark date to be five days before the date VA receives the document, excluding Saturdays, Sundays, and legal holidays").

¶¶ 37, 43, 81, 157-677 (citing declarations).)[22]

In response, the Legislature argues generally that there are no special circumstances here to warrant granting this relief, even temporarily. The record strongly suggests otherwise. Specifically, the evidence is nearly overwhelming that the pandemic *does* present a unique need for relief in light of: (1) the experience during the Spring election, (2) much greater projected numbers of absentee ballot requests and votes in November, and (3) ongoing concerns about the USPS's ability to process the delivery of absentee ballot applications and ballots timely. None of this was remotely contemplated by the Legislature in fashioning an election system based mainly in person voting, nor addressed by the Seventh Circuit's recent decision in *Luft*. Moreover, the relief requested is narrowly tailored only to those voters who timely fulfilled *all* of the necessary steps to vote by mail, but were thwarted through no fault of their own. Indeed, this is exactly the "1% problem" that the Seventh Circuit indicated requires a safety net in both *Luft* and *Frank II*. The Gear plaintiffs further suggest that the court limit it to the week before the deadline for requesting absentee ballots, which for this election is October 29, 2020. Up until that deadline, voters may request a replacement ballot by mail. *See* Wis. Stat. § 6.86(5) (explaining process for requesting an absentee ballot).

The Legislature also argues that this solution may create significant administrative

---

[22] The Swenson plaintiffs also request online ballot delivery for individuals with print disabilities under the ADA. While this request may have merit, plaintiffs have failed to explain adequately why the current options have proven inadequate in past elections or how the pandemic creates sufficient, additional burdens to warrant relief. Given the numerous requests for relief in these consolidated cases, the court must remain focused on those requests for which the need and solution are clear and circumstances surrounding the pandemic in particular warrant an injunction.

hurdles for local election officials, specifically citing to the need by local election officials to recast the absentee ballot into a form that is readable by voting machines.  However, local election officials themselves represent that this inconvenience is outweighed by the benefit of having fewer, in-person voters on election day.  (Gear Br. (dkt. #421) 42.)  Plus, Wisconsin has a four-year history when fax or electronic delivery was available to all voters at the discretion of local election officials without incident.   In contrast, the court's injunction will only apply to a narrow subset of those voters for whom an absentee ballot was not received timely by mail, who afterwards request a replacement ballot in the week leading up to the deadline for making such a request, *and* satisfy local election officials of the need for an alternative means of delivery.  For all these reasons, this limited relief should not overtax election officials' abilities to administer the November election.

Finding that plaintiffs are likely to succeed on their claim that limiting receipt of absentee ballots to mail delivery burdens voters' rights who fail to receive their absentee ballot timely, and that this burden is not outweighed by the interests of the State, the court will grant that relief.  As set forth below, however, the ban on allowing online access to replacement absentee ballots or emailing replacement ballots is only lifted for the narrow period from October 22 to October 29, 2020, as to those voters who timely requested an absentee ballot, the request was approved, and the ballot was mailed, but the voter did not receive the ballot in time to vote. For the limited number of disabled who truly require an electronic ballot to vote effectively under the ADA, and have failed to discern an effective means to vote using a hard absentee ballot, after meeting all the same requirements set forth above for all voters, this may also provide an alternative.

### e.  Mail Absentee Ballots to All Registered Voters

Finally, with respect to absentee ballots, the Edwards plaintiffs seek an order requiring the WEC to send out absentee ballots to all registered voters, or at least to all voters who previously voted absentee.  This request was not pursued at the hearing, and for good reason, since it is neither narrowly tailored to the alleged violations to voting rights caused by the pandemic, nor considers the substantial burden it would place on the WEC and local election officials who have already begun responding to actual applications for absentee ballots.  The court, therefore, denies this request.

### 3.  In-Person Voting

### a.  Early In-Person Voting

Plaintiffs further seek several injunctions relating to in-person voting.  To begin, the Edwards plaintiffs seek to enjoin Wisconsin Statute § 6.86(1)(b), which limits in-person, absentee voting to the period beginning 14 days before the election and ending the Sunday before the election.  This request warrants little discussion because the Edwards plaintiffs failed to develop the record as to why a 12-day period is not sufficient to provide voters an adequate opportunity to vote early in-person.  Viewing the election system as whole, a two-week period for in-person, early voting, is sufficient to protect voters' constitutional rights, especially when considered in light of a robust mail-in absentee voting option and what will hopefully be a generally safe and adequate, in-person voting opportunity on the day of the election.

### b.  Selection of Early In-Person Voting Sites

The Edwards and Swenson plaintiffs also seek to enjoin Wisconsin Statute §

55

6.855(1), which requires municipalities to designate in-person, absentee voting site or sites (other than the clerk of board of election commissioners' office) 14 days before absentee ballots are available for the primary.  For the November election, this means the required designations were due by June 11, 2020.  Plaintiffs contend that extending this deadline would (1) allow increased flexibility and (2) reduce crowds and encourage social distancing by allowing extra sites added.  Here, again, plaintiffs have failed to develop any record to find that additional, in-person voting sites are necessary to meet the demand of voters who wish to vote in person before the election day, especially given that voters may do so over a 12-day period of time.  Accordingly, the court will also deny this request.

### a.  Photo ID Requirement

The DNC and Edwards plaintiffs both seek an order enjoining the photo ID requirement under Wisconsin Statute § 6.87(1), although the contours of the relief requested are different:  the DNC plaintiffs seek to enjoin the requirement for those individuals who attest under penalty of perjury that they cannot meet those requirements after reasonable efforts; while the Edwards plaintiffs seek to enjoin the requirement for people with disabilities if they swear that they are unable to obtain the required ID.

The DNC's request for relief from the photo ID requirement falters for similar reasons as plaintiffs' request for relief from the proof-of-residence requirement.  When pressed at the hearing, the DNC plaintiffs listed four declarations from individuals who they represented were not able to vote in the April 2020 election because of the ID requirement.  From the court's review of these four declarations, only one -- the declaration of Shirley Powell (dkt. #341) -- actually provides support for the requested relief.  Powell

avers that she attempted to request an absentee ballot by mail, but could not do so because she did not want to leave her house to obtain the necessary copy of her photo ID.  (*Id.* ¶ 5.)[23]  That proof falls well short of a substantial burden on her right to vote.

For their part, the Edward plaintiffs simply direct the court to a report about the difficulty in obtaining photo IDs for the *2016* election, offering neither evidence specific to the COVID-19 pandemic nor proof of any unique burdens it places on disabled voters under the ADA.  While the court acknowledges that some voters like Powell may encounter difficulty in uploading a photo of their ID or obtaining a hard copy, this burden has likely diminished since April 2020, given both the additional time voters will have to obtain the necessary documents to request an absentee ballot electronically or by mail, coupled with the increased awareness of how COVID-19 spreads and efforts one can take to avoid transmission upon leaving the house.[24]

Even if not entitled to broader relief, plaintiffs argue, the creation of a "safe harbor" or "fail-safe" measure is called for by the Seventh Circuit's decisions in *Luft* and *Frank II*. However, the court concludes that, while not a perfect solution, the "indefinitely confined" designation under Wisconsin Statute § 6.87(4)(b)2 provides such relief already for those

---

[23] The other individuals -- Sue Rukamp, Sharon Gamm and Marlene Sorenson -- simply averred that they encountered difficulty in uploading a photo of their ID or submitting a hard copy via mail, but it appears that all three were eventually able to *request* an absentee ballot.  (Dkt. ##349, 294, 355.)  Not to diminish the burdens that they encountered, their declarations do *not* support providing relief from the photo ID requirement.  Instead, the difficulties that they encountered are more appropriately addressed in providing electronic delivery of ballots for those individuals who do not timely receive absentee ballots by mail and by extending the deadline for receipt of absentee ballots to account for USPS delays.  Both forms of relief are granted below.

[24] Of course, the court is not definitively concluding such a burden cannot be proved, just that plaintiffs have not begun to proffer evidence of their likelihood of doing so given the work-arounds now available.

57

unique individuals who are *both* (1) not able to upload a photograph of their ID or obtain a copy *and* (2) avoiding public outings because of legitimate COVID-19 concerns.

Apparently anticipating this outcome, plaintiffs further argue that if the court relies on the "indefinitely confined" status as a safety net for the photo ID requirement, then it should also define that term and direct the WEC to provide this definition in its materials explaining and promoting voting via absentee ballot. As it concluded in its earlier opinion and order, however, the plain language of the statute, coupled with the WEC's March 2020 guidance that the term "does not require permanent or total inability to travel outside of the residence" provides sufficient, albeit imperfect, information to guide voters' use of that safe harbor. *See* Wisconsin Election Commission, *Guidance for Indefinitely Confined Electors COVID-19* (Mar. 29, 2020) ), https://elections.wi.gov/node/6788.

On this record, therefore, the court concludes that plaintiffs have failed to demonstrate a likelihood of succeeding in their claim that the COVID-19 pandemic amplifies the typical burden of requiring a photo ID, so as to outweigh the State's repeatedly recognized interest in doing so. Because the court relies on the "indefinitely confined" option as a safety net or fail-safe for those legitimately unable to meet this requirement, however, the court will direct the WEC to include on the MyVote website (and on any additional materials that may be printed explaining the "indefinitely confined" option) the language provided in their March 2020 guidance, which explains that the indefinitely confined exception "does not require permanent or total inability to travel outside of the residence."

### b. Election Official Residence Requirement

Next, the Edwards and Swenson plaintiffs seek to enjoin Wisconsin Statute § 7.30(2), which requires that each election official be an elector of the county in which the municipality is located. This request has significant more traction in light of the record. In particular, based on her past experience and unique perspective, Administrator Wolfe testified that her biggest worry in the administration of the November election is a lack of poll workers for in-person voting on election day. (8/5/20 Hr'g Tr. (dkt. #532) 83.) Both for the April and August 2020 elections, local municipalities struggled to recruit and retain sufficient poll workers, which resulted in some localities being severely limited in providing in-person voting opportunities. In fact, even with substantially greater warning and opportunity to plan, local election officials still had difficulty securing adequate people for Wisconsin's much smaller August 2020 election. (*Id.* at 82-83.) At minimum, eliminating the residence requirement would provide greater flexibility across the state to meet unanticipated last-minute demands for staffing due to COVID-19 outbreaks or fear.

In response, the Legislature simply argues that this requirement furthers the State's interest in promoting a decentralized approach to election management. Without discounting the value of this interest, if a county or municipality lacks sufficient poll workers and wishes to recruit workers from other locations within the state, *including* accessing National Guard members who reside outside of their community (should the Governor choose to answer the repeated call by local officials to make them available sooner rather than later), the municipality or county has already conceded its inability to maintain that interest while still conducting a meaningful election, at least with respect to

the location of residence of poll workers. Regardless, in light of the record evidence demonstrating that recruitment of poll workers will present a tricky and fluid barrier for adequate in-person voting options up to and during election day, plaintiffs have demonstrated a likelihood of success in proving that this requirement will burden their right to vote and that this burden outweighs any state interest in maintaining the requirement over expressed, local need.. As such, the court will grant this requested relief during the ongoing pandemic.

### c.   Ensure Safe and Adequate In-Person Voting Sites

The DNC and Swenson plaintiffs seek an order requiring the WEC to provide safe and adequate, in-person voting options, including (1) adequate voting sites with sufficient number of poll workers, and (2) implementation of safety protocols like PPE, masks, social distancing requirements, hand washing and sanitizing steps.  While the court agrees, and more importantly the WEC and, in turn, local election officials agree, that these are appropriate steps to be taken, the court sees no basis to *order* this requested relief.

Specifically, the WEC has earmarked $4.1 million to provide increased safety measures at locations and has also designated $500,000 to secure and distribute sanitation supplies.  WEC also is providing public health guidance and training to local election officials.  Plaintiffs fail to describe how these measurers fall short.  As for the concern about the number of voting locations, as previously described, local election officials in Milwaukee and Green Bay, in particular, have indicated their intent to open significantly more polling locations than that opened in April.  Again, considering the election system as a whole, including the WEC's, local officials', and now the court's efforts to ensure

robust absentee voting options, the court concludes that plaintiffs have failed to demonstrate that the WEC and local election officials' efforts to date with respect to ensuring safe and adequate election-day voting sites are inadequate.

### 4. Requests for Miscellaneous Relief

Finally, the Swenson plaintiffs propose a number of other areas of relief, which all involve ordering the WEC to do more or do better. Specifically, the Swenson plaintiffs seek orders requiring the WEC to: (1) upgrade electronic voter registration systems and absentee ballot request systems; (2) engage in a public education drive; (3) ensure secure drop boxes for in-person return of absentee ballots; and (4) develop policies applicable to municipal clerks regarding coordinating with USPS to ensure timely delivery of and return of absentee ballots. Again, all of these are worthwhile requests, but the record reflects that the WEC is taking such steps or, at least, that a court order to the same effect is unlikely to do more before November 3 than hamper the ongoing state and local efforts. For example, in its June 25, 2020, report to the court, the WEC detailed its efforts to upgrade MyVote and WisVote, as well as provide federal funds to help municipalities with their IT needs. Moreover, the WEC described its development of various voter outreach videos, guides and surveys to help educate voters on unfamiliar aspects of voting. Further, as the Legislature points out, Wisconsin Statute § 6.869 already requires the WEC to prescribe uniform instructions on absentee voting. As for the request for more drop boxes, the WEC is providing funding from the CARES Act to municipalities to provide such boxes. Finally, as described above, the WEC is working with the USPS to implement intelligent mail barcodes to track absentee ballots.

To the extent mail delivery issues persist despite these steps, the court has attempted by entry of the order below to accommodate these concerns by permitting online access, by emailing and faxing of absentee ballots for those individuals who do not receive their requested absentee ballots timely, and by extending the absentee ballot receipt date. Plaintiffs' further requests for relief are either too vague to be meaningful or unnecessary because the WEC is already taking such steps.

### B.  Alternate Claims for Relief Under the Due Process and Equal Protection Clauses and Voting Rights Act

As already discussed, constitutional challenges to laws that regulate elections are generally analyzed under balancing test set forth by the U.S. Supreme Court in the *Anderson-Burdick* test.  *See, e.g., Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008); *Luft*, 963 F.3d at 671; *see also* Samuel Issacharoff et al., *The Law of Democracy* 92-127 (5th ed. 2016) (reviewing the general constitutional framework for challenges to election laws affecting the right to vote).  This balancing test is rooted in both the First and Fourteenth Amendments to the U.S. Constitution.  *See Burdick*, 504 U.S. at 434 (citing *Anderson*, 460 U.S. at 788-89).  In interpreting the Supreme Court's election law jurisprudence, the Seventh Circuit has concluded that the *Anderson-Burdick* test "applies to *all* First and Fourteenth Amendment challenges to state election laws."  *Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019) (emphasis in original); *see also Harlan v. Scholz*, 866 F.3d 754, 759 (7th Cir. 2017) (the *Anderson-Burdick* framework addresses "the constitutional rules that apply to state election regulations").

As explained during oral argument, this court is exceedingly reluctant to apply more

generalized constitutional tests to the election laws challenged here, at least without a specific legal and factual basis to do so.  Indeed, in its order preceding completion of briefing and oral arguments on the motions for preliminary injunction, the court suggested that to proceed on claims under other constitutional frameworks, plaintiffs must adequately distinguish such claims from those brought under *Anderson-Burdick*.  (*See* 6/10/20 Op. & Order (dkt. #217) 14-15.)  Without ever adequately addressing this concern, some plaintiffs nevertheless maintain that this court should venture outside of the *Anderson-Burdick* framework and consider their claims under alternative procedural due process and equal protection clause standards.

Specifically, plaintiffs urge the court to apply the more general procedural due process balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  That test requires the court to balance: (1) the interest that will be affected by the state action; (2) the risk of erroneous deprivation of this interest through the procedures used by the state and the probable value, if any, of additional procedural safeguards; and (3) the state's interest, including the fiscal and administrative burdens that the additional procedure would entail.  *Id.* at 340-49.  The Swenson plaintiffs contend that the *Anderson-Burdick* and *Mathews* tests are "analytically distinct" because "[t]he focus of the procedural due process inquiry is what *process* is due before a statutorily protected liberty or property interest is deprived."  (Swenson Pls.' Br. ('459, dkt. #41) 47 n.188.)  Similarly, the DNC plaintiffs contend that "*Anderson-Burdick* balances burdens on voting rights against states' justifications, while due process claims focus on the sufficiency of the process involved before the State deprives someone of their right to vote."  (DNC Pls.' Br. (dkt. #420) 55.)

During initial briefing, no plaintiff could cite to any case law to support the nuanced differences suggested by their respective positions.  To the contrary, the DNC plaintiffs acknowledged that "we have not yet found a decision in which a court accepted an *Anderson-Burdick* claim while rejecting a due process challenge to the same provision; or rejected an *Anderson-Burdick* challenge while striking down the same provision as violating due process."  (DNC Br. (dkt. #420) 54.)  Since then, plaintiffs have pointed to three, recent election cases in which a district court applied the general *Mathews* test to election law challenges, all of which were considered in the context of the current pandemic.  (*See* Notice of Supp. Authority (dkt. #536) (citing *The New Georgia Project v. Raffensperger*, 1:20-cv-01986-ELR (N.D. Ga. Aug. 31, 2020)); Notice of Supp. Authority (dkt. #534) (citing *Frederick v. Lawson*, No. 19-cv-01959, 2020 WL 4882696 (S.D. Ind. Aug. 20, 2020)); Notice of Supp. Authority (dkt. #523) (citing *Democracy N.C. v. N.C. State Bd. of Elections*, No. 20-cv-457 (M.D.N.C. Jul. 27, 2020)).)  However, even these cases fail to address the overlap between the *Mathews* and *Anderson-Burdick* standards, much less the exclusive role played by the latter test in the U.S. Supreme Court's overall election law jurisprudence, thus providing little guidance as to the role, if any, of the *Mathews* test here.  Accordingly, plaintiffs have not convinced this court that in the claims before it, an independent analysis under the *Mathews* test is necessary, much less appropriate.[25]

As for the equal protection claims, plaintiffs rely on the standard articulated by the

---

[25] The DNC plaintiffs themselves admit that the "*Anderson-Burdick* and *Mathews v. Eldridge* analyses are both multi-factor balancing inquiries . . . and the results of the inquiries may often be the same." (DNC Pls.' Br. (dkt. #420) 55.)

Supreme Court's *per curiam* decision in *Bush v. Gore*, 531 U.S. 98 (2000).  There, the Supreme Court explained that a state "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05.[26]  Notwithstanding that the Supreme Court took unusual pains to limit its "consideration" specifically to the "present circumstances" surrounding the 2000 Florida recount, *id.* at 109, other courts have appeared to rely on *Gore* in attempting to analyze subsequent election challenges.  *See, e.g.*, *Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 337 (4th Cir. 2016) (redistricting); *Obama for Am. v. Husted*, 697 F.3d 423, 428–29 (6th Cir. 2012) (restrictions on early voting); *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1077 & n.7 (9th Cir. 2003) (ballot-initiative process).

Even if applicable, however, the Legislative defendants persuasively point out that this standard requires plaintiffs to prove that the arbitrary and disparate treatment is a result of specific election "procedures." *Bush*, 531 U.S. at 105.  Here, the alleged disparate treatment is rooted in poll closings and poll-worker shortages, lack of adequate personal protective equipment at some polling locations and disparate treatment regarding voter registration and requests for absentee ballots.  Arguably, therefore, these allegations are not rooted in specific "procedures" at all.  Even if they were, plaintiffs again fail to explain adequately what *additional* relief would or should be afforded under the equal protection

---

[26] Plaintiffs also included a variety of facts regarding the disparate impact of COVID-19 on particular groups seeking to vote, such as specific racial minorities and the elderly.  Without denigrating this impact in any way, plaintiffs' equal protection claim is premised on a general "arbitrary treatment" theory, rather than an argument that defendants' actions specifically discriminated against a particular protected class of voters, making many of these facts not relevant to, and thus not referenced further in, the court's discussion.

clause that is not already available under *Anderson-Burdick*.

Finally, in addition to these constitutional arguments, the Swenson plaintiffs assert a claim under Section 11(b) of the Voting Rights Act ("VRA"), which provides in relevant part that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting." 52 U.S.C. § 10307(b). The Swenson plaintiffs argue that defendants' inadequate response to the pandemic means that voters are intimidated to vote in person, for fear of catching COVID-19. (Swenson Pls.' Br. (dkt. #41) 25.) Although admittedly a creative argument, such an interpretation seriously stretches the purpose and common-sense meaning of section 11(b).

The VRA was signed into law in 1965 against the backdrop of the civil rights movement and state resistance to enforcement of the Fifteenth Amendment. *See generally* Dep't of Justice, *History of Federal Voting Rights Laws* (July 28, 2017), https://www.justice.gov/crt/history-federal-voting-rights-laws. While other sections of the VRA had enormous consequences on voting rights -- particularly section 2, which prohibits discriminatory voting practices, and section 5, which provides for federal "preclearance" of election changes in states with a history of discriminatory practices -- relatively little case law has explored the scope of section 11(b). *See* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173, 190 (2015). Considering this background, there is no evidence that Congress contemplated extending the VRA to impose liability on states that do not take adequate action to reduce citizens' "intimidation" of in-person voting due to an infectious virus.

66

Moreover, the plain language of the statute itself suggests that the intimidation must be caused by a "person," not a disease or other natural force.  Further, the parties disagree over whether section 11(b) requires a *mens rea* -- plaintiffs argue that it does not, the Legislature argues that it does -- and no definitive answer is found in case law.  In light of these various considerations and uncertainties, 11(b) also appears a poor fit for analyzing the issues presented in this case, and the court finds that plaintiffs have presented no likelihood of success on the merits of their claims under the VRA as well.

## ORDER

IT IS SO ORDERED:

1) Common Cause Wisconsin's motion for leave to file a brief as amicus curiae ('249 dkt. #251; '278 dkt. #186; '340 dkt. #51; '459 dkt. #75) is GRANTED.

2) Plaintiffs Democratic National Committee and Democratic Party of Wisconsin's motion for preliminary injunction ('249 dkt. #252) is GRANTED IN PART AND DENIED IN PART as explained above and set forth below and in the separate preliminary injunction order.

3) The Wisconsin Legislature's motion to dismiss the Gear complaint ('278 dkt. #382) is DENIED.

4) Plaintiffs Sylvia Gear, *et al.*'s motion for preliminary injunction ('278 dkt. #304) is GRANTED IN PART AND DENIED IN PART as explained above and set forth below and in the separate preliminary injunction order.

5) Defendants Scott Fitzgerald, Robin Vos, Wisconsin State Assembly, and Wisconsin State Senate's motion to dismiss the Edwards complaint ('340 dkt. #12) is GRANTED IN PART AND DENIED IN PART.  Plaintiffs' claims against Scott Fitzgerald and Robin Vos are DISMISSED.  In all other respects, the motion is denied.

6) Defendants the WEC Commissioners and Administrator's motion to dismiss the Edwards complaint ('340 dkt. #14) is DENIED.

7) American Diabetes Association's motion for leave to file an amicus curiae brief ('340 dkt. #23) is GRANTED.

8) Plaintiffs Chrystal Edwards, *et al.*'s motion for preliminary injunction ('340 dkt. #195) is GRANTED IN PART AND DENIED IN PART as explained above and set forth below and in the separate preliminary injunction order.

9) The Wisconsin Legislature's motion to dismiss the Swenson complaint ('459 dkt. ##27, 272) is DENIED.

10)    Plaintiffs Jill Swenson, *et al.*'s motion for preliminary injunction ('459 dkt. #40) is GRANTED IN PART AND DENIED IN PART as explained above and set forth below and in the separate preliminary injunction order.

11)    Defendants the Commissioners of the Wisconsin Election Commission and its Administrator are:

   a) Enjoined from enforcing the deadline under Wisconsin Statute § 6.28(1), for online and mail-in registration.  The deadline is extended to October 21, 2020.

   b) Directed to include on the MyVote and WisVote websites (and on any additional materials that may be printed explaining the "indefinitely confined" option) the language provided in their March 2020 guidance, which explains that the indefinitely confined exception "does not require permanent or total inability to travel outside of the residence."

   c) Enjoined from enforcing the deadline for receipt of absentee ballots under Wisconsin Statute § 6.87(6), and the deadline is extended until November 9, 2020, for all ballots mailed and postmarked on or before election day, November 3, 2020.

   d) Enjoined from enforcing Wisconsin Statute § 6.87(3)(a)'s ban on delivery of absentee ballots to mail only for domestic civilian voters, with that lifted to allow online access to replacement absentee ballots or emailing replacement ballots, for the period from October 22 to October 29, 2020, provided that those voters who timely requested an absentee ballot, the request was approved, and the ballot was mailed, but the voter did not receive the ballot.

   e) Enjoined from enforcing Wisconsin Statute § 7.30(2), to the extend individuals need not be a resident of the county in which the municipality is located to serve as election officials for the November 3, 2020, election.

12)   The preliminary injunction order is STAYED for seven days to provide defendants and intervening defendants an opportunity to seek an emergency appeal of any portion of the court's order.

Entered this 21st day of September, 2020.

BY THE COURT:


/s/

_____
WILLIAM M. CONLEY
District Judge